# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

SOPHIA WILANSKY,

                Plaintiff,

              v.

MORTON COUNTY, NORTH DAKOTA; "JOHN DOE" law enforcement officer in his personal capacity; KYLE KIRCHMEIER, in his personal and official capacities; PAUL LANEY, in his personal capacity; and THOMAS IVERSON, in his personal capacity,

                Defendants.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

## NATURE OF ACTION

1.     In the early hours of November 21, 2016, Sophia Wilansky was standing peacefully in front of a police barricade on a public bridge thirty miles south of Mandan when a law enforcement officer launched an explosive munition directly at her.  The munition hit her left forearm and exploded, nearly severing her hand and altering her life forever.  This brazen act violated customary law enforcement practice, basic safety standards, manufacturer warnings and specifications, ordinary standards of care, and clearly established law.

2.     In the days that followed her injury, law enforcement officers attempted to conceal this use of excessive force by defaming Sophia to the press, falsely asserting that she caused her own injury while attempting to deploy a homemade improvised explosive device.

3.     Despite enduring numerous painful surgeries to save her arm from amputation and a grueling ongoing rehabilitation, Sophia still has almost no feeling in or ability to use her left hand and forearm.  She is disabled and disfigured, and she will likely remain so permanently.  Her disability severely limits her ability to participate in everyday life and causes her ongoing mental and emotional trauma.

4.     As a result of Defendants' false and defamatory statements, Sophia has developed an undeserved reputation as a violent protester and would-be terrorist,

with all the attendant social and occupational harms.  It is unlikely she will ever completely shake this deleterious reputation.

5.      This civil action arises from the horrific injury Sophia suffered as a result of the use of excessive force by law enforcement, and from the reputational injuries Sophia suffered as a result of law enforcement's attempts to blame Sophia for her own injury.  This is a civil action for compensatory economic and noneconomic damages, punitive damages, costs, and attorney fees, as well as narrowly-tailored injunctive relief under 42 U.S.C. § 1983, 42 U.S.C § 1988, N.D.C.C. § 9-10-01, N.D.C.C. § 9-10-06, N.D.C.C. § 14-02-01, and the common law of the State of North Dakota.

## PARTIES

6.      Plaintiff Sophia Wilansky is a citizen and resident of New York.  At the time she was injured, she was only 21 years old.

7.      Defendant Morton County is a political subdivision created and organized in and under the laws of the State of North Dakota.  Morton County operates the Morton County Sheriff's Office, which, at all times relevant to this action, had law enforcement authority over the public bridge ("Backwater Bridge") where Sophia was injured on November 21, 2016.

8.      Defendant "John Doe" is the law enforcement officer who, on November 21, 2016, at approximately 4:00 a.m. at Backwater Bridge launched an

explosive munition at Sophia Wilansky that severely injured her left arm.  The true name of this Defendant is currently unknown to Sophia, who therefore sues him/her by this fictitious name.  Sophia will seek leave to amend this Complaint to name John Doe as soon as his/her identity is ascertained through discovery.  Upon information and belief, at all times relevant to this action, Defendant John Doe was a law enforcement officer acting at the direction and under the supervision of the Morton County Sheriff's Office.  Upon information and belief, at all times relevant to this action, Defendant John Doe was acting under the color of law and within the scope of his/her employment.  Upon information and belief, Defendant John Doe is a citizen and resident of North Dakota.

9.      Defendant Kyle Kirchmeier is—and was at all times relevant to this action—the Sheriff of Morton County, North Dakota.  Upon information and belief, at all times relevant to this action, Defendant Kirchmeier had ultimate decision-making authority over the law enforcement response to the Dakota Access Pipeline protests and had supervisory authority over the law enforcement officers who responded to those protests.  Defendant Kirchmeier is a citizen and resident of Morton County, North Dakota.

10.     Defendant Paul Laney is—and was at all times relevant to this action—the Sheriff of Cass County, North Dakota.  Defendant Laney personally participated in the law enforcement response to the Dakota Access Pipeline protests between

August 2016 and March 2017.  Defendant Laney is a citizen and resident of Cass County, North Dakota.

11.     Defendant Thomas Iverson is a Major in the North Dakota State Highway Patrol.  At all times relevant to this action, Defendant Iverson was a Lieutenant in the North Dakota State Highway Patrol.  Defendant Iverson is a citizen and resident of Burleigh County, North Dakota.

## JURISDICTION AND VENUE

12.     This Action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the laws of the State of North Dakota.

13.     This Court has original jurisdiction over Sophia's constitutional and federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     This Court has supplemental jurisdiction over Sophia's state law claims pursuant to 28 U.S.C. § 1367, because these claims are part of the same case and controversy as Sophia's federal claims.

15.     This Court has independent original jurisdiction over Sophia's state law claims pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

16.    Venue is proper in the District of North Dakota pursuant to 28 U.S.C. §§ 1391, because the events giving rise to these claims occurred in the District of North Dakota, and also because at least one of the defendants resides in this District and all of the defendants are residents of the State of North Dakota.

## FACTUAL ALLEGATIONS

### A. Construction of the Dakota Access Pipeline in North Dakota Draws Protesters from Across the Country.

17.    The Dakota Access Pipeline ("DAPL") runs from the shale oil fields of the Bakken region of northwest North Dakota through South Dakota and Iowa to an oil terminal near Patoka, Illinois.  DAPL is owned and operated primarily by Dakota Access, LLC, a subsidiary of Energy Transfer Partners.  The pipeline commenced commercial operations on June 1, 2017.

18.    Energy Transfer Partner first publicly announced its plan to build DAPL in June 2014.  The initial plan called for the pipeline to cross the Missouri River several miles north of Bismarck, North Dakota.

19.    Citizens of Bismarck opposed this plan on the grounds that it threatened the city's water supply, which comes from the Missouri River.  Partly as a result of this opposition, the initial plan was rejected by the U.S. Army Corp of Engineers.

20.    The pipeline was then rerouted to cross the Missouri River at Lake Oahe, which is south of Bismarck and a few miles north of the Standing Rock Sioux Tribe reservation.

21.    The Standing Rock Sioux Tribe publicly opposed this new route on the grounds that it would threaten their water supply, disrupt their sacred cultural sites, and violate their national sovereignty.  The Tribe also objected that it had not been adequately consulted in the planning of the pipeline and that the pipeline would have a negative impact on the environment.  Other Tribes and environmental groups opposed the pipeline on similar grounds.

22.    Despite this opposition, construction on the DAPL project started in early 2016.

23.    In response, individuals from around the country and the world began traveling to North Dakota to support the Standing Rock Sioux Tribe and protest the pipeline.  Many of these individuals referred to themselves as "water protectors."

