**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**

SOPHIA WILANSKY,

                Plaintiff,

           v.

MORTON COUNTY, NORTH DAKOTA;
"JOHN DOE" law enforcement officer in his
personal capacity; KYLE KIRCHMEIER, in
his personal and official capacities; PAUL
LANEY, in his personal capacity; and
THOMAS IVERSON, in his personal
capacity,

              Defendants.

Case No.  1:18-cv-00236

Honorable Judge Hovland

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO**
**COUNTY DEFENDANTS' AND THOMAS IVERSON'S MOTIONS TO DISMISS**

## TABLE OF CONTENTS

FACTUAL BACKGROUND ..................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.     DEFENDANTS' NEW FACTS ARE MATTERS OUTSIDE THE PLEADINGS AND SHOULD NOT BE CONSIDERED. ............................................................. 3

II.    PLAINTIFF HAS ADEQUATELY PLEADED A VIOLATION OF HER FOURTH AMENDMENT RIGHTS. ........................................................................ 5

     1.  Officer Doe Intentionally Applied Physical Force to Sophia. ............................... 6

     2.  Any Application of Physical Force Constitutes a Seizure. .................................... 9

III.   PLAINTIFF HAS ADEQUATELY PLEADED A VIOLATION OF HER FOURTEENTH AMENDMENT RIGHTS. .......................................................... 10

     1.  Officer Doe's Conduct Violates the Fourteenth Amendment .............................. 11

     2.  Officer Doe's Conduct Shocks the Conscience. .................................................. 13

IV.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THE PLEADINGS. ........................................................................................... 15

     1.  Officer Doe Violated the Clearly Established Prohibition on Using Deadly Force Against Non-Threatening Civilians. ................................................................... 16

     2.  Officer Doe Violated the Clearly Established Prohibition on Throwing Flashbangs at or near Civilians. ........................................................................................... 17

     3.  Defendants' Proposed New Facts Do Not Invalidate the Clearly Established Prohibitions Against Throwing Flashbangs at or Otherwise Using Deadly Force Against Non-Threatening Persons. ..................................................................... 20

V.    DEFENDANTS DO NOT DISPUTE THE LEGAL SUFFICIENCY OF PLAINTIFF'S *MONELL* CLAIM AND STATE LAW CAUSES OF ACTION. .... 22

VI.   DEFENDANTS' MOTIONS TO DISMISS FAIL TO ESTABLISH THEIR DEFAMATORY STATEMENTS ARE ABSOLUTELY PRIVILEGED. .......... 23

     1.  Defendant Iverson's Statements Were Not Made Within the Scope of His State Employment. ...................................................................................................... 23

     2.  Defendants' Statements Are Not Absolutely Privileged. ..................................... 24

VII.  PLAINTIFF IS ENTITLED TO SEEK INJUNCTIVE RELIEF ON HER EXCESSIVE FORCE CLAIMS. .......................................................................... 28

CONCLUSION ....................................................................................................... 30

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Alternate Fuels, Inc. v. Cabanas*, 435 F.3d 855 (8th Cir. 2006) ..................................................27

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) .............................................7

*Ashanti v. City of Golden Valley*, 666 F.3d 1148 (8th Cir. 2012) ..................................................4

*Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013) ......................................6, 7, 9

*Barr v. Matteo*, 360 U.S. 564 (1959) ...........................................................................................28

*Barton v. Taber*, 820 F.3d 958 (8th Cir. 2016) .............................................................................11

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012) .............................................................21

*BJC Health Sys. v. Columbia Gas Co*, 348 F.3d 685 (8th Cir. 2003) ............................................5

*Boyd v. Benton County.*, 374 F.3d 773 (9th Cir. 2004) ...........................................................13, 18

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ...................................3, 4, 14, 20

*Brendlin v. California*, 551 U.S. 249 (2007) ...........................................................................6, 7, 10

*Brooks v. Gaenzle*, 614 F.3d 1213 (10th Cir. 2010) ......................................................................8

*Brower v. County of Inyo*, 489 U.S. 593 (1989) .............................................................................7

*Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) ....................................................17

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ..............................................................................28

*C.N. v. Willmar Pub. Sch.*, 591 F.3d 624 (8th Cir. 2010) ........................................................5, 10

*California v. Hodari D.*, 499 U.S. 621 (1991) .........................................................................9, 10

*Carr v. Tatangelo*, 338 F.3d 1259 (11th Cir. 2003) .......................................................................9

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) ................................................................7, 9

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................................................30

*Clark v. Edmunds*, 513 F.3d 1219 (10th Cir. 2008) .......................................................................8

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998) .............................................................8, 13

*Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005) ..........................................................................17

*Dadd v. Anoka County*, 827 F.3d 749 (8th Cir. 2016) ................................................3, 15

*Davis v. White*, 794 F.3d 1008 (8th Cir. 2015) ..............................................................11

*Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) ...................................................8, 11, 14

*Edwards v. Byrd*, 750 F.3d 728 (8th Cir. 2014) .......................................................13, 19

*Ellison v. Lesher*, 796 F.3d 910 (8th Cir. 2015) ......................................................15, 17

*Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010) ...........................13, 16, 18

*Florida v. Bostick*, 501 U.S. 429 (1991) ........................................................................10

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ........................................7, 15, 17

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167
(2000) ...........................................................................................................................29

*Gardner v. Bd. of Police Commr's*, 641 F.3d 947 (8th Cir. 2011) .................................6

*Gardner v. Buerger*, 82 F.3d 248 (8th Cir. 1996) ...................................................14, 17

*Geraci v. Women's All., Inc.*, 436 F. Supp. 2d 1022 (D.N.D. 2006) ............................23

*Gonzales v. Douglas*, No. cv-15-00064, 2016 WL 4530442 (D. Ariz. Aug. 30,
2016) ......................................................................................................................13, 19

*Gorog v. Best Buy Co.*, 760 F.3d 787 (8th Cir. 2014) ....................................................4

*Hall v. Ramsey County*, 801 F.3d 912 (8th Cir. 2015).................................................14

*Hanania v. Loren-Maltese*, 319 F. Supp. 2d 814 (N.D. Ill. 2004)................................28

*Harrington v. Wilber*, 353 F. Supp. 2d 1033 (S.D. Iowa 2005) ....................................28

*Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ..........8

*Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525 (8th Cir 2005) ....................29

*Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002)............................................................15

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)...........................................11, 12, 20

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018).....................................................15, 16, 22

*Lemery v. Beckner*, 323 Fed. App'x 644 (10th Cir. 2009)..........................................7, 8

*Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995) ....................................................9, 17

*McAuley v. Fed. Ins. Co.*, 500 F.3d 784 (8th Cir. 2007) ...................................................................4

*McCaslin v. Wilkins*, 183 F.3d 775 (8th Cir. 1999) ...........................................................17

*Moore v. Indehar*, 514 F.3d 756 (8th Cir. 2008) ...........................................................17

*Neal v. Ficcadenti*, 895 F.3d 576 (8th Cir. 2018) ...........................................................21

*Novoselsky v. Brown*, 822 F.3d 342 (7th Cir. 2016) ...........................................................26

*Park v. Forest Serv.*, 205 F.3d 1034 (8th Cir. 2000) ...........................................................28

*Ribbey v. Cox*, 222 F.3d 1040 (8th Cir. 2000) ...........................................................17

*Ryan v. Armstrong*, 850 F.3d 419 (8th Cir. 2017) ...........................................................11, 12

*Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697 (8th Cir. 2003) ...........................................................5

*Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492 (8th Cir. 1988) ......................................29, 30

*Taylor v. City of Middletown*, 436 F. Supp. 2d 377 (D. Conn. 2006) ...............................13, 18, 19

*Tennessee v. Garner*, 471 U.S. 1 (1985) ...........................................................17

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ........................................................... passim

*Terry v. Ohio*, 392 U.S. 1 (1968) ...........................................................9