24.    Water protectors began living in makeshift camps south of Mandan along the Cannonball River.

25.    By September 2016, water protectors had established a central camp, known as "Oceti Sakowin."  Oceti Sakowin was located immediately east of North Dakota Highway 1806, approximately fifty miles south of Bismarck/Mandan and a mile south of Backwater Bridge.

26.    Oceti Sakowin sat on federal land.  The U.S. Army Corp of Engineers consented to the water protectors residing on this land.

27.     Between September and December 2016, thousands of water protectors resided at Oceti Sakowin.

**B. As DAPL Protests Continue into Late 2016, the Response from Law Enforcement Gets Increasingly Aggressive and Violent.**

28.     As early as April 2016, water protectors staged periodic DAPL protests to bring national attention to their concerns and to try to convince lawmakers to block completion of the pipeline.

29.     Prior to September 2016, law enforcement presence at DAPL protests was minimal.  Law enforcement officers did not wear tactical riot gear and did not routinely carry or deploy less-lethal weapons.

30.     On September 3, 2016, water protectors conducted a DAPL protest on a pipeline worksite.  Private security guards hired by Energy Transfer Partners arrived with security dogs, which attacked and bit several water protectors.  The clash made national news and resulted in widespread criticism of Energy Transfer Partners and Morton County's law enforcement officials.

31.     After this incident, the Morton County Sheriff's Office began maintaining a larger presence at and responding more aggressively to DAPL protests.

32.     Morton County Sheriff's Office requested assistance from other law enforcement agencies in North Dakota.  In response, law enforcement officers from

other North Dakota sheriff's offices and police departments traveled to Morton County to assist in responding to DAPL protests.

33.     On September 8, 2016, the Governor of North Dakota activated the North Dakota National Guard, which, along with the North Dakota State Highway Patrol, began routinely assisting the Morton County Sheriff's Office in responding to DAPL protests.

34.     Upon information and belief, for all periods relevant to this action, these state and local North Dakota law enforcement officers worked under the supervision and direction of Defendant Kirchmeier and acted under the authority of the Morton County Sheriff's Office.

35.     Upon information and belief, many of these North Dakota law enforcement officers lacked adequate training in the appropriate use of less-lethal weapons.

36.     By early October 2016, more than 400 law enforcement officers from across the State of North Dakota were assisting Morton County with its response to DAPL protests.

37.     In October 2016, North Dakota made an Emergency Management Assistance Compact request to neighboring states for assistance with the DAPL protests.  In response, law enforcement officers from numerous states—including Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska—traveled

to Morton County to help the Morton County Sheriff's Office respond to the DAPL protests.

38.     Upon information and belief, for all periods relevant to this action, these out-of-state law enforcement officers worked under the supervision and direction of Defendant Kirchmeier and acted under the authority of the Morton County Sheriff's Office.

39.     Upon information and belief, many of these out-of-state law enforcement officers lacked adequate training in the appropriate use of less-lethal weapons.

40.     As law enforcement officers poured into Morton County from other counties and states, the law enforcement presence at DAPL protests swelled dramatically.  By the end of October, almost 1,000 law enforcement officers from numerous city, county, and state law enforcement agencies were assisting Morton County with its response to DAPL protests.

41.     The law enforcement presence at DAPL protests also became increasingly militarized over time.  Law enforcement officers began routinely arriving at protests in armed vehicles and wearing tactical riot gear.  They began removing their badges and carrying riot batons.    They also became increasingly hostile to and aggressive with the protesters.

**C. Law Enforcement Officers without Adequate Training Begin Routinely Deploying Less-Lethal Weapons Against the DAPL Protesters.**

42.　　Throughout October and November 2016, Defendant Kirchmeier and the Morton County Sheriff's Office regularly equipped the law enforcement officers under their direction, supervision, and authority with less-lethal weapons.

43.　　These officers regularly deployed these weapons at DAPL protests.

44.　　The purpose of less-lethal weapons is pain compliance, or the intentional infliction of pain, distress, and fear to compel compliance with law enforcement's desires.

45.　　The less-lethal weapons used by these law enforcement officers included OC spray (commonly known as "pepper spray"), sponge bullets (commonly known as "rubber bullets"), CS grenades and cannisters (commonly known as "tear gas grenades"), beanbags, stinger ball grenades (grenade-like objects that expel numerous small rubber pellets), Tasers, and flash-sound diversionary devices (commonly known as "flashbangs" and sometimes referred to as "concussion grenades" or "percussion grenades").

46.　　Starting in October 2016, law enforcement began arriving at DAPL protests in Bearcats (armored SWAT vehicles), Mine Resistant Ambush Protected vehicles (MRAPs), and military Humvees.

47.    During a DAPL protest on October 22, 2016, law enforcement officers fired scores of rubber bullets and sprayed dozens of protesters with pepper spray. Numerous protesters suffered minor injuries, headaches, and trouble breathing.

48.    On October 27, hundreds of law enforcement officers wearing tactical riot gear arrived at a DAPL protest site in armored vehicles.  Morton County also deployed SWAT teams and at least one sniper unit to cover the protest.  Some of these units were accompanied by private DAPL security contractors.  Law enforcement officers were equipped with pepper spray, shotguns loaded with sponge bullets and bean bags, and other less-lethal weapons, which they deployed against the protesters.  Numerous protesters suffered injuries caused by these weapons.  The Associated Press reported that this operation "dramatically escalated" the dispute between law enforcement and the water protectors.

49.    On November 2, law enforcement officers wearing heavy body armor began using tear gas against DAPL protesters.

50.    On November 18, almost two dozen federal congresspersons wrote letters to President Obama expressing shock about the "increasingly hostile tactics deployed by state and local law enforcement officials."  The congresspersons also expressed concern about law enforcement's efforts to undermine press freedoms and the water protectors' right to peacefully assemble.  They called on Governor Dalrymple to withdraw the National Guard.  Governor Dalrymple refused.

51.     Less-lethal weapons are dangerous.     Especially if deployed indiscriminately or inappropriately, they can cause severe injuries, including death.

52.     The manufacturers and suppliers of less-lethal weapons advise that these weapons should only be used by law enforcement officers who have successfully completed formal training in their appropriate use.  The websites for Defense Technologies (a less-lethal weapon manufacturer) and Safariland Group (a less-lethal weapon supplier) include links to formal training courses for law enforcement officers on the use of less-lethal weapons.

53.     The product specifications for less-lethal weapons also include express warnings that these weapons should only be handled and deployed by individuals who have successfully completed formal training in their use.