*Thompson v. City of Monticello*, 894 F.3d 993 (8th Cir. 2018) ...........................................12, 15

*Ulrich v. Pope County*, 715 F.3d 1054 (8th Cir. 2013) ...........................................................3

*United States v. Baker*, 16 F.3d 854 (8th Cir. 1994) ...........................................................18

*United States v. Mendenhall*, 446 U.S. 554 (1980) ...........................................................9

## STATE CASES

*Bender v. City of Seattle*, 99 Wash. 2d 582 (1983) ...........................................................28

*Nelson v. Gillette*, 571 N.W.2d 332 (N.D. 1997) ...........................................................23

*Pulkrabek v. Sletten*, 557 N.W.2d 225 (N.D. 1996) ...........................................................26

*Small v. McRae*, 651 P.2d 982 (Mont. 1982) ...........................................................27

*Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73 (N.D. 1991) ...................................25

*Stafney v. Standard Oil Co.*, 299 N.W. 582 (N.D. 1941) ...........................................................25

*State v. New Holland*, 869 N.W.2d 136 (N.D. 2015) ...................................................................24

*Tangedal v. Mertens*, 883 N.W.2d 871 (N.D. 2016) ...................................................................23

*Trentecosta v. Beck*, 703 So. 2d. 552 (La. 1997) .........................................................................28

## OTHER AUTHORITIES

10 C.F.R. § 1047.7 (2019) ...........................................................................................................16

Fed. R. Evid. 201 ...........................................................................................................................4

North Dakota Century Code § 14-02-05.......................................................................................24

North Dakota Century Code § 12.1-05-12.....................................................................................16

Model Penal Code § 3.11(2) (Am. Law Inst. 2017) ....................................................................16

Restatement (Second) of Torts § 619.............................................................................................25

The Complaint alleges that Officer John Doe intentionally fired a grenade-like explosive he knew to be incredibly dangerous directly at Sophia Wilansky, an unarmed peaceful protester who was actively complying with law enforcement orders to retreat from a police barricade.  In so doing, Officer Doe flouted manufacturer warnings, national law enforcement standards, and twenty years of judicial precedent.  The resulting explosion stopped Sophia's retreat, knocked her to the ground, and blew off most of her left forearm.  These allegations must be accepted as true for purposes of Defendants' motions to dismiss, notwithstanding Defendants' efforts to debate them by introducing matters outside the pleadings.  As described below, the law is unambiguous that intentionally targeting a peaceful protester with a flashbang constitutes excessive force in violation of the United States constitution.  The law is equally unambiguous that this conduct violates clearly established law, such that Defendants are not entitled to qualified immunity. Defendants concede the legal sufficiency of all Plaintiff's state law claims (Counts IV–VII) against Officer Doe.  With respect to Plaintiff's defamation claim, Defendants are attempting to cloak themselves in the shroud of absolute privilege by introducing myriad new facts regarding the scope of their job duties.  These new facts are contested, and the Court should refrain from considering them until Plaintiff has had an opportunity to test them through discovery.

## FACTUAL BACKGROUND

As of November 20, 2016, law enforcement, under the direction of Defendant Kyle Kirchmeier, had erected a barricade consisting of concrete roadblocks and concertina razor wire on the Backwater Bridge.  Compl. ¶¶ 80–81, 86.  That day, a large group of Dakota Access Pipeline protesters conducted a protest on the bridge; it ended around midnight.  Compl. ¶ 91.  By 2:00 a.m. on November 21, few protesters remained on the bridge, and those who did were calm and peaceful.  Compl. ¶¶ 98–99.  At this point, law enforcement no longer had any reasonable concern for its safety.

Around 4:00 a.m. on November 21, with the setting still placid, Sophia approached a burned-out truck on the protester side of the barricade. Compl. ¶ 101.  She was unarmed and did not threaten law enforcement in any way. Compl. ¶ 102. She was outnumbered by the officers directly across the barricade, who ordered her to move away from the truck. Compl. ¶ 104. Before she could respond, the officers began firing rubber bullets at her. Compl. ¶ 105. One of these bullets struck her in the arm, and she began complying with law enforcement orders by retreating away from the truck and barricade. Compl. ¶¶ 106–107.

While she was retreating, Officer Doe fired what Plaintiff believes was a flashbang directly at her. Compl. ¶¶ 108–109. Every reasonable law enforcement officer knows that flashbangs are explosive and dangerous and that they are likely to cause serious injury or death if they detonate near people. Compl. ¶¶ 51–72. A reasonable officer knows never to throw flashbangs directly at people. Compl. ¶ 74. Yet this is precisely what Officer Doe did, suggesting he maliciously intended to hurt Sophia.

The flashbang hit Sophia and detonated, completely destroying her left forearm. Compl. ¶¶ 110–111. The blast knocked her to the ground, and she started screaming in pain. Compl. ¶ 113. Officer Doe made no attempt to help her. Compl. ¶ 115. The other officers near him cheered and congratulated him on his aim. Compl. ¶ 114. Sophia was eventually carried to a car by other protesters and taken to receive medical assistance. Compl. ¶ 116–118. Sophia is now permanently disabled and disfigured. Compl. ¶¶ 179–180. She faces a lifelong risk that her arm will need to be amputated. Compl. ¶ 183. She has brought federal civil rights and state law claims (Counts I through VII) against those responsible for the injuries she sustained on the bridge that night.

In the days after Sophia was injured, Defendant Thomas Iverson issued statements to the press he knew to be false, in which he attempted to cover up Officer Doe's misconduct by accusing

2

Sophia of injuring herself with an improvised explosive device.  Compl. ¶¶ 130–135.  During the weeks and months that followed, Defendants Kirchmeier and Paul Laney publicly repeated these defamatory statements.  Compl. ¶¶ 136–140, 148–149.  Plaintiff has brought defamation claims (Count VIII) against those responsible for these false statements.

## ARGUMENT

On a Rule 12(b)(6) motion, "the factual allegations in the complaint are accepted as true and viewed most favorably to the plaintiff."  *Dadd v. Anoka County*, 827 F.3d 749, 754 (8th Cir. 2016).  "[I]nferences are to be drawn in favor of the non-moving party."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).  "[D]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim which would entitle h[er] to relief."  *Ulrich v. Pope County*, 715 F.3d 1054, 1058 (8th Cir. 2013).

## I.   DEFENDANTS' NEW FACTS ARE MATTERS OUTSIDE THE PLEADINGS AND SHOULD NOT BE CONSIDERED.

Although the Complaint survives either way, the Court should disregard the numerous pages of new facts Defendants propose in their briefs, the vast majority of which are not even relevant to Defendants' current arguments.  For example, proposed new facts related to the cause of and run-up to the November 20 protest are irrelevant to Defendants' argument that Sophia was not seized or subjected to excessive force.  Likewise, the proposed new facts Defendants draw from this Court's orders in *Dundon v. Kirchmeier*, No. 1:16-cv-406, all relate to conduct by protesters other than Sophia that occurred hours before Sophia was injured.  And the proposed new facts involving the ownership and legal status of the bridge and surrounding areas are irrelevant because Sophia's claims are not predicated on any First Amendment rights or protections.

Even if the new facts Defendants propose were relevant, on a motion to dismiss Defendants cannot contest the facts (and resulting reasonable inferences) alleged in the Complaint, especially

through external documents.   A Rule 12(b)(6) motion "succeed[s] or fail[s] based upon the allegations contained in the face of the complaint." *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007) (internal quotation marks omitted).   "[M]atters outside the pleading may not be considered in deciding a Rule 12 motions to dismiss," unless they are "necessarily embraced by the pleadings." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).   Matters outside the pleadings include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *Gorog v. Best Buy Co.*, 760 F.3d 787, 791 (8th Cir. 2014) (internal quotation marks omitted).