54.     Less-lethal weapons that explode, such as flashbangs and CS grenades ("explosive less-lethal munitions") are particularly dangerous.  These munitions should never be fired directly at individuals or into crowds.

55.     The product specifications for the Defense Technologies flashbangs used by law enforcement officers at DAPL protests includes the following warning:

> The Distraction Device unit should only be deployed in areas that
> have been visually observed to be clear of potential hazards.  It
> is recommended that the immediate area for deployment be
> visually affirmed to be clear of personnel and that the device is
> delivered so that the ports are free from obstruction. . . . The
> cleared area for deployment should be 5 – 6 feet around which
> the device is expected to come to rest.

56.   Upon information and belief, a key instruction in standard training courses on flashbangs and other explosive less-lethal munitions is that such munitions should never be aimed or launched directly at individuals or into large groups of people.

57.   The "Flash Bang 101" section of the law enforcement information website www.Policeone.com warns about the "potential for death or serious physical injury" from the use of flashbangs and notes that "in the recent past, users have lost entire hands, parts of hands, and flesh from various parts of the body (including face) during operational deployments" of flashbangs.  The article admonishes officers to avoid allowing flashbangs to detonate near civilians.

58.   A comprehensive review of the use of flashbangs published in 2011 by the National Tactical Officers Association, the trade group for SWAT teams, notes:

> [The] most common wound from a diversionary device involves contact with the human body. . . .  When the pressure wave is too close to the body, contact injuries can occur.  They include injuries ranging from minor burns to serious blast force trauma. Thousands of pounds of pressure per square inch can be exerted toward the body.  There have been reports of serious hand injuries from holding the devices when they went off unintentionally.  There is a recent case from the Charlotte-Mecklenburg Police Department where a veteran SWAT officer was killed when the device detonated near his abdomen.

59.   The National Tactical Officers Association concluded that "sighted deliveries of distraction devices are necessary absent exigent circumstances" to ensure that the devices do not detonate in close proximity to any individuals.

13

60.    The Association strongly advises that untrained law enforcement officers not be allowed to equip or deploy flashbangs.

61.    Over the past twenty years, there have been numerous widely publicized incidents where individuals lost arms, hands, or fingers when flashbangs detonated too close to them.

62.    In 2002, Arkansas police officer Brandt Carmical's arm had to be amputated at the wrist when a flashbang detonated in his hand.

63.    In 2003, the British photojournalist Guy Smallman suffered a severe injury remarkably similar to Sophia's when he was hit by a flashbang while covering a G-8 protest in Geneva, Switzerland.  The Swiss Federal Supreme Court ruled that the police were liable for his injury because their indiscriminate use of the flashbang had violated law enforcement guidelines on the proper use of such devices.

64.    In 2004, Master Sergeant Dean Wagner lost his right hand when a flashbang detonated next to him.

65.    In December 2011, the city of Minneapolis paid one million dollars to settle an excessive force lawsuit involving a woman who suffered a bone-deep blast injury to her leg when she was hit by a flashbang during a drug raid.

66.    In January 2015, ProPublica published an investigation into the use of flashbangs by law enforcement officers, which found that "at least 50 Americans,

14

including police officers, have been seriously injured, maimed or killed by flashbangs since 2000."

67.     Over the past twenty years, numerous Courts have ruled that throwing flashbangs without conducting a prior visual inspection of the deployment area to ensure no one is present constitutes unconstitutional excessive force.

68.     Explosive less-lethal munitions display clear warnings that they should only be used by law enforcement officers who have successfully completed a training program on the appropriate use of such weapons.

69.     The Defense Technology CS grenades used by law enforcement officers in October and November 2016 against DAPL protesters prominently display the following warning:

> TO BE USED BY TRAINED LAW ENFORCEMENT, CORRECTIONAL OR MILITARY PERSONNEL WHO HAVE SUCCESSFULLY COMPLETED A TRAINING PROGRAM FOR THE DEPLOYMENT OF CHEMICAL AGENTS AND SMOKE.

The Defense Technology flashbangs used by law enforcement officers during the same period display a similar warning.

70.     Similarly, the product specifications for these flashbangs includes the following warning:

> **WARNING:**     TO BE USED BY TRAINED LAW ENFORCEMENT, CORRECTIONAL OR MILITARY PERSONNEL WHO HAVE SUCCESSFULLY COMPLETED A TRAINING PROGRAM FOR THE DEPLOYMENT OF

DISTRACTION DEVICE UNITS. **IMPROPER USE OF THE DISTRACTION DEVICE UNIT CAN RESULT IN DEATH OR SERIOUS BODILY INJURY.**

71.     Upon information and belief, it is standard policy in law enforcement agencies across the country that less-lethal weapons—and especially explosive less-lethal munitions—be handled and deployed only by law enforcement officers who have taken and passed formal training courses in the appropriate use of such weapons.

72.     As of November 2016, it was obvious to any qualified and reasonably competent law enforcement supervisor and policy-maker that flashbangs and other explosive less-lethal munitions are dangerous and can cause serious bodily harm if detonated in close proximity to an individual.

73.     As of November 2016, it was obvious to any qualified and reasonably competent law enforcement supervisor and policy-maker that flashbangs and other explosive less-lethal munitions should only be distributed to law enforcement officers who have successfully completed formal training in the appropriate use of such weapons.

74.     As of November 2016, it was obvious to any qualified and reasonably competent law enforcement officer that flashbangs and other explosive less-lethal munitions should never be launched at individuals or into crowded areas.

75.     Upon information and belief, throughout October and November 2016, Morton County routinely distributed flashbangs and other explosive less-lethal munitions to law enforcement officers who lacked sufficient training in the proper use of such devices.

76.     Upon information and belief, prior to Sophia's injury, law enforcement officers responding to DAPL protests in Morton County and acting under the authority, direction, and supervision of Defendants Kirchmeier and Morton County repeatedly aimed and launched flashbangs and other explosive less-lethal munitions at individuals and/or into crowded areas.

### D. Sophia Wilansky Travels to Oceti Sakowin to Participate in DAPL Protests.

77.     In the fall of 2016, Sophia was 21 years old, and had recently graduated from college.

78.     As a passionate environmentalist and committed social justice advocate, she was working to raise public awareness of the environmental impact of fossil fuel usage.

79.     After hearing about the Standing Rock Sioux Tribe's efforts to halt the construction of DAPL immediately north of the reservation, Sophia traveled to Oceti Sakowin and began living at the camp.

80.     While at Oceti Sakowin, Sophia learned that law enforcement had erected a barricade immediately north of Backwater Bridge.