Defendants concede that the Court may consider their proposed new facts only "to the extent they do not contradict the Plaintiff's pleadings." Mem. of Law in Supp. of Cty. Defs.' Mot. to Dismiss 10, ECF No. 29 (hereinafter "Cty. Defs. Mot. to Dismiss").   But it is unclear what other purpose these proposed facts would serve in resolving the motions to dismiss.   For example, the new facts Defendants propose regarding the dangers presented by the November 20 protest appear designed to support Defendants' requested inferences that Officer Doe was acting "without a malicious or sadistic intent" from a "strictly defensive position" to "repel" Sophia in order to "protect government property and the physical safety of law enforcement and other fire service personnel, and otherwise restore order." *Id.* at 29, 32.   Drawing such inferences in Defendants' favor is inappropriate on a motion to dismiss, especially since Plaintiff has pleaded facts that raise the opposite inferences. *Braden*, 588 F.3d at 595.

Many of Defendants' proposed new facts are "subject to reasonable dispute" and therefore ineligible for judicial notice.   Fed. R. Evid. 201.   Several of these public records are press releases created by Defendants themselves or their allies.   Cty. Defs. Mot. to Dismiss Exs. C, D, F, G.   One

question in this case is whether Defendants' public statements are true and comport with Defendants' internal beliefs and practices. Taking judicial notice of these press releases begs that question. Moreover, these public records may be biased or not properly contextualized.[1] For example, the job description documents attached to Defendant Iverson's motion are both dated many months before Sophia was injured. Mem. in Supp. of Mot. to Dismiss Exs. 1, 2, ECF No. 27 (hereinafter "Iverson Mot. to Dismiss"). These documents could have been superseded or augmented by subsequent documents, orders, or events. In fact, these documents may not even apply to the DAPL work Iverson was doing on behalf of Morton County. Plaintiff needs discovery to determine whether Defendants are properly interpreting their proffered public records. *See, e.g.*, *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700–01 (8th Cir. 2003) (affirming district court's conclusion that defendant's proffered documents constitute "matters outside the pleadings" because they may not be the only relevant documents on the subject); *BJC Health Sys. v. Columbia Gas Co*, 348 F.3d 685, 687–88 (8th Cir. 2003) (reversing district court that considered three documents defendant claimed were relevant to plaintiff's legal claim because it was not self-evident that they were the *only* relevant documents and plaintiff disputed their significance).

## II.    PLAINTIFF HAS ADEQUATELY PLEADED A VIOLATION OF HER FOURTH AMENDMENT RIGHTS.

"A litigant may state a Fourth Amendment violation by alleging facts which indicate a seizure occurred and that it was unreasonable." *C.N. v. Willmar Pub. Sch.*, 591 F.3d 624, 633 (8th Cir. 2010). Defendants never assert that Officer Doe's behavior was objectively reasonable.

---

[1] Defendants have rebuffed Plaintiff's numerous open records requests, citing an ongoing investigation into Sophia's injury. Compl. ¶¶ 153–154. It would be highly prejudicial now to accept as true Defendants' statements in cherry-picked self-serving documents at the same time that Defendants shield from public view the context provided by the numerous other documents sought by Plaintiff.

Instead, they dispute only that a seizure occurred.  "A Fourth Amendment seizure occurs when an officer, 'by means of physical force or show of authority, terminates or restrains an individual's freedom of movement, through means intentionally applied.'"  *Gardner v. Bd. of Police Commr's*, 641 F.3d 947, 951 (8th Cir. 2011) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)) (brackets and emphasis omitted).  Plaintiff has pleaded facts establishing both that Officer Doe intentionally applied physical force to her and that this force restrained her freedom of movement.

1.   <u>Officer Doe Intentionally Applied Physical Force to Sophia.</u>

A seizure requires "means intentionally applied."  *Brendlin*, 551 U.S. at 254.  In other words, the officer must intend to apply the physical force—the "means"—that ultimately results in the seizure.  This separates seizures from "unknowing act[s]," such as accidental collisions between officers and civilians.  *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1208 (8th Cir. 2013).

The Complaint alleges that Officer Doe launched a flashbang directly *at* Sophia.  Compl. ¶¶ 108–110.  A flashbang—like a grenade—has a pin that must be removed before the device can be deployed, which makes it implausible that Officer Doe launched the flashbang by accident.  If he had removed the pin accidentally, the flashbang would have detonated near him, not Sophia.  And if Sophia's injury had been an accident, the nearby officers would not have cheered and congratulated Officer Doe on his aim.  Compl. ¶ 114.  The most natural inference to draw from these facts is that the flashbang—the "means" Officer Doe used to injure Sophia—was "intentionally applied."

Defendants argue no seizure occurred because the Complaint did "not allege the force was applied for the purpose of law enforcement gaining physical control over Plaintiff," and that Officer Doe's "intention in applying the alleged force [was to] keep[] Plaintiff and other protesters

away from law enforcement."  Cty. Defs. Mot. to Dismiss 23.  This conflates the intent to apply physical force with the intended outcome of applying that force.  A seizure only requires that the officer intend to apply physical force, not that the officer intend the force to generate a particular outcome.  It is the *means*, not the *result*, that must be intended.  *Brendlin*, 551 U.S. at 254.

In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Supreme Court held that a seizure occurs even if the physical force applied has a different result than intended, such as when an officer accidentally discharges his gun into a suspect while merely attempting to bludgeon him with it, or where an officer intends to shoot a suspect in the leg, but hits him in the heart instead. *Id.* at 598–99.  In *Atkinson v. City of Mountain View*, the Eighth Circuit held that an officer's "subjective motive" for applying physical force is irrelevant so long as the force itself was "intentionally applied."  709 F.3d at 1208.  Officer Doe intended to apply physical force to Sophia, so it does not matter what precise effect he intended that force to have.

If Defendants were correct that no seizure occurs when law enforcement officers use physical force to repel, rather than detain, officers who use force to disperse crowds would be fully insulated from Fourth Amendment excessive force lawsuits.  No court holds this, and, to the contrary, courts routinely allow such excessive force claims to proceed.  *See, e.g.*, *Lemery v. Beckner*, 323 Fed. App'x 644 (10th Cir. 2009) (seizure occurred where officer hit plaintiff in eye with pepper ball while trying to disperse crowd); *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) (denying qualified immunity to officers who hit plaintiff with pepper ball while trying to disperse protesters); *Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) (denying qualified immunity to officer who shot plaintiff in face with beanbag round while trying to quell riot); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) (denying summary judgment to officers who used aggressive pain compliance measures to remove protesters from abortion

clinic); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) (denying qualified immunity to officers who used pepper spray to force protesters to unlink and disperse). As the Second Circuit explained in the context of assessing an excessive force claim brought by injured protesters, "there is no intuitive reason to think a recalcitrant protester who is being arrested has more robust rights than a compliant protester who is not." *Edrei v. Maguire*, 892 F.3d 525, 543 (2d Cir. 2018).

The cases cited by Defendants do not support their misinterpretation of the intention requirement. *County of Sacramento v. Lewis,* 523 U.S. 833 (1998), which predates all but one of the above-cited cases supporting Plaintiff's position, involved a high-speed chase where a police officer lost control of his vehicle and accidentally hit the fleeing suspect. *Id.* at 836–37. The Court held no seizure had occurred because the officer never intended to apply any physical force. *Id.* In *Brooks v. Gaenzle*, 614 F.3d 1213 (10th Cir. 2010), the intention of the officer was not at issue because no one disputed that the officer intended to shoot at the plaintiff. *Id.* at 1215–16. The issue of officer intent was not ripe in *Clark v. Edmunds*, 513 F.3d 1219 (10th Cir. 2008), because the plaintiff conceded she had not been seized. *Id.* at 1222. And in a decision that was issued after both *Brooks* and *Clark*, the Tenth Circuit held that "when law enforcement officers shoot at a fleeing suspect, a seizure occurs if the shot strikes the fleeing person." *Lemery*, 323 Fed. App'x at 649 (alterations and quotation marks omitted).