17

81.    The barricade spanned the width of the highway and consisted of concrete roadblocks covered in multiple rings of concertina razor wire.  Immediately in front of these concrete roadblocks were two large burned-out vehicles.

82.    This barricade prevented water protectors and others from traveling between Bismarck/Mandan and Oceti Sakowin on Highway 1806.  Such travelers, including emergency medical personnel, were forced to use a considerably longer and more circuitous route between the camp and Mandan.

**E. On November 20, 2016, Law Enforcement Officers Respond Violently to a DAPL Protest on Backwater Bridge.**

83.    Throughout November 2016, water protectors attempted to negotiate the reopening of Backwater Bridge with Morton County to no avail.  The County kept the bridge closed and barricaded.

84.    On the afternoon of November 20, several water protectors arrived at Backwater Bridge with a semi-truck and towed one of the burned-out vehicles off of the bridge and into a nearby ditch.

85.    Law enforcement officers prevented these water protectors from towing away the second burned-out vehicle.

86.    Over the next several hours, hundreds of water protectors gathered south of the barricade on Backwater Bridge to protest the continued closure of the bridge.

87.     Morton County Sheriff's Office requested the assistance of every available law enforcement officer in the entire state of North Dakota.

88.     In response, dozens of law enforcement officers arrived at Backwater Bridge.

89.     Morton County equipped these officers with tactical riot gear, police shields, and less-lethal weapons, including sponge bullets, beanbags, tear gas canisters, pepper spray, and flashbangs.

90.     Upon information and belief, and contrary to customary law enforcement policy and practice, many of the law enforcement officers equipped with less-lethal weapons lacked sufficient training in their proper use and deployment.

91.     The November 20 protest lasted several hours and ended around midnight.

92.     Throughout the entire protest, the law enforcement officers and the protesters remained separated by the barricade of concrete blocks and razor wire.

93.     Despite the protection afforded by this barrier, law enforcement officers used dozens of less-lethal weapons on the protesters.

94.     Law enforcement officers repeatedly fired tear gas canisters into crowds of protesters on the bridge.

95.    In clear violation of the manufacturer's warnings and customary law enforcement practice, law enforcement officers under the direction, supervision, and authority of Defendants Kirchmeier and Morton County launched numerous explosive less-lethal munitions, including flashbangs, directly into crowds of protesters.

96.    Despite the sub-freezing temperatures, law enforcement officers deployed a water cannon against the protesters. In response, wet protesters built small campfires south of the barricade to warm and dry themselves so as to avoid contracting hypothermia.

97.    By midnight almost all of the protesters had returned to Oceti Sakowin or otherwise dispersed.

**F. In the Early Morning Hours of November 21, 2016, Sophia Is Grievously Injured by Law Enforcement.**

98.    By 2:00 a.m. on November 21, 2016, the few water protectors still present at Backwater Bridge were chatting quietly near the makeshift campfires. The water protectors were no longer actively protesting.

99.    The area around the bridge was quiet and tranquil.

100.    Occasionally, water protectors would approach the barricade to try to communicate with law enforcement officers.

101.    Slightly before 4 a.m., Sophia Wilansky approached the barricade near the remaining burned-out vehicle and chatted with other water protectors nearby.

After a few minutes, these other water protectors departed, leaving Sophia alone in front of the barricade.

102.   Sophia did not yell at, menace, or threaten the law enforcement officers on the other side of the barricade in any way.  She was not carrying any weapons.

103.   While she was standing quietly in front of the barricade, another water protector approached her and began a conversation with her.

104.   While Sophia was talking with this other water protector, law enforcement officers ordered them to move away from the burned-out vehicle.

105.   Before Sophia had a chance to react to this order, law enforcement officers began firing sponge bullets at her and the other water protector.

106.   One of these bullets hit Sophia in the upper left arm.  It left a mark that is still visible today.

107.   Sophia began retreating from the barricade and pleaded with the officers to stop firing at her.

108.   While Sophia was still retreating, Defendant Doe fired an explosive less-lethal munition at her.

109.   Upon information and belief, the explosive less-lethal munition was a flashbang.  Upon information and belief, the flashbang was a Defense Technology low roll non-reloadable distraction device.

110.   This munition hit Sophia in the left forearm and exploded.

111.   The explosion blew through Sophia's jacket and nearly severed her left hand from her arm.   The blast destroyed almost all of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm.

112.   Blood poured out of the wound and filled the sleeve of her jacket.  Her forearm bone protruded from her sleeve.

113.   Sophia screamed in pain and fell to the ground.

114.   While Sophia lay in the road, bleeding and crying out in pain, the law enforcement officers on the scene laughed and cheered.   They congratulated Defendant Doe on his marksmanship.

115.   None of the officers offered to assist Sophia.

116.   While the law enforcement officers charged with keeping people safe were laughing in callous disregard for her suffering, water protectors ran from the nearby campfires to help Sophia.

117.   These water protectors carried Sophia south and loaded her into a car.

118.   Because Backwater Bridge was closed and barricaded, Sophia could not travel directly north to Sanford Hospital in Bismarck.  Instead, she traveled south to the Prairie Knights Casino and Resort, where she waited for an ambulance to arrive.

119.   When Sophia arrived at the casino, officers from the Bureau of Indian Affairs applied a tourniquet to her wound.  Eventually, an ambulance arrived at the casino and raced Sophia to Sanford Hospital in Bismarck.

120.   The doctors at the hospital assessed Sophia's injury and quickly concluded they were not equipped to handle it.  Almost her entire left forearm was missing.  Her hand was barely still connected to her arm.  The hospital arranged for Sophia to be flown to Hennepin County Medical Center ("Hennepin") in Minneapolis, the nearest level one trauma center.

121.   The doctors at Hennepin photographed her arm (see Exhibit 1) and then rushed Sophia into surgery.  They debrided her wound and grafted veins from her thigh into her arm to restore blood flow and avoid complete amputation.

122.   During the operation, the surgeons removed a small piece of shrapnel, which they sent to the pathology department to be photographed and preserved.

123.   The surgeons stabilized Sophia's arm and avoided amputation.

**G. Law Enforcement Attempts to Conceal Its Role in Sophia's Injury by Concocting and Publicizing the False Accusation That She Injured Herself While Attempting to Harm Law Enforcement.**

124.   News of Sophia's injury spread quickly on social media.  Almost immediately, local and national news organizations began covering the story.

125.   Sophia's father gave interviews to several news organizations to decry law enforcement's wanton use of excessive force against his daughter in the middle of the night when no protest was occurring.