Moreover, even if the law required that Officer Doe intended to detain Sophia (it does not), the Complaint sufficiently alleges that. Officer Doe aimed the flashbang at Sophia. The entire purpose of a flashbang "is to temporarily stun people," *Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014), so it is logical to conclude that Officer Doe's intention was to at least temporarily detain

8

Sophia.  And if her injury was not intentional, the officers near Doe would have called for medical assistance instead of cheering and congratulating him.

>    2.    Any Application of Physical Force Constitutes a Seizure.

Defendants also assert that the Complaint fails to allege Sophia was "arrested or restrained" or otherwise "not free to terminate her encounter with law enforcement."  Cty. Defs. Mot. to Dismiss 23.  But that misstates the test.  A seizure can occur in two distinct ways:  when the subject yields to a show of authority by law enforcement *or* when law enforcement applies physical force to the subject.  *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)).  When an officer intentionally applies physical force, a seizure occurs "*regardless* of whether the citizen yields to that force."  *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995); *see also Hodari D.,* 499 U.S. at 625 ("[W]ith respect to application of physical force, a seizure occurs even though the subject does not yield.").  Any amount of physical force constitutes a seizure even if the force does not "actually succeed in stopping or holding [the target] even for an instant."  *Atkinson*, 709 F.3d at 1207–08 (alterations in original); *see also Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003) (fleeing suspect was seized as soon as he was shot by police even though he never submitted, continued to run, and ultimately evaded capture for days); *Ciminillo v. Streicher*, 434 F.3d 461, 465–66 (6th Cir. 2006) ("[P]olice officers seize those persons who are the deliberate object of their exertion of force," even if the person "was not eventually placed in handcuffs or taken to the police station.").  The fact that Sophia was not arrested that night is utterly irrelevant.

Defendants cite several Supreme Court cases on this topic, but none calls into question the proposition that the mere application of physical force effects a seizure.  With one exception, none even involved the use of physical force at all.  *See United States v. Mendenhall*, 446 U.S. 554,

(1980); *Florida v. Bostick*, 501 U.S. 429 (1991); *Brendlin*, 551 U.S. at 249. As for the one exception, the Court held that the fleeing suspect was not seized while being chased by a police officer *until* officer made physical contact with him. *Hodari D*, 499 U.S. at 623. The *Hodari* Court then explained that the application of physical force alone—even if the target is not thereby successfully restrained—constitutes a seizure:

> There can be constructive detention, which will constitute an arrest, although the party is never actually brought within the physical control of the party making an arrest. This is accomplished by merely touching, however slightly, the body of the accused, by the party making the arrest and for that purpose, although he does not succeed in stopping or holding him even for an instant. . . . The word "seizure" readily bears the meaning of a laying of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.

*Id.* at 625–26 (internal quotation marks omitted). Because Officer Doe applied physical force to Sophia, the Complaint need not allege that she yielded to that force or was otherwise successfully detained.

Regardless, the Complaint *does* allege that Sophia yielded to Officer Doe's force and was thereby temporarily detained. The flashbang stopped Sophia's movement and knocked her to the ground. Compl. ¶¶ 107, 113. She was completely immobilized by the blast and had to be literally carried away by others to obtain medical treatment. Compl. ¶ 117. Because she was unable to walk away and terminate her encounter with law enforcement, she was detained and therefore seized even under Defendants' misunderstanding of the law.

## III.   PLAINTIFF HAS ADEQUATELY PLEADED A VIOLATION OF HER FOURTEENTH AMENDMENT RIGHTS.

Defendants cite no law or precedent prohibiting a plaintiff from bringing an excessive force claim under both the Fourth and Fourteenth Amendments simultaneously and in the alternative. Defendants even cite to a case where the Eighth Circuit analyzed an excessive force claim under both Amendments. *Willmar Pub. Schs.*, 591 F.3d at 624 (cited at Cty. Defs. Mot. to Dismiss 26).

In fact, if the Court concludes that Sophia was not seized, then her excessive force claim must proceed under the Fourteenth Amendment.  *See Edrei*, 892 F.3d at 525 (analyzing unseized protesters' excessive force claims under Fourteenth Amendment).

      1.    <u>Officer Doe's Conduct Violates the Fourteenth Amendment</u>.

Regardless of whether Plaintiff's excessive force claim proceeds under the Fourth or Fourteenth Amendment, the same standard applies.  The outdated "shocks the conscience" standard described in the County Defendants' brief was abrogated by the Supreme Court in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and replaced with the same objective reasonableness standard used under the Fourth Amendment.  *Id.* at 2473; *see also Edrei*, 892 F.3d at 534 ("Although prior excessive force cases [under the Fourteenth Amendment] spoke of whether the official's conduct 'shocks the conscience,' *Kingsley* asked whether the force was 'objectively unreasonable.'") (internal citations omitted).

Unlike the Defendants here, the Eighth Circuit has recognized this change in the Fourteenth Amendment excessive force standard.  *See, e.g., Davis v. White*, 794 F.3d 1008, 1011 (8th Cir. 2015) ("In *Kingsley v. Hendrickson*, the Supreme Court recently held that the objective reasonableness standard applies to excessive force *due process* claims . . ."); *Ryan v. Armstrong*, 850 F.3d 419, 425 n.3 (8th Cir. 2017) ("In *Kingsley v. Hendrickson*, the Supreme Court rejected analysis of a defendant's subjective state of mind in excessive force cases and concluded the appropriate standard for a [Fourteenth Amendment] excessive force claim is solely an objective one.") (internal citations and quotation marks omitted); *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (After *Kingsley,* "objective reasonableness standard [now] governs excessive force claims brought [under the Fourteenth Amendment].").

After *Kingsley*, a plaintiff pursuing an excessive force claim under the Fourteenth Amendment is no longer required to allege any subjective "malice" by the law enforcement officer and need only show that the force "used against h[er] was objectively unreasonable." 135 S. Ct. at 2473–74. Courts assess whether conduct was objectively reasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight." *Ryan*, 850 F.3d at 427 (quoting *Kingsley*, 135 S. Ct. at 2473). The *Kinglsey* Court articulated six factors to consider in determining whether an officer's conduct was objectively reasonable:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

135 S. Ct. at 2473. "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Thompson v. City of Monticello*, 894 F.3d 993, 1000 (8th Cir. 2018).

Defendants never assert that Officer Doe's conduct was objectively reasonable. Nor could they. All six *Kingsley* factors indicate that Officer Doe's conduct was objectively unreasonable. *First,* the amount of force applied was extreme despite the fact that no force was necessary because Sophia was already moving away from the barricade in compliance with law enforcement orders. *Second,* Sophia's injury was severe. *Third,* Officer Doe made no attempt to limit or temper the amount of force he used by either ensuring the flashbang detonated *away* from Sophia or by using a less-dangerous weapon, such as the sponge bullets that had been utilized successfully just moments earlier. *Fourth,* several hours had passed since the large scale confrontation between protesters and law enforcement, and the few remaining people near the bridge were calm and peaceful, so no security issue existed at the time Officer Doe injured Sophia. *Fifth,* the officers at

12

the bridge clearly did not perceive a threat to themselves since they were laughing and joking immediately after Sophia was injured. *Sixth*, Sophia was not actively resisting when Officer Doe attacked her.

*Kingsley* factors aside, numerous courts have already concluded that it is objectively *un*reasonable to throw flashbangs at—or even near—individuals who do not pose an immediate and serious safety threat. *See, e.g.*, *Terebesi*, 764 F.3d at 238 ("[The Court] cannot conceive of a set of circumstances that would permit an officer . . . to throw a flash-bang device directly at a person."); *Gonzales v. Douglas*, No. cv-15-00064, 2016 WL 4530442, *9 (D. Ariz. Aug. 30, 2016) (same); *Taylor v. City of Middletown*, 436 F. Supp. 2d 377, 386–87 (D. Conn. 2006) (same); *Estate of Escobedo v. Bender*, 600 F.3d 770, 779–81 (7th Cir. 2010) (holding that even blindly throwing a flashbang into an area that may contain civilians is objectively unreasonable); *Boyd v. Benton County.*, 374 F.3d 773, 779 (9th Cir. 2004) (same); *cf. Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014) (holding that throwing flashbang near peaceful non-resisting detainees was not only objectively unreasonable, but shocked the conscience).