126.   In an attempt to avoid the ensuing negative media coverage, Defendants Kirchmeier, Iverson, Laney, and Morton County embarked on a public campaign of misinformation and false accusations.

127.   In a news conference on November 21, Defendant Kirchmeier denied that law enforcement agents caused Sophia's injury, stating, "We don't know where [the explosion] came from, but it wasn't law enforcement."

128.   Defendant Kirchmeier then accused the water protectors near Sophia of hurling explosive fuel canisters at law enforcement officers and suggested that Sophia may have been injured by one of these canisters.

129.   Maxine Herr, a spokesperson for Morton County Sheriff's Office, reiterated Defendant Kirchmeier's false accusations to other media outlets, stating that "[n]one of our equipment would cause an injury like that," that the munition that injured Sophia "wasn't from our law enforcement, because we didn't deploy anything that should have caused that type of damage to her arm," and that Sophia may have been injured while protesters were "rigging up their own explosives" to use against law enforcement.

130.   Over the next few days, Defendant Iverson issued several written statements to the news media, in which he repeated and elaborated on the false accusations made by Defendants Kirchmeier and Morton County.

131.   Defendant Iverson wrote that the injuries Sophia "sustained are inconsistent with any resources utilized by law enforcement and are not a direct result of any tools or weapons used by law enforcement."

132.   Defendant Iverson also told the news media that law enforcement officers present at Backwater Bridge on November 20–21 did not use flashbangs at any time.

133.   Defendant Iverson also wrote that protesters rolled metal cylinders toward Sophia immediately before she was injured, that "Law Enforcement had received information that protest[e]rs were using one-pound propane cylinders as explosives," and that "small propane tanks rigged as improvised explosive devices" were recovered from the crime scene.

134.   Defendant Iverson also wrote that at the time Sophia was injured, she and other protesters nearby exhibited "strange mannerisms [that] led law enforcement to believe they were there for a purpose with a calculated effort to either cause harm or breach the line."

135.   Defendant Iverson also wrote that at the time Sophia was injured, water protectors were broadcasting over the radio that protesters were arriving at Backwater Bridge with guns, possibly to charge the police barricade.

136.   On December 3, Defendants Laney and Kirchmeier gave another news conference in which they again denied that law enforcement was responsible for Sophia's injury.  Defendant Kirchmeier told the news media that he was unaware of any use of flashbangs by any law enforcement officers and that none of the weapons law enforcement used could have caused the injury Sophia suffered.

137.   At this conference, Defendants Laney and Kirchmeier accused Sophia of causing her own injury by participating in the attempted use of improvised explosive devices against law enforcement officers.

138.   Defendant Laney told the news media, "There were explosive instruments being handled by people on that bridge that night. . . .  Whether their intent was to throw them at us or whether their intent was to blow up that truck, I don't know.  But I do know that they were handling explosive devices and they handled it wrong and something happened."

139.   In a legal filing on December 22, 2016, Defendants Kirchmeier and Morton County repeated the accusation that Sophia was injured by the premature explosion of an improvised explosive device created by DAPL protesters.

26

140.   These statements by Defendants Morton County, Kirchmeier, Iverson, and Laney are all false.

141.   In September 2016, North Dakota law enforcement agencies purchased dozens of tear gas grenades and one hundred flashbangs expressly for use at DAPL protests.

142.   Videos taken at the protest on November 20 show law enforcement officers launching flashbangs at protesters.

143.   Sophia was not injured by a propane tank or any other improvised explosive device.  She was injured by an explosive less-lethal munition, which was launched at her by Defendant John Doe.

144.   Sophia has never participated in the creation or deployment of any improvised explosive device, against law enforcement or anyone else.

145.   None of the Defendants have retracted or corrected their defamatory statements.

146.   To the contrary, Defendants continued to publicly repeat them.

147.   In a May 2017 presentation that is still publicly available online, Defendant Laney displayed a picture of Sophia and publicly declared:

> You can see the damage she did to her arm.  What happened—
> our people saw her sneak up—the remaining five-ton vehicle that
> was left there, she had taken cover behind that.  Whether she was
> going to use this propane bomb to throw at our lines or whether
> she was going to try to place it under the truck to blow it up, we
> don't know.  We don't know what that intent was.  But it went

> off in her arms and that's what did the damage and that's what
> hurt her…. [T]here was nothing we had in our inventory that we
> would have launched at people that would do that.

148.   On information and belief, Defendants Kirchmeier, Iverson, Laney, and

Morton County made the defamatory statements above, and others like them,

knowing that they were untrue, with actual malice, or with reckless indifference to

the unreasonable risk that they were false.

149.   On information and belief, Defendants Kirchmeier, Iverson, Laney, and

Morton County made the defamatory statements above, and others like them,

knowing that they would damage Sophia's reputation in order to discredit her and

deflect blame for her injury away from Morton County and the law enforcement

officers acting under its authority, supervision, and direction.

## H. Law Enforcement Blocks Sophia's Attempts to Determine the Identity of Her Attacker.

150.   On November 22, 2016, while Sophia was still recovering from her first

surgery and prepping for her second one, FBI agents arrived at her hospital room

and—without a warrant—confiscated her clothes and the shrapnel removed from her

arm.

151.   After her initial surgeries at HCMC, Sophia returned to New York with

her father to recuperate.  Together, they undertook to determine the identity of her

attacker, John Doe.

152.   Consistent with its previous attempts to deflect blame for her injury, law enforcement did everything in its power to prevent Sophia from learning the identity of Defendant John Doe.

153.   In February 2017, Sophia sent Open Records Requests—the North Dakota equivalent of a Freedom of Information Act request—to Morton County, the North Dakota State Highway Patrol, and numerous other state and local law enforcement agencies requesting all videos taken by law enforcement near Backwater Bridge around the time of Sophia's injury.

154.   These law enforcement agencies replied that such videos—if they existed—were exempt from disclosure because of an ongoing criminal investigation.

155.   Attorneys for Morton County disclosed one dash cam video they claimed to have received from the North Dakota State Highway Patrol.  The video purports to cover the time period from 3:49 a.m. to 4:15 a.m. on November 21.  The video contains two unexplained gaps, including one five-minute gap that appears to cover the exact time Sophia was injured.  There are also unexplained gaps in the audio.

156.   What the video does show is that no protest was occurring around the time Sophia was injured.  No one was yelling, threatening law enforcement, or attempting to breach the police barricade.  Instead, the video shows a handful of quiet water protectors roaming around the bridge and warming themselves at fires.