    2.    <u>Officer Doe's Conduct Shocks the Conscience</u>.

The Complaint sufficiently pleads a Fourteenth Amendment violation even under the pre-*Kingsley* "shocks the conscience" standard. The Complaint alleges facts that imply Officer Doe engaged in "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849 (articulating pre-*Kingsley* Fourteenth Amendment excessive force standard). Officer Doe fired a flashbang directly *at* Sophia, which implies he intended to hit her with it. Compl. ¶ 108–109. And every reasonable officer knows that hitting someone with a flashbang will likely cause serious harm, or even death. Compl. ¶¶ 51, 54–58, 61–66, 70, 72. Thus, it is only reasonable to infer that Officer Doe intended to injure Sophia. If Sophia's injury

had been unintended, Officer's Doe's coworkers would have gasped in horror, not cheered. Compl. ¶ 114.  Officer Doe's refusal to help Sophia after she was injured additionally implies that he was "inspired by malice or sadism rather than a merely careless or unwise excess of zeal." *Hall v. Ramsey County*, 801 F.3d 912, 918 (8th Cir. 2015) (internal quotation marks omitted).  Compl. ¶ 115.  Officer Doe's conduct was not justified by any government interest because Sophia was already complying with law enforcement orders and posed no threat to anyone at the time he attacked her.  Compl. ¶ 108.

Defendants allege that Officer Doe only intended "to repel Plaintiff and other protester[]s from the barricade, to protect government property and the physical safety of law enforcement and other fire service personnel, and otherwise restore order on the scene."  Cty. Defs. Mot. to Dismiss 23.  This radical retelling of Sophia's encounter with Officer Doe asks the Court to consider not just new facts, but new facts that directly contradict those alleged in the Complaint.  It also asks the Court to draw inferences in Defendants' favor about Officer Doe's motivation.  That would be inappropriate even at summary judgment, and it is certainly improper on a motion to dismiss, when the Court must assume the facts in the Complaint are true and draw all reasonable inferences in Plaintiff's favor.  *Braden*, 588 F.3d at 595.  Defendants also assert that Sophia "had no right to be in any location where force was allegedly applied" and that her behavior "evidence[s] a failure to comply with the clear directive from law enforcement."  Cty. Defs. Mot. to Dismiss 29.  These new facts are similarly inconsistent with the Complaint and should be disregarded for that reason. They are also irrelevant.  Even if it were illegal for Sophia to be on the bridge and even if she were ignoring law enforcement commands, that does not justify the use of potentially lethal force against her.  *See Edrei*, 892 F.3d at 530–31 (denying qualified immunity where officers deployed less-lethal weapon against protesters who were illegally blocking traffic); *Gardner v. Buerger*, 82 F.3d

248, 251 (8th Cir. 1996) (denying qualified immunity to officer who fatally shot individual who was actively and physically resisting arrest); *Ellison v. Lesher*, 796 F.3d 910, 914 (8th Cir. 2015) (denying qualified immunity to officer who fatally shot individual who was refusing to comply with law enforcement orders).

Based on the facts alleged in the Complaint, Plaintiff satisfies even the pre-*Kingsley* "shocks the conscience" standard for pleading a Fourteenth Amendment excessive force claim. Officer Doe maliciously fired an explosive munition at Sophia with the intent to injure her. That shocks the conscience.

## IV.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THE PLEADINGS.

At this early stage, before Plaintiff has had access to discovery, "defendants must show that they are entitled to qualified immunity on the face of the complaint." *Dadd*, 827 F.3d at 754 (internal quotation marks omitted). Officer Doe is not entitled to qualified immunity if he violated a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates the law." *Thompson*, 894 F.3d at 999 (internal quotation marks omitted).

To determine whether a right is clearly established, "a court should look to all available decisional law including decisions of state courts, other circuits, and district courts." *Hill v. McKinley*, 311 F.3d 899, 910 (8th Cir. 2002) (internal quotation marks omitted). "[I]t is not necessary, of course, that the very action in question has previously been held unlawful." *Thompson*, 894 F.3d at 999 (internal quotation marks omitted). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Fogarty*, 523 F.3d at 1161 (alternation and

internal quotation marks omitted).  The key question is "whether the officer had fair notice that [his] conduct was unlawful . . . [based on] the law at the time of the conduct."  *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted).

Defendants assert "[t]here simply is no existing precedent which establishes beyond debate the unconstitutionality of Defendants' alleged conduct."  Cty. Defs. Mot. to Dismiss 32.  That is utterly false.  In fact, two separate lines of precedent each independently gave Officer Doe fair notice that his conduct was unlawful.

1.  <u>Officer Doe Violated the Clearly Established Prohibition on Using Deadly Force Against Non-Threatening Civilians.</u>

Deadly force is "force which a reasonable person would consider likely to cause death or serious bodily harm."  10 C.F.R. § 1047.7 (2019); *accord* Model Penal Code § 3.11(2) (Am. Law Inst. 2017); N.D. Cent. Code Ann. § 12.1-05-12 (West 2018) ("'Deadly force' means force which a person uses with the intent of causing, or which he knows creates a substantial risk of causing, death or serious bodily injury.").  Flashbangs meet this definition when detonated near individuals.  Law enforcement primers on flashbangs explain that they can cause death or serious bodily harm to nearby individuals.  Compl. ¶ 57.  The National Tactical Officers Association—the trade group for SWAT teams—has warned that flashbangs detonated near individuals have caused death and serious blast force trauma.  Compl. ¶ 58.  There have been numerous widely publicized reports of individuals suffering serious bodily harm from flashbangs.  Compl. ¶¶ 62–66.  And flashbang devices themselves come emblazoned with a bolded warning that they may "result in death or serious bodily injury."  Compl. ¶ 70.  The Seventh Circuit held that a "flash-bang device" is essentially a "bomb."  *Escobedo*, 600 F.3d at 786.

"Since 1985, it has been established by the Supreme Court that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury

to the officer or others is not permitted." *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008). "[W]here a person 'poses no immediate threat to the officer and no threat to others,' deadly force is not justified." *Ellison*, 796 F.3d at 916 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). The Eighth Circuit has repeatedly withheld qualified immunity from officers who used deadly force against individuals who did not pose a significant and immediate safety threat. *See e.g., id.* at 917; *Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005); *Ribbey v. Cox*, 222 F.3d 1040 (8th Cir. 2000); *McCaslin v. Wilkins*, 183 F.3d 775 (8th Cir. 1999); *Gardner*, 82 F.3d at 248; *Ludwig*, 54 F.3d at 465. This principle has even been applied to less-lethal weapons that are far less dangerous than flashbangs. *See, e.g., Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (holding that "law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, [and] who posed little to no threat to anyone's safety . . ."); *Fogarty*, 523 F.3d at 1147 (denying qualified immunity to officer who fired "less-lethal munition" at protester who was not resisting and did not pose any serious safety threat).

Every reasonable law enforcement officer knows that flashbangs are likely to cause serious bodily harm or even death if detonated near someone. Compl. ¶¶ 51–72. As a result, Officer Doe had clear notice from the wealth of prior case law on the use of deadly force that firing such a device directly at a non-threatening civilian was unlawful. Officer Doe is not entitled to qualified immunity.

    2.    <u>Officer Doe Violated the Clearly Established Prohibition on Throwing Flashbangs at or near Civilians</u>.

More than two decades ago, the Eighth Circuit expressed "grave concern" about the lawfulness of deploying flashbangs without taking adequate precautions to avoid injuring people.