157.   The law enforcement officers on the video were relaxed.  They do not sound anxious about the possibility of violence from any of the protesters.  They do not seem concerned that protesters with guns might be approaching the bridge to storm the barricade.  Most importantly, the officers do not appear scared or worried that there might be an explosive device nearby, even when they order protesters away from the burned-out vehicle.  This is inconsistent with the public accusations made by Defendants that protesters were throwing Coleman propane tanks rigged to explode at law enforcement officers and that Sophia was planting such an explosive at the barricade.

158.   Sophia requested that Morton County explain and fill the gaps in the video and audio.  Morton County refused and responded that it could not be required to do so.

159.   In March 2017, Sophia sent Morton County Sheriff's Office an Open Records Request seeking "use of force" reports from November 20–21, policies regarding the use of dash/body cameras and less-lethal weapons, and records disclosing the identities of the law enforcement officers present at Backwater Bridge on November 21.  Morton County denied these requests on the grounds that these documents related to an ongoing criminal investigation.

160.   In April 2017, Sophia appealed the denials of her Open Records Requests to the North Dakota State Attorney General.

161.    In August 2017, the North Dakota State Attorney General affirmed the denial of her requests.

162.    In October 2017, Sophia sent Morton County Sheriff's Office an Open Records Request seeking all documents related to herself.

163.    Morton County again denied this request on the grounds that such documents—to the extent they existed—related to an ongoing criminal investigation.

164.    Sophia filed Freedom of Information Act requests for similar documents with the Federal Bureau of Investigations, the Department of Justice, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  These requests were largely denied by the three agencies on the same grounds that the documents were relevant to an open criminal investigation.

165.    In February 2018, Sophia filed a lawsuit against the federal government in Federal District Court for the District of Minnesota seeking to compel the return of her clothing and shrapnel, so she could conduct forensic testing on them.

166.    Morton County intervened in the lawsuit to oppose Sophia's request.

167.    In opposing her request, both Morton County and the federal government argued in part that it was unnecessary for the court to compel the return of Sophia's clothing and shrapnel because Sophia could file a civil rights lawsuit and demand these items in discovery.

31

168.   In August 2018, the court accepted this argument.   It dismissed Sophia's lawsuit.

169.   For these reasons, despite significant and prolonged efforts, Sophia is currently unable to identify the specific law enforcement officer who injured her on Backwater Bridge on November 21, 2016.  As a result, Sophia has no choice but to sue this officer as a John Doe defendant.

I.  **Sophia Continues to Suffer the Physical, Mental, Emotional, Economic, and Reputational Harms Caused by Law Enforcement's Actions.**

170.   Since her injury, Sophia has had five surgeries to save and reconstruct her arm.  These surgeries were painful and invasive, and they caused significant and permanent damage to many parts of Sophia's body.

171.   During the first surgery, doctors opened Sophia's left thigh and removed two veins, which they then implanted in her left arm to replace the destroyed arteries.  Only one of these two transplants succeeded.

172.   During the second surgery, doctors further debrided her arm and removed additional dead tissue from her wound.

173.   During the third surgery, doctors opened Sophia's back and removed her right latissimus dorsi muscle, which they used to replace the muscle she had lost from her left arm.  They also removed skin from Sophia's right thigh, and used it to cover the newly transplanted muscle tissue.  They left holes in her lower back to

drain the blood oozing from the space where her back muscle used to be. She received blood thinners to avoid clots.

174.   Before the fourth surgery, Sophia consented to having one of her leg bones (the fibula) removed to be used to reconstruct the bone in her arm. Luckily, doctors were able to avoid this by using the fibula from a cadaver instead. Still, they had to remove part of Sophia's iliac crest bone to finish the reconstruction. They also implanted a metal plate, interlocking screws, and nerves from a cadaver in her arm. To date, this nerve transplant has not worked, and Sophia has not recovered much, if any, feeling in her palm or fingers. To the contrary, the surgery actually caused Sophia to lose the small amount of remaining sensation she had in her pinky finger and the ulnar side of her hand.

175.   During the fifth surgery, doctors removed tendons from the dorsal side of her hand and transplanted them to her thumb.

176.   Recovery from these surgeries has taken months and been extremely painful. For long stretches of time, Sophia could not work or perform basic daily activities because she was in too much pain.

177.   To reduce the pain, Sophia's doctors gave her pain medications, which left her too groggy to work or fully participate in daily life.

178.   In recent months, Sophia has had to endure the physically exhausting and mentally taxing process of weaning herself off the pain medications and avoiding dependence on them.

179.   Sophia's left arm is still scarred and disfigured and will remain so permanently.

180.   Sophia still has almost no feeling in or use of her left hand and forearm. This makes even the most mundane acts of daily life, such as zipping up a jacket, extremely difficult.  She can only type with one hand.  She opens many containers such as food packaging with her teeth.

181.   She is unlikely to ever recover feeling in or significant use of her left arm and hand.

182.   The limited use of her left hand and arm makes Sophia unsuited and unqualified for numerous occupations, which permanently limits her career options.

183.   Sophia's injury has robbed her of her independence and caused her extraordinary mental trauma.  During the weeks following her injury, Sophia was terrified that she would lose her entire arm.  She now lives with the knowledge that she will never be able to use her left hand or participate in activities that require both hands.  She also lives with the knowledge that even a minor injury to her left arm will almost definitely result in complete amputation.  Given her young age, doctors have warned her that there is a reasonable likelihood that her transplants will

eventually fail, and she will one day lose her left hand.  She lives with the constant fear of this amputation.

184.   The surgeries Sophia endured were expensive, as were the hospital stays, doctors' appointments, and physical therapy sessions that accompanied them. To date, the medical bills directly related to her injury total more than $500,000.  Her injury may require additional surgeries in the future and will inevitably necessitate regular clinical and hospital visits.

185.   The defamatory statements made by Defendants have caused Sophia significant reputational, social, and occupational harm.

186.   Sophia unwillingly lost her privacy.  She started receiving threats of violence.  People scorn her on social media and post hateful messages about her online.  People have created fake Facebook pages in her name that still exist today (despite repeated requests from her to Facebook to remove them).

187.   If you "google" Sophia's name today, several prominent results are news stories accusing Sophia of trying to harm law enforcement with explosives. These stories reference or quote the defamatory statements made by Defendants.

188.   These search results likely form the first impression any prospective employer would have of Sophia, which negatively affects her prospects for obtaining a job.

189.   Sophia's family members also receive threats of violence, which is a further source of anxiety and mental anguish for Sophia.

## FIRST CAUSE OF ACTION
## EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983
## (FOURTH AMENDMENT)
*(John Doe Law Enforcement Officer)*

190.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

191.   Defendant Doe is a "person," as that term is used in the text of 42 U.S.C. § 1983.

192.   While acting under color of law, Defendant Doe launched an exploding munition at Sophia, which terminated her freedom of movement and grievously injured her left arm.