*United States v. Baker*, 16 F.3d 854, 855 (8th Cir. 1994).  Since then a long line of precedents have established that firing flashbangs at, or even near, people constitutes excessive force.

In 2004, the Ninth Circuit called flashbangs "inherently dangerous" and held that it was unlawful to blindly throw one into an apartment without first peaking to ensure no one would be in the blast radius.  *Boyd*, 374 F.3d at 779.  Since *Boyd*, numerous courts have denied qualified immunity to officers accused of such conduct.  Courts have similarly denied qualified immunity to officers, like Doe, who are accused of the even more egregious offense of throwing flashbangs directly at people.  In 2006, the District of Connecticut denied qualified immunity where the "plaintiffs' version of defendants' conduct permit[ted] the inference that [Defendants] intended to throw the device at plaintiffs."  *Taylor*, 436 F. Supp. 2d at 387.  The outraged court exclaimed that it "cannot conceive of a set of circumstances that would permit an officer, contrary to the intended use of the device, to throw a flash-bang device directly at a person."  *Id.* at 387.

In 2014, the Seventh Circuit denied qualified immunity to an officer who entered the house of a drug dealer known to be armed and threw a flashbang into his bedroom without first looking to ensure it would not hit him.  *Escobedo*, 600 F.3d at 779–81.  The Court held:

> Flash bang devices are essentially grenades and can be very dangerous and destructive. . . .   [P]olice cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism, 'flash-bang device,' particularly where they do not believe [he] is an unusually dangerous individual. . . .   Based on the pre-existing case law, it was clearly established as of July 19, 2005, that throwing a flash bang device blindly into an apartment . . . where the individual attempting to be seized is not an unusually dangerous individual, is not the subject of an arrest, and has not threatened to harm anyone but himself, is an unreasonable use of force.

*Id.* at 785.  The Second Circuit reviewed a case with similar facts in 2014 and reached the same conclusion.  *Terebesi*, 764 F.3d at 238.  In denying the officer qualified immunity at summary judgment, the Second Circuit reasoned that "every appellate court to address the issue has found

18

questionable the use of [flashbangs] in routine searches and seizures that do not pose high levels of risk to the officers or third parties." *Id.* The Second Circuit also adopted the *Taylor* Court's view that it "cannot conceive of a set of circumstances that would permit an officer . . . to throw a flash-bang device directly at a person." *Id.* (quoting *Taylor*, 436 F. Supp. 2d at 386–87).

In 2016, the District of Arizona denied qualified immunity to officers who "either aimed a flash bang at [the plaintiff] or threw it in his direction without looking and seeing that he was already there." *Gonzales*, 2016 WL 4530442 at *9. The officers argued that no prior precedent rendered their particular conduct unlawful because they deployed the flashbang outdoors whereas prior cases all involved indoor detonations. The District of Arizona rejected this argument, stating that the "indoors-outdoors distinction does not matter." *Id.*

Two years before Officer Doe injured Sophia, the Eight Circuit joined these other courts and denied qualified immunity to prison guards who, shortly after a prison riot, threw a flashbang into a cell containing detainees who were not resisting or acting violently. *Edwards*, 750 F.3d at 732. The Eighth Circuit held under the older, more exacting "shocks the conscience" standard that it clearly violated the Fourteenth Amendment to detonate a flashbang near detainees who posed no serious safety threat. *Id.* In light of *Edwards*, there is no way Officer Doe could have believed firing a flashbang at Sophia was lawful. *Edwards* involved detainees, who have fewer rights and protections than civilians like Sophia. *Edwards* took place moments after a prison riot, whereas Sophia was injured hours after the November 20 confrontation between protesters and law enforcement officers had ended. And the officers in *Edwards* simply deployed their flashbang recklessly, whereas Officer Doe allegedly aimed the flashbang at Sophia.

19

3. Defendants' Proposed New Facts Do Not Invalidate the Clearly Established Prohibitions Against Throwing Flashbangs at or Otherwise Using Deadly Force Against Non-Threatening Persons.

In an attempt to avoid the precedents described above, Defendants try to distinguish Officer Doe's behavior in several ways, mostly involving the introduction of new facts and inferences in Doe's favor, which are inappropriate on a motion to dismiss. *Braden*, 588 F.3d at 598.

Defendants argue that Plaintiff "cites no case law involving the use of less-lethal weapons from a strictly defensive position." Cty. Defs. Mot. to Dismiss 32. Of course, there is no requirement that a Complaint cite case law, and most do not. This opposition brief, on the other hand, cites more than a dozen excessive force cases that bear directly on Officer Doe's conduct, many specifically involving flashbangs. Defendants' characterization of Officer Doe as being in "a strictly defensive position" is directly contradicted by the allegation in the Complaint that no one on the bridge was threatening law enforcement at the time Sophia was injured. Compl. ¶¶ 98–99. To the extent "defensive position" is a reference to the fact that Officer Doe was protected by a concrete barricade and armored vehicles when he fired on Sophia, this is just a further reason why his wanton use of force was objectively unreasonable. Compl. ¶ 108.

Defendants also assert that Officer Doe fired the flashbang "without a malicious or sadistic intent to cause harm" and that no precedent makes such non-malicious conduct a clearly established violation of the law. Cty. Defs.' Mot to Dismiss 32. Defendants are wrong on both counts. The Complaint alleges numerous facts that raise the inference that Officer Doe acted with malice: he fired the flashbang at Sophia while she was already complying with law enforcement orders; he made no attempt to help her after she was injured; and his fellow officers cheered and congratulated him for injuring her. Compl. ¶¶ 108, 114, 115. In any event, since *Kingsley*, malice is not required to establish an excessive force claim under either the Fourth or Fourteenth Amendment. 135 S. Ct. at 2473.

Defendants cite a single case, *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012), in support of their request for qualified immunity.  The facts of *Bernini* are drastically different than those here.  In *Bernini*, police deployed smoke, stinger blast balls, and chemical irritants against a large group of "aggressive protesters" who refused to comply with law enforcement orders and were, as Defendants themselves characterize it, "attempting to breach barricades."  Cty. Defs. Mot. to Dismiss 32–33.  The police in *Bernini* were trying to control a growing group of more than one hundred aggressive protesters who intended to penetrate a police line and were refusing to comply with law enforcement orders.  *Bernini*, 665 F.3d at 1004.  Officer Doe was responding to a single unarmed protester who was already retreating in compliance with law enforcement orders.  Whereas there was no record in *Bernini* that "any of the defendants directly used force against any of the plaintiffs" or caused any severe or lasting injuries, *id.* at 1006, Officer Doe aimed an explosive munition directly at Sophia and left her permanently disabled and disfigured.  Individually and collectively, these differences render *Bernini* completely irrelevant.

Defendants' litany of proposed facts related to the November 20 protest at Backwater Bridge suggest they believe the danger present during that earlier protest might somehow help justify Officer Doe's conduct.  Not so.  Hours elapsed between that protest and Sophia's injury, and "a reasonable officer is not permitted to ignore changing circumstances and information that emerges once arriving on scene." *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018).  Whatever threat the November 20 protest posed to law enforcement had passed long before Officer Doe attacked Sophia.  Compl. ¶ 98.  Sophia was injured at a time when the few remaining protesters on the bridge were calm and peaceful.  Compl. ¶ 99.

Finally, Defendants fall back on the generic assertion that no prior precedent involved "circumstances similar to those alleged in this case."  Cty. Defs. Mot. to Dismiss 32.  But there

21

need not be "a case directly on point for a right to be clearly established," and even "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela*, 138 S. Ct. at 1152–53 (internal quotation marks omitted).  Prior precedents simply need to make the contours of the relevant rule "sufficiently definite that any reasonable officials in the defendant's shoes would have understood that he was violating it."  *Id.* (internal quotation marks omitted); *Terebesi*, 764 F.3d at 237 n. 20 ("Some measure of abstraction and common sense is required with respect to police methods and weapons in light of rapid innovation in hardware and tactics.").  The many cases cited above do precisely that.  Moreover, those cases *do* involve circumstances similar to this case:  they include fact patterns involving protesters, flashbangs, outdoor confrontations, and plaintiffs who were complying with law enforcement orders when they were injured.  These cases provide more than "fair notice" to Officer Doe "that [his] conduct was unlawful" and that he was violating "clearly established law."  *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted).