193.   Defendant Doe seized Sophia within the meaning of the Fourth Amendment.

194.   Defendant Doe's seizure of Sophia was objectively unreasonable.

195.   Defendant Doe's seizure of Sophia violated clearly established law.

196.   As a direct and foreseeable consequence of Defendant Doe's actions, Sophia has suffered and continues to suffer substantial economic loss, physical pain and suffering, physical impairment and disfigurement, mental anguish, emotional distress, fear of injury, loss of future employment opportunities, and loss of future earnings capacity.

197.   As a direct and foreseeable consequence of Defendant Doe's actions, Sophia was deprived of her rights under the Fourth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**
**EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983**
**(FOURTEENTH AMENDMENT)**
*(John Doe Law Enforcement Officer)*

198.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

199.   Defendant Doe is a "person," as that term is used in the text of 42 U.S.C. § 1983.

200.   While acting under color of law, Defendant Doe launched an exploding munition at Sophia, which deprived her of her liberty without due process of law and grievously injured her left arm.

201.   Defendant Doe's deprivation of Sophia's liberty was objectively unreasonable.

202.   Defendant Doe's deprivation of Sophia's liberty violated clearly established law.

203.   Defendant Doe's action shocks the conscience.

204.   As a direct and foreseeable consequence of Defendant Doe's actions, Sophia has suffered and continues to suffer substantial economic loss, physical pain and suffering, physical impairment and disfigurement, mental anguish, emotional

distress, fear of injury, loss of future employment opportunities, and loss of future earnings capacity.

205.   As a direct and foreseeable consequence of Defendant Doe's actions, Sophia was deprived of her rights under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

**THIRD CAUSE OF ACTION**
**EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983**
(***MONELL v. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977)**)
*(Morton County and Kyle Kirchmeier in his official capacity)*

206.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

207.   Defendants Morton County and Kirchmeier are "persons," as that term is used in the text of 42 U.S.C. § 1983.

### A. Defendant Kirchmeier Directed, Approved, or Ratified the Objectively Unreasonable and Unconstitutional Use of Explosive Less-Lethal Munitions by His Subordinates.

208.   Upon information and belief, Defendant Kirchmeier had final policymaking authority to determine how law enforcement responded to the DAPL protests, including the rules governing when and how explosive less-lethal munitions could be used against protesters.

209.   It would have been obvious to a reasonable policymaker that launching explosive less-lethal munitions directly at nonviolent protesters is objectively

unreasonable, violates clearly established law, and would likely lead to the deprivation of protesters' constitutional rights.

210.   Upon information and belief, Defendant Kirchmeier nevertheless directed, approved, or ratified this unconstitutional conduct by his subordinates.

211.   As a direct and foreseeable consequence of Defendant Kirchmeier's policy decisions and actions, Sophia was seriously injured and deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

### B. Defendant Morton County Had a Policy or Custom of Using Explosive Less-Lethal Munitions in an Objectively Unreasonable and Unconstitutional Manner Against DAPL Protesters.

212.   Prior to November 21, 2016, law enforcement officers acting under the direction, supervision, and authority of Defendant Morton County established a policy or custom of using explosive less-lethal munitions in an objectively unreasonable and unconstitutional manner against DAPL protesters.

213.   Upon information and belief, Defendant Kirchmeier was aware of and approved, ratified, or acquiesced to this policy or custom.

214.   Defendant Doe acted pursuant to this policy or custom and under the color of law when s/he launched an explosive munition at Sophia.

215.   As a direct and foreseeable consequence of Defendant Morton County's unconstitutional policy or custom, Sophia was seriously injured and

deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

### C. Defendants Kirchmeier and Morton County Failed to Adequately Train and Supervise the Law Enforcement Officers Who Responded to the DAPL Protests.

216.   At all times relevant to this lawsuit, Defendant Kirchmeier was responsible, on behalf of Defendant Morton County, for supervising and directing the conduct of the law enforcement officers who were responding to DAPL protests.

217.   In October and November 2016, Defendant Kirchmeier regularly equipped law enforcement officers under his direction and supervision with explosive less-lethal munitions for use against DAPL protesters.

218.   On information and belief, Defendant Kirchmeier knew that law enforcement officers he equipped with explosive less-lethal munitions lacked adequate experience and training in the appropriate use of these weapons.

219.   It would have been obvious to a reasonable law enforcement supervisor that adequate experience and training in the use of explosive less-lethal munitions is necessary to avoid an unreasonable risk of serious injuries and civil rights violations.

220.   On information and belief, Defendant Kirchmeier knew that the officers under his direction and supervision were routinely using explosive less-lethal munitions in an objectively unreasonable and unconstitutional manner against protesters.

221.   On information and belief, Defendant Kirchmeier equipped inadequately trained law enforcement officers with explosive less-lethal munitions with deliberate indifference to the likelihood that this would result in serious injuries and violations of DAPL protesters' constitutional rights.

222.   As a direct and foreseeable consequence of Defendants Kirchmeier's and Morton County's inadequate training and deliberate indifference, Sophia was seriously injured and deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
## ASSAULT AND BATTERY
*(John Doe Law Enforcement Officer and Morton County)*

223.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

224.   On November 21, 2016, Defendant Doe launched an explosive munition at Sophia with the intent to cause—or with reckless indifference to the unreasonable risk that it would cause—harmful or offensive contact with her without her consent.

225.   The explosive munition contacted Sophia and exploded, causing a serious injury to her left arm.

226.   Defendant Doe intentionally made physical contact with Sophia without her consent.

227.   Defendant Doe intentionally placed Sophia in fear of imminent harmful or offensive contact without her consent.

228.   As a direct and foreseeable consequence of Defendant Doe's actions, Sophia has suffered and continues to suffer substantial economic loss, physical pain and suffering, physical impairment and disfigurement, mental anguish, emotional distress, fear of injury, loss of future employment opportunities, and loss of future earnings capacity.

229.   When s/he injured Sophia, John Doe was acting within the scope of his/her employment as an agent of Morton County.

230.   Morton County is liable for John Doe's wrongful conduct under the doctrine of respondeat superior.

### FIFTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(John Doe Law Enforcement Officer and Morton County)*

231.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

232.   Defendant Doe intentionally launched an explosive munition at Sophia.

233.   This conduct was extreme and outrageous.

234.   As a direct and foreseeable consequence of this extreme and outrageous conduct, Sophia has suffered and continues to suffer severe and permanent bodily harm, as well as severe emotional distress and mental anguish.