## V.   DEFENDANTS DO NOT DISPUTE THE LEGAL SUFFICIENCY OF PLAINTIFF'S *MONELL* CLAIM AND STATE LAW CAUSES OF ACTION.

Defendants' only argument against Plaintiff's *Monell* claim is that Morton County cannot be liable if Officer Doe did not violate Sophia's constitutional rights.  Cty. Defs. Mot. to Dismiss 33.  Plaintiff agrees that her *Monell* claim is dependent on the viability of her underlying excessive force claims against Officer Doe.  However, as explained above, Plaintiff has more than adequately pleaded those underlying claims, so her *Monell* claim survives as well.

Defendants argue that Plaintiff's supervisory causes of action against Morton County (Counts IV–VII) similarly rise or fall with her federal excessive force claims.  That is not correct.  The supervisory causes of action—unlike the *Monell* claim—are premised on Plaintiff's state law claims, not her federal civil rights claims.  Under North Dakota law, "a political subdivision can

be liable for injuries caused by the negligence or wrongful act or omission of an employee acting within the scope of the employee's employment." *Tangedal v. Mertens*, 883 N.W.2d 871, 875 (N.D. 2016) (internal quotation marks omitted); *see also Nelson v. Gillette*, 571 N.W.2d 332, 334 (N.D. 1997) ("Political subdivisions are vicariously liable for tortious actions of their public employees."). The North Dakota legislature has not disrupted "the long-standing doctrine of respondeat superior codified at Section 32-13.1-03(1) of the North Dakota Century Code," so "[a]s a general rule, entities such as political subdivisions are liable for torts committed by their employees acting within the scope of their employment." *Geraci v. Women's All., Inc.*, 436 F. Supp. 2d 1022, 1029 (D.N.D. 2006). Therefore, Morton County may be held vicariously liable for Officer Doe's violations of North Dakota state tort law.

Defendants do not dispute the legal sufficiency of any of Plaintiff's state law causes of action against Officer Doe. Thus, these causes of action—assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and violations of North Dakota Century Code sections 9-10-01 and 9-10-06—all automatically survive Defendants' motions to dismiss. Defendants also do not dispute the existence of complete diversity between the parties and therefore concede that this Court has an independent basis of jurisdiction to hear Plaintiff's state law claims, even if her federal claims are dismissed. As a result, this case will proceed to discovery regardless of the outcome of Defendants' motions to dismiss.

## VI.   DEFENDANTS' MOTIONS TO DISMISS FAIL TO ESTABLISH THEIR DEFAMATORY STATEMENTS ARE ABSOLUTELY PRIVILEGED.

### 1.   Defendant Iverson's Statements Were Not Made Within the Scope of His State Employment.

Defendant Iverson argues that the defamation claim against him must be brought against the State instead because the Complaint "makes no allegations that Iverson's statements were anything other than made within the scope of his employment." Iverson Mot. to Dismiss 5. That

23

is incorrect.  The Complaint alleges that he made the defamatory statements "on a subject matter irrelevant to any common interest or duty."  Compl. ¶ 260.  As Defendant Iverson concedes, he only acts within the scope of his state employment—and therefore is only covered by sovereign immunity—when he is "acting on behalf of the state."  *State v. New Holland*, 869 N.W.2d 136, 140 (N.D. 2015).  Iverson was not acting on behalf of the state when he defamed Sophia.  At best, he was acting on behalf of Morton County, and, at worst, he was acting ultra vires.  Neither the Complaint, nor any of the documents referenced in Defendants' briefs suggests that the State of North Dakota ever tasked Defendant Iverson with commenting on local law enforcement activities and investigations related to protests.

> 2.    <u>Defendants' Statements Are Not Absolutely Privileged</u>.

Defendants argue they had absolute privilege under the North Dakota Century Code to falsely and maliciously smear Sophia with accusations that she participated in deploying bombs to harm law enforcement officers or damage property.[2]  But the fact-intensive question of whether Defendants were properly discharging their official duties in making those statements is not ripe for disposition on the pleadings, as evidenced by Defendants' improper reliance on numerous external exhibits.

A communication is privileged if "made [i]n the proper discharge of an official duty."  N.D. Cent. Code Ann. § 14-02-05 (West 2018).  While arguing that the Court decides whether a privilege exists under the circumstances of the communication at issue, Iverson Mot. to Dismiss 6, Iverson omits the critical corollary:  the jury must resolve any factual dispute regarding those circumstances.  That is, where the circumstances are disputed, "[i]t is for the court…to decide

---

[2] Iverson takes the lead in making this argument with the other defendants incorporating his arguments by reference.

whether the facts *found by the jury* made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged."  Restatement (Second) of Torts § 619 cmt. a. (1977) (emphasis added); *see Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 79 (N.D. 1991) (favorably citing Restatement (Second) of Torts § 619).

As an initial matter, Iverson mischaracterizes Plaintiff's position.  She does not claim that the mere fact she sued Iverson in his individual capacity defeats absolute privilege.  Instead, she sued Iverson in his individual capacity because he was not properly discharging any of his official duties when he defamed her.  In short, the relevant inquiry is the scope of Iverson's official duties. Iverson argues those duties are described by a job questionnaire and description he attaches to his motion to dismiss.  Iverson Mot. to Dismiss Exs. 1, 2.  Without any opportunity to take discovery, Plaintiff has no basis to confirm whether these documents properly describe Iverson's duties, especially with respect to his involvement in the DAPL protests.  The fact that Iverson resorts to job duties as the crux of his argument distinguishes this case from those involving statutory duties that may be suited for resolution on the pleadings.  Indeed, as the North Dakota Supreme Court has held, the traditional circumstance in which an absolute privilege attaches is a communication that "is required by statute" or otherwise "made in the discharge of a duty under express authority of law."  *Stafney v. Standard Oil Co.*, 299 N.W. 582, 588 (N.D. 1941).  Defendants do not claim that any of the statements at issue here were required by statute.

Without a controlling statute, the "official duty" issue here is necessarily mired in factual details regarding the nature and scope of Iverson's job duties.  Even if the Court were to consider the "matters outside the pleadings" that Iverson proposes,[3] his two exhibits do not resolve the issue.

---

[3] As explained above, the Court should not consider these exhibits because their accuracy, applicability, and comprehensiveness are subject to reasonable dispute, cannot be determined from the documents themselves, and require discovery to vet.

None of the carefully demarcated job duties described in those documents involves updating the public on criminal investigations unrelated to vehicle safety.  It is not enough to argue that Iverson's job duties include speaking to the press.  That is too broad and proves too much. Defendant Iverson is not tasked with speaking to the press about any and all matters.  The relevant inquiry is which topics are within the scope of Iverson's duty to speak to the press.  His questionnaire provides the answer:  the "primary purpose" of his position is "[to] direct and carry on a public education and information program and assist and cooperate with all governmental or private agencies, organizations, or groups in order to encourage better and safer driving practices. *The overall purpose is for the reduction of motor vehicle crashes*."  Iverson Mot. to Dismiss Ex. 1 at #12 (emphasis added).  Similarly, the purpose of Iverson's work unit is to provide a public education and information program "for the purpose of reducing the number of motor vehicle crashes."  *Id.* at #11.  The circumstances around Sophia's injury have nothing to do with traffic safety.