235.   When s/he injured Sophia, John Doe was acting within the scope of his/her employment as an agent of Morton County.

236.   Morton County is liable for John Doe's wrongful conduct under the doctrine of respondeat superior.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
*(John Doe Law Enforcement Officer and Morton County)*

237.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

238.   Defendant Doe owed Sophia a duty to use due care in the discharge of his/her law enforcement duties, including a general duty to exercise reasonable care under the circumstances.

239.   Defendant Doe launched an explosive munition at Sophia in violation of this duty of care.

240.   This conduct was extreme and outrageous.

241.   As a direct and foreseeable consequence of Defendant Doe's extreme and outrageous conduct, unbroken by any controlling intervening cause, Sophia has suffered and continues to suffer severe and permanent bodily harm, as well as severe emotional distress and mental anguish.

242.   When s/he injured Sophia, John Doe was acting within the scope of his/her employment as an agent of Morton County.

243.   Morton County is liable for John Doe's wrongful conduct under the doctrine of respondeat superior.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND VIOLATION OF NORTH DAKOTA CENTURY CODE §§ 9-10-01 AND 9-10-06
*(John Doe Law Enforcement Officer, Morton County, and Kyle Kirchmeier in his official capacity)*

244.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

245.   Defendant Doe owed Sophia a duty to use due care in the discharge of his/her law enforcement duties, including a general duty to exercise reasonable care under the circumstances.

246.   Defendant Doe also has a duty to Sophia to use reasonable care and skill in the management of his/her property and person and to act reasonably to abstain from injuring her and to protect her from harm.

247.   By launching an explosive munition at Sophia, Defendant Doe failed to discharge these duties.

248.   Defendant Doe's actions violated or departed from professional standards of conduct.

249.   Defendant Doe's actions violated or departed from an objective standard of ordinary care.

250.   Defendants Morton County and Kirchmeier owed Sophia a duty to use due care in the supervision, direction, and training of the law enforcement officers acting under their direction and authority in responding to DAPL protests.

251.   By failing to adequately supervise, direct, and train the law enforcement officers responding to the DAPL protests while also equipping those officers with dangerous and potentially lethal weapons, Defendants Morton County and Kirchmeier failed to discharge the duties of care that they owed to Sophia.

252.   Defendants Morton County's and Kirchmeier's inadequate supervision, direction, and training violated or departed from professional standards of conduct.

253.   Defendants Morton County's and Kirchmeier's inadequate supervision, direction, and training violated or departed from an objective standard of ordinary care.

254.   As a direct and foreseeable consequence of Defendants Doe's, Morton County's, and Kirchmeier's actions, Sophia has suffered and continues to suffer substantial economic loss, physical pain and suffering, physical impairment and disfigurement, mental anguish, emotional distress, fear of injury, loss of future employment opportunities, and loss of future earnings capacity.

## EIGHTH CAUSE OF ACTION
## DEFAMATION AND VIOLATION OF NORTH DAKOTA CENTURY
## CODE § 14-02-01
*(Paul Laney, Thomas Iverson, Morton County, and Kyle Kirchmeier in both his official and personal capacities)*

255.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

256.   After Sophia was injured on November 21, 2016 by a munition launched at her by a law enforcement officer, Defendants Morton County, Kirchmeier, Laney, and Iverson issued written press releases and made oral statements to local and national news media accusing Sophia of having caused her own injury by carrying and detonating an improvised explosive device intended to be used against law enforcement officers.

257.   Defendants Morton County, Kirchmeier, Laney, and Iverson published these statements by communicating them to local and national news media with the intent—or with reckless disregard for the unreasonable risk—that the statements would be conveyed and amplified by the news media such that individuals throughout the country would see and hear the statements.

258.   Defendants Morton County, Kirchmeier, Laney, and Iverson made these statements knowing—or with reckless disregard for the unreasonable risk— that the statements were false.

259.   These statements exposed Sophia to hatred, contempt, ridicule, and obloquy, caused people to shun and avoid her, and injured her reputation and employment prospects.  These statements also jeopardized the safety of Sophia and her family.

260.   These statements were not privileged and were made with actual malice, without reasonable grounds for believing them to be true, and on a subject matter irrelevant to any common interest or duty.

261.   As a direct and foreseeable consequence of Defendants Morton County's, Kirchmeier's, Laney's, and Iverson's statements, Sophia suffered and continues to suffer substantial economic harm, mental and emotional trauma, and reputational, social, and professional harm.

## PRAYER FOR RELIEF

WHEREFORE, to redress the injuries directly and foreseeably caused by Defendants' conduct as stated in the preceding paragraphs, and to prevent the substantial risk of irreparable injury to other persons in Morton County as a result of the policies, customs, practices, and supervisory misconduct alleged herein, Plaintiff hereby requests the following relief:

A. Economic compensatory damages of millions of dollars, in a particular amount to be established at trial, as compensation for Sophia's past and

future medical care, rehabilitation services, loss of earning and earning capacity, and loss of employment opportunities;

B. Noneconomic compensatory damages of millions of dollars, in a particular amount to be established at trial, as compensation for Sophia's past and future pain and suffering, inconvenience, physical impairment, physical disfigurement, mental anguish, emotional distress, fear of injury, injury to reputation, and humiliation;

C. The issuance of an Order and Permanent Injunction requiring Morton County Sheriff's Office to train all of its law enforcement officers in the proper and appropriate use of less-lethal weapons and prohibiting all law enforcement officers acting under the authority of Morton County from handling, possessing, or deploying any less-lethal weapons until they have successfully completed such training;

D. The issuance of an Order and Permanent Injunction requiring Morton County Sheriff's Office to issue a press release to local and national news media in which it retracts the false and defamatory statements made by Defendants about Sophia, identifies the law enforcement officer who injured her, and accepts responsibility for her injury;

E. Punitive damages in an amount to be established at trial;

F.  An award of attorney's fees and expert fees pursuant to 42 U.S.C. § 1988 and any other applicable statutes, laws, or grounds;

G.  An award for the costs, expenses, and interest incurred in pursuit of this action pursuant to 42 U.S.C. § 1988 and any other applicable statutes, laws, or grounds; and

H.  Whatever additional relief the Court may deem proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all claims so triable.

Dated:  November 19, 2018             Respectfully submitted,

*/s/ Edward C. Barnidge*
Edward C. Barnidge
Benjamin M. Stoll
WILLIAMS & CONNOLLY LLP
725 Twelfth Street Northwest
Washington, DC 20005
(202) 434-5000
ebarnidge@wc.com
bstoll@wc.com

*Attorneys for Plaintiff*