As one of Defendants' leading authorities holds, "the correct inquiry" is two-fold: "whether the action of distributing the press release *and the release's contents* were related to [the employee's] duties." *Novoselsky v. Brown*, 822 F.3d 342, 350 (7th Cir. 2016).  Because the content of Iverson's comments about Sophia do not relate to the scope of his press responsibilities—the dissemination of information designed to reduce motor vehicle accidents—his exhibits only invite further development of the relevant facts and do not resolve the question.  *See Pulkrabek v. Sletten*, 557 N.W.2d 225, 226 (N.D. 1996) ("Even in the case of an absolute privilege [], however, a communication must be pertinent to be free of liability.")  As a result, his motion to dismiss fails.

Even Iverson recognizes that his expressly demarcated job duties do not contemplate public announcements of the type that took place here, as he urges the Court to find an "implied" duty to

address the subjects at issue in his statements, citing the out-of-state case, *Small v. McRae*, 651 P.2d 982, 992 (Mont. 1982). Iverson Mot. to Dismiss 14. But the analogy to *Small* does not hold. In *Small*, the court found that the official's express duty under a collective bargaining agreement to provide advance notice to an academic chairperson that he was being removed from that role subsumed a related duty to provide the reasons for the termination. By contrast, here, rather than seeking to claim a duty naturally subsumed within another, Iverson is claiming a wholly distinct and unrelated duty. His express duty to provide information to the public on traffic safety cannot possibly be deemed to imply a duty to provide information on purported bomb-rigging activity.

The Eight Circuit's decision in *Alternate Fuels, Inc. v. Cabanas*, 435 F.3d 855, 859 (8th Cir. 2006), frequently cited in Iverson's motion, highlights the importance of providing the parties the opportunity to develop the relevant factual record on the absolute privilege question. The public official in *Cabanas* purportedly interfered with a potential private transfer of mining permits by telling the buyer that his department would never approve the transfer. *Id.* Based on testimony provided by the official's supervisor, the court held that the government official was not entitled to absolute privilege because he did not have the authority to make decisions regarding the transfer. *Id.* Similarly, testimony and other evidence is needed here to determine the scope of Iverson's job duties. The fact that Iverson is already relying on supposed "implied" job duties only underscores the importance of discovery here.

The same conclusion applies to the other defendants. The sum total of the County Defendants' arguments is that Sheriff Kirchmeier was the designated chair of the Uniform Incident Command Policy Group and the overall incident commander responding to the DAPL protests while Sheriff Laney was a member of that group and an Operations Commander. Cty. Defs. Mot. to Dismiss 34–35. These titles tell us nothing about what Kirchmeier's and Laney's actual job

27

duties were.  *See Barr v. Matteo*, 360 U.S. 564, 573–74 (1959) (holding that absolute privilege turns not on an official's title, but on his actual job duties).  In *Barr*, where the matter was on appeal following a jury trial, the Supreme Court held based on the full record present there that absolute privilege applied to the public official's press release.  So too here, the analysis must extend far beyond the operational titles held by Kirchmeier and Laney and must delve into their particular job duties.  *See, e.g.*, *Hanania v. Loren-Maltese*, 319 F. Supp. 2d 814, 838 (N.D. Ill. 2004) (town president's admission that issuing press releases was not her job precluded claim of absolute privilege).  As such, the County Defendants' motion to dismiss fails as to Plaintiff's defamation claim as well.[4]

## VII.   PLAINTIFF IS ENTITLED TO SEEK INJUNCTIVE RELIEF ON HER EXCESSIVE FORCE CLAIMS.

Defendants argue that the Complaint does not allege a threat of future injury that is "real and immediate" and therefore Plaintiff lacks standing to seek injunctive relief as a remedy for her excessive force claims.[5]  Cty. Defs. Mot to Dismiss 36.  Standing to seek injunctive relief requires a "showing that the plaintiff faces a threat of ongoing or future harm."  *Park v. Forest Serv.*, 205 F.3d 1034, 1037 (8th Cir. 2000).  The Complaint alleges facts that imply such a threat.  Sophia is a passionate environmentalist and committed social justice advocate who regularly protests

---

[4] While Iverson correct observes that some courts have concluded statements in certain press releases were subject to absolute privilege, Iverson Mot to Dismiss 9–10, other court have found to the contrary.  *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 261 (1993); *Harrington v. Wilber*, 353 F. Supp. 2d 1033, 1043 (S.D. Iowa 2005); *Bender v. City of Seattle*, 99 Wash. 2d 582 (1983) ("Although the release of information to the press and public by police officers is a very important function, we are persuaded that such communications do not rise to the level of such compelling public policy as to require an absolute privilege."); *Trentecosta v. Beck*, 703 So. 2d 552 (La. 1997) (qualified privilege applied to statements of results of investigation and fact of arrest but not to officer's unfounded statements that defendant had bilked charitable organizations).  This only underscores the need for discovery into Defendants' job duties.

[5] Defendants do *not* contest Plaintiff's standing to seek injunctive relief on her defamation claim.

pipelines.  Compl. ¶ 78.  She has protested DAPL in Morton County in the past, but she is afraid to do so in the future because of the safety threat to even peaceful protesters posed by Morton County's practice of equipping inadequately trained officers with flashbangs.  Compl. ¶¶ 75–76. Plaintiff is not aware of any disavowal of this practice by Morton County.  To the contrary, Morton County is actively contesting Plaintiff's request for an injunction requiring adequate training.

These allegations are analogous to those made in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 185–89 (2000).  In *Laidlaw*, environmentalists alleged they had previously fished, hiked, and camped on lands near the defendant's plant, but no longer felt comfortable doing so because of the defendant's pollution.  *Id.* at 181–83.  The Supreme Court found these allegations sufficient to confer standing to seek injunctive relief.  *Id.*  Plaintiff similarly has alleged facts implying that Morton County's ongoing practice of inadequately training officers equipped with flashbangs makes her uncomfortable continuing her desired protest activities.  As a result, a finder of fact could conclude that, absent the injunction Plaintiff requests, "the defendant[s'] allegedly wrongful behavior will likely occur or continue."  *Id.* at 190.

The Eighth Circuit has historically granted injunctions similar to the one requested here. *See, e.g., Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 529 (8th Cir 2005) (enjoining juvenile officer from removing students from boarding school where district court had concluded prior removal of students was unconstitutional); *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492, 1494 (8th Cir. 1988) (granting parents' request to permanently enjoin school and band director from conducting mandatory prayer sessions).  In *Steele*, the Eighth Circuit affirmed a permanent injunction against future mandatory prayer sessions even though it was not clear that the students who had been forced to participate in the past prayer sessions would be required to participate in future ones.  To the contrary, the school and the band director expressly disavowed

an intent to continue such prayers in the future. *Id.* Morton County has not even disavowed its practice of inadequately training law enforcement officers in the use of flashbangs, nor has it disavowed the deployment of flashbangs at and against non-threatening protesters.

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), does not compel a different result. In *Lyons*, the Supreme Court rejected the plaintiff's requested injunction against the use of chokeholds by Los Angeles police officers because the plaintiff had not shown that "the City ordered or authorized police officers to act in such a manner." *Id.* at 105–106. The Complaint here does not share that defect, and instead expressly alleges that Morton County authorized or had a policy or custom of allowing inadequately trained law enforcement officers to deploy flashbangs in dangerous ways. Compl. ¶¶ 75, 210, 212–213. The Complaint also directly alleges that Morton County has been deliberately indifferent to the need to adequately train officers who are equipped with flashbangs and that this indifference was a proximate cause of Sophia's injury. Compl. ¶¶ 218–221.

## CONCLUSION

For the reasons stated above, Plaintiff requests that the Court deny Defendants' motions to dismiss in full.

Dated:  February 25, 2019                    Respectfully submitted,

                                             */s/ Edward C. Barnidge*
                                             Edward C. Barnidge
                                             Benjamin M. Stoll
                                             WILLIAMS & CONNOLLY LLP
                                             725 Twelfth Street Northwest
                                             Washington, DC 20005
                                             (202) 434-5000
                                             ebarnidge@wc.com
                                             bstoll@wc.com

                                             *Attorneys for Plaintiff*