**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Sophia Wilansky, | | |
| | Plaintiff, | |
| vs. | | Civil No.: 1:18-cv-236 |
| Morton County, North Dakota; "John Doe" law enforcement officer in his personal capacity; Kyle Kirchmeier, in his personal and official capacities; Paul Laney, in his personal capacity; and Thomas Iverson, in his personal capacity, | | |
| | Defendants. | |

**ORDER GRANTING, IN PART, AND CONVERTING TO SUMMARY JUDGMENT AND DEFERRING, IN PART, COUNTY DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANT IVERSON'S MOTION TO DISMISS**

[¶1]    THIS MATTER comes before the Court on the Motions to Dismiss filed by State Defendant Major Thomas Iverson ("Defendant Iverson") and County Defendants Morton County, Sheriff Kyle Kirchmeier, and Former Sheriff Paul Laney ("County Defendants"). Doc. Nos. 26, 28. Plaintiff, Sophia Wilansky ("Wilansky"), filed a Consolidated Opposition to both Motions on February 25, 2019. Doc. No. 35. Defendant Iverson replied in support of his Motion on March 8, 2019, and the County Defendants replied in support of their Motion on March 21, 2019. Doc. Nos. 38, 41. For the reasons explained below, Defendant Iverson's Motion to Dismiss is **GRANTED** and County Defendants' Motion to Dismiss is **GRANTED, IN PART, AND CONVERTED TO SUMMARY JUDGMENT AND DEFERRED, IN PART.**

1

## I.   FACTUAL BACKGROUND

[¶2]      The facts are taken from the Complaint and assumed to be true for purposes of ruling on the present Motions. See Minnesota Majority v. Mansky, 708 F.3d 1051, 1056 (8th Cir. 2013).

[¶3]      Wilansky, a citizen and resident of the State of New York, traveled to North Dakota in the fall of 2016 to join the Standing Rock Sioux Tribe and its supporters in advocating against the construction of the Dakota Access Pipeline ("DAPL"), which was slated to cross a few miles north of the Standing Rock Tribe's Reservation. Doc. No. 1, ¶¶6, 20, 79. The Tribe opposed the location and construction of the Pipeline, asserting it would endanger their water supply, disrupt cultural sites, and violate their sovereignty. Doc. No. 1, ¶6. Wilansky, who describes herself as "a passionate environmentalist and committed social justice advocate," joined the Tribe and its supporters in vocalizing this message, including living at the protestors' main camp, Oceti Sakowin, located near Highway 1806 and the Backwater Bridge. Doc. No. 1, ¶¶25, 78. Wilansky joined thousands of protestors residing at Oceti Sakowin between September and December of 2016. Doc. No. 1, ¶27.

[¶4]      Wilansky asserts prior to September 2016, there was minimal law enforcement presence, even with the protestors employing periodic protests as early as April 2016. Doc. No. 1, ¶¶28-29. Wilansky asserts this minimal presence changed due to an incident on September 3, 2016, involving the protestors and private security guards hired by Energy Transfer Partners. Doc. No. 1, ¶30. Wilansky indicates several protestors were bitten by security dogs handled by the security guards. Doc. No. 1, ¶30. According to Wilansky, Morton County's law enforcement officials faced widespread criticism after the "attack." Doc. No. 1, ¶30. As a result, she asserts, the Morton County Sheriff's Office began "maintaining a larger presence at and responding more aggressively to DAPL protests." Doc. No. 1, ¶31.

[¶5]     This larger presence included law enforcement agencies from other North Dakota sheriff's offices, police departments, and the North Dakota State Highway Patrol. Doc. No. 1, ¶¶32, 33. In addition, the Governor of North Dakota activated the North Dakota National Guard on September 8, 2016 to provide assistance to law enforcement at the DAPL protest sites. Doc. No. 1, ¶33. In total, more than 400 law enforcement officers from across North Dakota were assisting Morton County by early October of 2016. Doc. No. 1, ¶36.

[¶6]     In October 2016, North Dakota issued an "Emergency Management Assistance Compact". Doc. No. 1, ¶37. In response, law enforcement agencies from numerous states, including, Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska, joined Morton County and other North Dakota law enforcement agencies at the protest sites. Doc. No. 1, ¶37. Wilansky asserts these local and out-of-state law enforcement personnel worked "under the supervision and direction of Defendant Kirchmeier and acted under the authority of the Morton County Sheriff's Office." Doc. No. 1, ¶¶34, 38. Many of these officers, Wilansky asserts, "lacked adequate training in the appropriate use of less-lethal weapons." Doc. No. 1, ¶¶35, 39. Almost 1,000 law enforcement officials were assisting Morton County by the end of October of 2016. Doc. No. 1, ¶40.

[¶7]     Wilansky alleges as the law enforcement presence grew, the militarized nature of these officials did as well. Doc. No. 1, ¶41. She asserts law enforcement officers arrived in armored vehicles, wore tactical riot gear, removed their badges, and carried riot batons. Doc. No. 1, ¶41. She alleges Defendants Kirchmeier and Morton County equipped these officers with less-lethal weapons throughout October and November 2016. Doc. No. 1, ¶42. According to the Complaint, the officers deployed less-lethal weapons against DAPL protestors, including:

> OC spray (commonly known as "pepper spray"), sponge bullets (commonly known as "rubber bullets"), CS grenades and cannisters (commonly known as "tear gas

> grenades"), beanbags, stinger ball grenades (grenade-like objects that expel numerous small rubber pellets), Tasers, and flash-sound diversionary devices (commonly known as "flashbangs" and sometimes referred to as "concussion grenades" or "percussion grenades")

Doc. No. 1, ¶¶42, 43, 45.

[¶8]     In particular, Wilansky alleges officers used rubber bullets and pepper spray on October 22, 2016, pepper spray, shotguns loaded with sponge bullets and bean bags, and other less-lethal weapons on October 27, 2016, and tear gas on November 2, 2016. Doc. No. 1, ¶¶47-49. She contends officers "repeatedly aimed and launched flashbangs and other explosive less-lethal munitions at individuals and/or into crowded areas." Doc. No. 1, ¶76.

[¶9]     Wilansky asserts law enforcement officers who deployed these less-lethal weapons, particularly explosives, during October and November 2016 lacked sufficient training to use these weapons. Doc. No. 1, ¶75. These weapons, Wilansky argues, should only be used by law enforcement officers who have successfully completed formal training in their use. Doc. No. 1, ¶53. She points to a number of sources lending credence to her statement: the manufacturers and suppliers of these weapons, warnings on the product specifications themselves, statements from The National Tactical Officers Association, and standard policies in law enforcement agencies. Doc. No. 1, ¶¶52, 60, 71.

[¶10]     One specific warning some of these sources issue, which Wilansky asserts is vital, is explosive less-lethal munitions should never be fired into crowds or directly at individuals. Doc. No. 1, ¶54. To support her view of the dangerousness of these weapons, Wilansky provides several examples of individuals who have suffered injuries due to flashbangs or other explosives, including those who lost hands, arms, and suffered other serious injuries. Doc. No. 1, ¶¶61-66. She asserts "numerous Courts have ruled that throwing flashbangs without conducting a prior visual

inspection of the deployment area to ensure no one is present constitutes unconstitutional excessive force." Doc. No. 1, ¶67.

[¶11]    On this basis, she asserts "[a]s of November 2016, it was obvious to any qualified and reasonably competent law enforcement supervisor and policy-maker that flashbangs and other explosive less-lethal munitions are dangerous and can cause serious bodily harm if denotated in close proximity to an individual." Doc. No. 1, ¶72. Wilansky further claims only officers who have successfully completed training on their use should be given such weapons. Doc. No. 1, ¶73.  She avers "these explosive less-lethal munitions should never be launched at individuals or in crowded areas." Doc. No. 1, ¶¶74.

[¶12]    This is relevant, she claims, because her injuries were allegedly a result of an officer using a flashbang on November 21, 2016. Doc. No. ¶84. Wilansky maintains the injury occurred near a barricade set up by Morton County immediately north of the Backwater Bridge ("the Bridge") on Highway 1806. Doc. No. 1, ¶80. The barricade consisted of "concrete roadblocks covered in multiple rings of concertina razor wire," and spanned the width of the highway. Doc. No. 1, ¶81. In front of the barricade sat two large burned-out vehicles. Doc. No. 1, ¶81. The barricade's location, she maintains, prevented individuals from travelling between Oceti Sakowin Camp and Bismarck-Mandan on Highway 1806. Doc. No. 1, ¶82.

[¶13]    Wilansky asserts throughout November of 2016 protestors attempted to negotiate with Morton County to reopen the Backwater Bridge, but were unsuccessful. Doc. No. 1, ¶83. When these negotiations failed, on the afternoon of November 20, 2016, several protestors towed one of the burned-out vehicles off the Bridge with a semi. Doc. No. 1, ¶85. Protestors attempted to tow away the second burned-out vehicle, but law enforcement prevented them from doing so. Doc. No.

1, ¶85. After this occurred, protestors continued to gather over the next several hours south of the barricade on the Backwater Bridge to protest the continued closure of the Bridge. Doc. No. 1, ¶86.

[¶14]     In response, Morton County issued a request for assistance of all available law enforcement officers in the state of North Dakota. Doc. No. 1, ¶87. "Dozens of law enforcement officers arrived at Backwater Bridge." Doc. No. 1, ¶88. Wilansky asserts "Morton County equipped these officers with tactical riot gear, police shields, and less lethal weapons, including sponge bullets, beanbags, tear gas canisters, pepper spray, and flashbangs." Doc. No. 1, ¶89. Wilansky alleges "many of the law enforcement officers equipped with less-lethal weapons lacked sufficient training in their proper use and deployment." Doc. No. 1, ¶90.

[¶15]     Wilansky asserts over the course of the protest on November 20, 2016, law enforcement officers used dozens of less-lethal weapons, "repeatedly fir[ing] tear gas canisters into crowds of protestors on the bridge." Doc. No. 1, ¶94. In addition, she asserts law enforcement officers "launched numerous explosive less-lethal munitions, including flashbangs, directly into crowds of protestors." Doc. No. 1, ¶95. However, "by midnight almost all of the protestors had returned to Oceti Sakowin or otherwise dispersed." Doc. No. 1, ¶97.

[¶16]     Wilansky asserts that by 2:00 a.m. on November 21, 2016, only a few protestors remained on the Bridge, chatting quietly near makeshift campfires. Doc. No. 1, ¶98. She asserts there were no active protests happening. Doc. No. 1, ¶98. She maintains "the area around the bridge was quiet and tranquil," with a few protestors occasionally approaching the barricade to communicate with law enforcement. Doc. No. 1, ¶¶99, 100.

[¶17]     Wilansky herself approached the barricade near the remaining burned-out vehicle slightly before 4:00 a.m. to chat with other nearby protestors. Doc. No. 1, ¶101. She asserts the other protestors departed from the area leaving her alone in front of the barricade. Doc. No. 1, ¶101. She

alleges she "did not yell at, menace, or threaten the law enforcement officers on the other side of the barricade in any way," nor did she have any weapons. Doc. No. 1, ¶102. Wilansky maintains another protestor approached her to engage in a conversation while she was standing in front of the barricade when law enforcement ordered them to "move away from the burned-out vehicle." Doc. No. 1, ¶¶104-105. She then claims the following events happened:

> Before [she] had a chance to react to this order, law enforcement officers began firing sponge bullets at her and the other water protector. One of these bullets hit [her] in the upper left arm. It left a mark that is still visible today. [She] began retreating from the barricade and pleaded with the officers to stop firing at her. While [she] was still retreating, Defendant Doe fired an explosive less-lethal munition at her. Upon information and belief, the explosive less-lethal munition was a flashbang. Upon information and belief, the flashbang was a Defense Technology low roll non-reloadable distraction device. This munition hit [her] in the left forearm and exploded. The explosion blew through [her] jacket and nearly severed her left hand from her arm. The blast destroyed almost all of the arteries, skin, tissue, muscles, nerves, tendons, and bone in her left forearm. Blood poured out of the wound and filled the sleeve of her jacket. Her forearm bone was protruded from her sleeve. [She] screamed in pain and fell to the ground. While [she] lay in the road, bleeding and crying out in pain, the law enforcement officers on the scene laughed and cheered. They congratulated Defendant Doe on his marksmanship.[1]

Doc. No. 1, ¶¶105-114.

[¶18]    Wilansky asserts law enforcement did not assist her; rather, protestors loaded her into a car and brought her to the Prairie Knights Casino and Resort to wait for an ambulance. Doc. No. 1, ¶¶118-119. She was eventually flown to Hennepin County Medical Center in Minneapolis, Minnesota. Doc. No. 1, ¶120. She was brought into surgery where the doctors removed a small piece of shrapnel, which was then sent to the pathology department to be preserved and photographed. Doc. No. 1, ¶122.

---

[1]The Defendants assert Wilansky's injuries were self-inflicted and occurred when she was attempting to create an explosive device using a propane tank. The Defendants maintain the home-made bomb exploded, causing Wilansky's injuries. However, the Court does not consider this evidence as it is not in the Complaint.

[¶19]    After the incident, Wilansky alleges, "[i]n an attempt to avoid the ensuing negative media coverage, Defendants Kirchmeier, Iverson, Laney, and Morton County embarked on a public campaign of misinformation and false accusations." Doc. No. 1, ¶126. For example, she asserts Defendant Kirchmeier accused protestors near Wilansky of "hurling explosive fuel canisters at law enforcement officers and suggested that [she] may have been injured by one of these," also stating, "We don't know where [the explosion] came from, but it wasn't law enforcement." Doc. No. 1, ¶¶127-128. She contends Morton County Sheriff's Office Spokesperson, Maxine Herr, stated "[n]one of our equipment would cause an injury like that," and the device that injured Wilansky "wasn't from our law enforcement, because we didn't deploy anything that should have caused that type of damage to her arm[.]" Doc. No. 1, ¶129. Wilansky also alleges Herr stated that Wilansky "may have been injured while protesters were 'rigging up their own explosives' to use against law enforcement." Doc. No. 1, ¶129.

[¶20]    Morton County and Defendant Kirchmeier were not the only ones to issue statements on the incident, according to Wilansky. She maintains Defendant Iverson issued written statements which repeated Defendants Kirchmeier and Morton County's statements. Doc. No. 1, ¶130. She asserts Defendant Iverson stated in one of these written statements that the injuries Wilansky "sustained are inconsistent with any resources utilized by law enforcement and are not a direct result of any tools or weapons used by law enforcement," further stating to news media that no flashbangs were used by officers at the Backwater Bridge on November 20-21. Doc. No. 1, ¶¶131,132. In other statements, Wilansky asserts Defendant Iverson stated "protestors rolled metal cylinders toward [Wilansky] immediately before she was injured, and that 'Law Enforcement had received information that protest[e]rs were using one-pound propane cylinders as explosives,' and that 'small propane tanks rigged as improvised explosive devices' were recovered from the crime

scene." Doc. No. 1, ¶133. Wilansky alleges Defendant Iverson also wrote "at the time [Wilansky] was injured, she and other protestors nearby exhibited 'strange mannerisms [that] led law enforcement to believe they were there for a purpose with a calculated effort to either cause harm or breach the line." Doc. No. 1, ¶134. Lastly, she asserts Defendant Iverson wrote "at the time [Wilansky] was injured, water protectors were broadcasting over the radio that protestors were arriving at Backwater Bridge with guns, possibly to charge the police barricade." Doc. No. 1, ¶135.

[¶21]    Wilansky asserts Defendants Kirchmeier and Laney also made other public statements at a December 3, 2016, news conference. Doc. No. 1, ¶136. She maintains at this conference the Defendants asserted she caused her own injury by "participating in the attempted use of improvised explosive devices against law enforcement officers." Doc. No. 1, ¶137. Specifically, she asserts Defendant Laney stated:

> There were explosive instruments being handled by people on that bridge that night. . . . Whether their intent was to throw them at us or whether their intent was to blow up that truck, I don't know. But I do know that they were handling explosive devices and they handled it wrong and something happened.

Doc. No. 1, ¶138.

[¶22]    Wilansky further asserts Defendants Kirchmeier and Morton County repeated in a legal filing on December 22, 2016 the "accusation that [Wilansky] was injured by the premature explosion of an improvised explosive device created by DAPL protesters." Doc. No. 1, ¶139. She also asserts in a May 2017 presentation, Defendant Laney showed a picture of Wilansky's arm and stated:

> You can see the damage she did to her arm. What happened— our people saw her sneak up—the remaining five-ton vehicle that was left there, she had taken cover behind that. Whether she was going to use this propane bomb to throw at our lines or whether she was going to try to place it under the truck to blow it up, we don't know. We don't know what that intent was. But it went off in her arms and that's what did the damage and that's what hurt her…. [T]here was nothing we had in our inventory that we would have launched at people that would do that.

Doc. No. 1, ¶147.

[¶23]     Wilansky asserts these statements by Defendants Morton County, Kirchmeier, Iverson, and Laney are false. Doc. No. 1, ¶140. As support for this assertion, she maintains in September 2016 law enforcement purchased hundreds of flashbangs expressly for DAPL protests and videos of the November 20, 2016 protest show officers launching flashbangs at protesters. Doc. No. 1, ¶¶141-142. She also denies participating in the creation or deployment of an improvised explosive device, and she maintains she was not injured by the same. Instead, she argues her injuries were caused by "an explosive less-lethal munition, which was launched at her by Defendant John Doe." Doc. No. 1, ¶¶143-144.

[¶24]     Wilansky maintains Defendants Kirchmeier, Iverson, Laney, and Morton County "made the defamatory statements above, and others like them, knowing that they were untrue, with actual malice, or with reckless indifference to the unreasonable risk that they were false." Doc. No. 1, ¶148. She further avers they made the statements "knowing that they would damage [her] reputation in order to discredit her and deflect blame for her injury away from Morton County and the law enforcement officers acting under its authority, supervision, and direction." Doc. No. 1, ¶149. She asserts none of the Defendants have "retracted or corrected their defamatory statements." Doc. No. 1, ¶145.

[¶25]     In addition, Wilansky asserts she attempted to identify the specific law enforcement officer who allegedly injured her, but her efforts were blocked by law enforcement. Doc. No. 1, ¶ H. She states that on November 22, 2016, in between surgeries, "FBI agents arrived at her hospital room and – without a warrant – confiscated her clothes and the shrapnel removed from her arm." Doc. No. 1, ¶150. After her surgeries and when she returned home, she claims she attempted to identify Defendant Officer Doe. Doc. No. 1, ¶151.

[¶26]     In February of 2017, she states she sent Open Records Requests to Morton County, the North Dakota State Highway Patrol, and other law enforcement agencies to request all videos from the night in question at the Backwater Bridge. Doc. No. 1, ¶153. She asserts she was told in response that if the videos exist, they were protected from disclosure due to the ongoing criminal investigation. Doc. No. 1, ¶154. One dashcam video, however, was released by Morton County. Doc. No. 1, ¶155.

[¶27]     Wilansky asserts the video covers the time frame of approximately 3:49 a.m. to 4:15 a.m. on November 21, 2016. Doc. No. 1, ¶155. She asserts there are two unexplained gaps in audio and video, including one gap for five-minutes "that appears to cover the exact time [Wilansky] was injured." Doc. No. 1, ¶155. She indicates the video shows no active protesting, no one yelling, law enforcement relaxed, and a few protestors roaming around on the Backwater Bridge. Doc. No. 1, ¶¶156, 157. She also points out that "the officers do not appear scared or worried that there might be an explosive device nearby, even when they order protestors away from the burned-out vehicle." Doc. No. 1, ¶157. To Wilansky, this "is inconsistent with the public accusations made by Defendants that protestors were throwing Coleman propane tanks rigged to explode at law enforcement officers and that [Wilansky] was planting such an explosive at the barricade." Doc. No. 1, ¶157.

[¶28]     Wilansky also sent Morton County an Open Records Request in March 2017, requesting use of force reports from November 20-21, policies pertaining to less-lethal weapons and dash/body cameras, and also a list of officers present at the Backwater Bridge on November 21, 2016. Doc. No. 1, ¶159. Morton County denied those requests again on the grounds of there being an open investigation. Doc. No. 1, ¶159. In April 2017, Wilansky made an appeal of the denial of

the records request to the North Dakota State Attorney General, who affirmed the denial in August 2017. Doc. No. 1, ¶¶160-161.

[¶29]    While Wilansky made Open Records Requests to Morton County for any document related to herself and Freedom of Information Act requests to the FBI, DOJ, and ATF, these requests were all denied largely on similar grounds:  there was an active investigation. Doc. No. 1, ¶¶162-164. Wilansky was apparently the subject of a criminal investigation for her alleged use of a home-made propane bomb at the scene of the DAPL protest. Such records are not available as open records under North Dakota law. See N.D.C.C. § 44-04-18.7.

[¶30]    She also filed a lawsuit against the United States in February 2018, in the Federal District Court for the District of Minnesota, requesting the Court to compel the FBI to return the piece of shrapnel and clothing confiscated when she was in the hospital so she could conduct forensic testing. Doc. No. 1, ¶165. The United States, and Morton County which intervened, argued, "it was unnecessary for the court to compel the return of Sophia's clothing and shrapnel because Sophia could file a civil rights lawsuit and demand these items in discovery." Doc. No. 1, ¶167. The Court agreed, dismissing her lawsuit. Doc. No. 1, ¶168. Wilansky asserts she has still not been able to identify the John Doe Defendant who allegedly injured her. Doc. No. 1, ¶169.

[¶31]    Wilansky has undergone numerous surgeries to repair her arm. Doc. No. 1, ¶¶170-175. She avers the injury has "robbed her of her independence and caused her extraordinary mental trauma." Doc. No. 1, ¶183. She also asserts the "defamatory statements made by Defendants have caused [her] significant reputational, social, and occupational harm." Doc. No. 1, ¶185.

[¶32]    On November 19, 2018, Wilansky filed a Complaint embodying eight causes of action including (1) Excessive Force in Violation of 42 U.S.C. § 1983 (Fourth Amendment) (John Doe Law Enforcement Officer); (2) Excessive Force in violation of 42 U.S.C. § 1983 (Fourteenth

Amendment); (3) Excessive Force in violation of 42 U.S.C. § 1983 (<u>Monell v. Dep't of Social Serv.</u>, 436 U.S. 658 (1977)) (Morton County and Kyle Kirchmeier in his official capacity); (4) Assault and Battery (John Doe Law Enforcement Officer and Morton County); (5) Intentional Infliction of Emotional Distress (John Doe Law Enforcement Officer and Morton County); (6) Negligent Infliction of Emotional Distress (John Doe Law Enforcement Officer and Morton County); (7) Negligence and Violation of North Dakota Century Code §§ 9-10-01 and 9-10-06 (John Doe Law Enforcement Officer, Morton County, and Kyle Kirchmeier in his official capacity); and (8) Defamation and Violation of North Dakota Century Code § 14-02-01 (Paul Laney, Thomas Iverson, Morton County, and Kyle Kirchmeier in both his official and personal capacities). Doc. No. 1. In lieu of filing Answers, the Defendants filed these respective Motions to Dismiss.

## II.   <u>LEGAL DISCUSSION</u>

### 1.   <u>Causes of Action the Court Will Dismiss</u>

[¶33]    For clarity, the Court will first consider Wilansky's claims that will be dismissed: (2) Excessive Force in violation of 42 U.S.C. § 1983 (Fourteenth Amendment); (3) Excessive Force in violation of 42 U.S.C. § 1983 (<u>Monell v. Dep't of Social Serv.</u>, 436 U.S. 658 (1977)) (Morton County and Kyle Kirchmeier in his official capacity); and (8) Defamation and Violation of North Dakota Century Code § 14-02-01 (Paul Laney, Thomas Iverson, Morton County, and Kyle Kirchmeier in both his official and personal capacities). Doc. No. 1.

### A.   <u>Standard of Review</u>

[¶34]    The Court applies the following standard to these specific claims. Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6)

of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. When considering a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true. Detailed factual allegations are not necessary under the Rule 8 pleading standard, rather a plaintiff must set forth grounds of its entitlement to relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" Aschcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). The determination of whether a complaint states a claim upon which relief can be granted is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. The court must consider whether the allegations set forth in the complaint "plausibly give rise to an entitlement to relief." Id. at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling him or her to relief. Ulrich v. Pope Cty., 715 F.3d 1054, 1058 (8th Cir. 2013).

## B. Facts Considered

[¶35]    "When considering . . . a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 (8th Cir. 2012). Those materials include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." Hughes v. City of Cedar Rapids, Iowa, 840 F.3d 987, 998 (8th Cir. 2016). Courts may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public

record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment." Miller, 688 F.3d at 931. However, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

[¶36]    The Defendants request the Court to consider a number of extrinsic documents they provided in conjunction with their Motions to Dismiss and take judicial notice of a number of facts not contained in Wilansky's Complaint without converting their Motions to Dismiss into Motions for Summary Judgment. These extrinsic documents include an emergency declaration issued by Morton County, an Executive Order by former Governor Jack Dalrymple, numerous press releases by law enforcement agencies, communications between government officials, warranty deeds, leases, and maps, among other documents. See Doc. Nos. 27-1 – 27-3; 30-1 – 30-13. In addition, the Defendants urge the Court to take judicial notice of facts contained in separate orders issued by this District in other DAPL-related cases such as Dakota Access, LLC v. Archambault, et al, Case No. 1:16-cv-296, and Dundon et al v. Kirchmeier et al, Case No. 1:16-cv-406. The Defendants request the Court to take judicial notice of at least twenty-three facts embedded in some of these extrinsic documents.

[¶37]    While the Court could go through a detailed analysis of each of the extrinsic facts provided by the Defendants to determine if they are "embraced by the pleadings" or meet another exception for consideration at this stage of the proceedings, the Court finds it unnecessary to do so as it relates to these claims. Unless otherwise noted, the Court has considered only the facts on the face of Wilansky's Complaint and determines, based on the same, these causes of action fail

to state viable claims for relief. Causes (2), (3), and (8) will therefore be dismissed for the following reasons.

### C. Causes of Action

#### i. *Excessive Force (Fourteenth Amendment) (Defendant Officer Doe)*

[¶38]     "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." Id. "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Id. (citation omitted).

[¶39]     While the parties agree an excessive force claim may be brought under the Fourteenth Amendment, they disagree as to the standard to be applied. The Defendants argue the standard is whether the law enforcement officer's specific application of force "shocks the conscience" which would include a subjective analysis into the officer's state of mind and whether he or she acted maliciously and sadistically for the purpose of causing harm. Doc. No. 29, p. 24. Wilansky, in contrast, argues the "shocks the conscience" standard was abrogated in 2015 by the Supreme Court in Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015) and supplanted with the "objective reasonableness" standard applied in Fourth Amendment excessive force cases.  Doc. No. 35, p. 11. For the reasons stated below, the Court agrees with the Defendants and will apply the "shocks the conscience" standard to this case.

[¶40]     To begin, the Supreme Court has noted not "all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments;

rather, [Graham v. Connor, 490 U.S. 386 (1989)] simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 (1997). However, for those excessive force claims that do not fit neatly into the Fourth or Eighth Amendment inquiries, a plaintiff may find reprieve in substantive due process under the Fourteenth Amendment.

[¶41]     If Wilansky was not seized pursuant to the Fourth Amendment but was rather a free citizen or non-detainee at the time Defendant Officer Doe allegedly subjected her to physical injury, her claim would appropriately be brought under the Fourteenth Amendment. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 844-45 (1998) ("Graham 'preserve[s] fourteenth amendment substantive due process analysis for those instances in which a free citizen is denied his or her constitutional right . . .  through means other than a law enforcement official's arrest, investigatory stop or other seizure.'"); see also id. at 844 (quoting Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996) ("[O]utside the context of a seizure . . . a person injured as a result of police misconduct may prosecute a substantive due process claim under section 1983")).

[¶42]     The Supreme Court has also grounded the standard to be applied in Fourteenth Amendment excessive force cases as those applications of force that "shock the conscience." In 1998 in Lewis, a case involving an excessive force claim brought under the Fourteenth Amendment on behalf of a non-detainee, the Supreme Court reiterated "[t]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." Id. at 845-46. (alterations). The Court noted the "cognizable level of executive abuse of power [is] that which shocks the

17

conscience," further noting "the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" Id. The Court went on to explain, "[w]hile the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'poin[t] the way.'" Id.

[¶43]   Wilansky argues the Supreme Court abrogated Lewis' "shocks the conscience" standard in 2015 in Kingsley, instead requiring all excessive force claims brought by any individual, detainee or not, be subjected to the "objective reasonableness" standard applied in Fourth Amendment cases. The Court disagrees. Kingsley did not expressly or implicitly overrule Lewis.

[¶44]   Kingsley sought to address a narrow issue applied to a narrow class of prospective plaintiffs, pretrial detainees. The Supreme Court in Kingsley was tasked with answering "whether, to prove an excessive force claim [under the Fourteenth Amendment], **a pretrial detainee** must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable."[2] Id. at 391-392 (emphasis added). The Court's discussion in Kingsley pertained to the specialized status of individuals as pretrial detainees and why the Court's articulated standard as applied to them specifically was appropriate. See Kingsley, 576 U.S. at 399-98 ("We have said that 'the Due Process Clause protects a **pretrial detainee** from the use of excessive force that amounts to punishment.'") (emphasis added); ("Our

---

[2] In Kingsley, the respondents argued the relevant legal standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment "should be subjective, *i.e.,* that the plaintiff must prove that the use of force was not 'applied in a good-faith effort to maintain or restore discipline' but, rather, was applied 'maliciously and sadistically to cause harm.'" Id. at 400. The Kingsley Court declined the invitation to make the standard a subjective one, instead holding "that **a pretrial detainee** must only show that the force purposely or knowingly used against him was objectively unreasonable." Id. (emphasis added). The Court listed a myriad of factors to consider in assessing objective reasonableness of the force, noting that one of the factors is whether the defendant had a malicious and sadistic purpose to cause harm. Id. The Court explained that while a showing of this factor is "not necessarily a condition for liability," it "might help show that the use of force was excessive." Id. at 402.

standard is also consistent with our use of an objective 'excessive force' standard where officers apply force to a person who, like Kingsley, **has been accused but not convicted of a crime**, but who, unlike Kingsley, is free on bail.") (emphasis added); ("For another thing, experience suggests that an objective standard is workable . . . We are also told that many facilities, including the facility at issue here, train officers to interact with all **detainees** as if the officers' conduct is subject to an objective reasonableness standard.") (emphasis added); ("Finally, the use of an objective standard adequately protects an officer who acts in good faith. We recognize that '[r]unning a prison is an inordinately difficult undertaking.'").

[¶45]     More importantly, <u>Kingsley</u> ended by acknowledging its potential limited application. <u>Kingsley</u>, 576 U.S. at 402 ("We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.").

[¶46]     The Supreme Court in <u>Kingsley</u> did not address the applicability of their newly-articulated "objective reasonableness" standard to cases involving non-detainees and free citizens. In fact, the Supreme Court did not address the "shocks the conscience standard" of <u>Lewis</u>. Many courts, including the Eighth Circuit, have therefore continued to apply the <u>Lewis</u> standard to non-detainees and the <u>Kingsley</u> standard to pretrial detainees. <u>See</u> <u>Ryan v. Armstrong</u>, 850 F.3d 419, 427 (8th Cir. 2017) ("We analyze the excessive force claims of pretrial detainees under an objective reasonableness standard."); <u>Davis v. White</u>, 794 F.3d 1008, 1011 (8th Cir. 2015) ("Davis was a post-arrest detainee at the time of the incident[, and] [i]n <u>Kingsley v. Hendrickson</u>, the Supreme Court recently held that the objective reasonableness standard applies to excessive force

19

due process claims by pretrial detainees."); cf Truong v. Hassan, 829 F.3d 627 (8th Cir. 2016) (applying the "shocks the conscience" standard to actions of city bus driver who forcibly removed passenger, non-detainee, from bus for failing to pay bus fare).

[¶47]    While other circuits[3] have adopted Wilansky's interpretation that the "objective reasonableness standard" in Kingsley is the appropriate standard in *all* excessive force claims under the Fourteenth Amendment, the Eighth Circuit has not made that same ruling. Therefore, because Wilansky's Fourteenth Amendment claim is based upon her status as a non-detainee or free citizen at the time of events in question, the Court will apply the "shocks the conscience standard" from Lewis.

[¶48]    "Whether conduct shocks the conscience is a question of law." Id. Conscience shocking conduct only includes "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." Id. (citing White v. Smith, 696 F.3d 740, 757–58 (8th Cir. 2012). "[T]he alleged substantive due process violations must involve conduct 'so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" Truong, 829 F.3d at 631.

---

[3] For example, the Second Circuit in Edrei v. Maguire, 892 F.3d 525 (2d Cir. 2018) expressly held "Kingsley provides the appropriate standard for all excessive force brough under the Fourteenth Amendment." Id. at 537.  However, the Edrei Court noted it did not believe Kingsley overruled Lewis, but rather "elaborated on it." Id. Explaining that under the Kingsley test, a court considers a myriad of factors to determine objective reasonableness, *including* whether the force "was applied maliciously and sadistically for the very purpose of causing harm." Id. While not a necessary showing to find objective unreasonableness, the Kingsley Court explained a showing of this factor "might help show the use of force was excessive." Id. Under this framework, the Edrei Court explained, "Kingsley teaches that purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force *is* conscience shocking." Id. at 536 (emphasis in original).

[¶49]     "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id. (emphasis in original); see also McCants v. City of Mobile, 752 F. App'x 744, 749 (11th Cir. 2018) ("In a non-custodial situation, like the present one, only a purpose to cause harm unrelated to the legitimate object of law enforcement satisfies the element of arbitrary conduct shocking to the conscience that is necessary for a due process violation."). The Eighth Circuit has further elaborated on the level of culpability a plaintiff must show:

> Proof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold. The lower deliberate indifference standard is sensibly employed only when actual deliberation is practical. By contrast, the intent-to-harm standard most clearly applies in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation. Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury.

Truong, 829 F.3d at 631 (citations omitted).

[¶50]     The Court finds based upon the facts alleged in the Complaint, Wilansky has not shown the Court could find Defendant Officer Doe's alleged use of force "shocks the conscience." By Wilansky's own description of events leading up to the November 21, 2016, incident, law enforcement dramatically increased their presence at DAPL protests beginning in September 2016. Doc. No. 1, ¶31. The tension rising between protestors and law enforcement was evident. This prompted Morton County to not only request assistance from other law enforcement agencies within the State, but also from Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska. Doc. No. 1, ¶37. By the end of October, 1,000 law enforcement officers were providing assistance to Morton County, and the North Dakota National Guard was also assisting. Doc. No. 1, ¶40.

[¶51]   By Wilansky's own account, the protestors and law enforcement had numerous confrontations between September 2016 and November 2016. Doc. No. 1, ¶¶44-50. She asserts officers became militarized, wearing tactical gear, arriving in military-style vehicles, and using crowd-control disbursal tactics. Doc. No. 1, ¶48. Particularly, according to Wilansky, it was the October 27, 2016, confrontation that "dramatically escalated" the dispute between law enforcement and the water protectors." Doc. No. 1, ¶48. It is apparent tensions between officers and protestors continued to grow as the protestors continued to demand the reopening of the Backwater Bridge, which law enforcement refused to reopen and kept barricaded.

[¶52]   The tension grew even more on November 20, 2016, when protestors arrived at the Backwater Bridge with a semi-truck to tow away one of two burned-out vehicles positioned on the Bridge near the barricade. Doc. No. 1, ¶84. After protestors successfully towed away the first vehicle, law enforcement intervened and prevented protestors from trying to remove the second vehicle. These facts suggest law enforcement intended protestors to remain distanced from the burned-out vehicles.

[¶53]   A large protest ensued after this according to Wilansky, with hundreds of protestors gathering south of the Backwater Bridge, and Morton County requesting "the assistance of every available law enforcement officer in the entire state of North Dakota." Doc. No. 1, ¶87. Wilansky asserts the protest lasted for hours, and law enforcement were again equipped with tactical riot gear. Doc. No. 1, ¶90. While Wilansky asserts the protest ended at midnight and "the area around the bridge was quiet and tranquil," she admits protestors were still approaching the barricade to try to communicate with law enforcement after the protestors were no longer "actively protesting." Doc. No. 1, ¶98-100. She also admits that at the time she approached the barricade around 4:00 a.m., protestors were gathered around the remaining burned-out vehicle that law enforcement

previously forbid protestors from removing from the Bridge. Doc. No. 1, ¶101. She admits law enforcement officers gave her, and the other protestor standing with her, orders to move away from the burned-out vehicle. Doc. No. 1, ¶104.

[¶54]    Wilansky's Complaint describes a chaotic scene the afternoon of November 20, 2016, going late into the night. Tensions were clearly elevated between protestors and law enforcement. While Wilansky maintains the protest just ended at midnight and all was calm and tranquil thereafter, it is difficult to ignore the tension that likely lingered after the protest did die down. It is evident law enforcement's desire remained to keep protestors away from the burned-out vehicle on the Bridge. Wilansky positioned herself near the exact burned-out vehicle. It does not shock the conscience for law enforcement to use non-lethal force to disburse protestors from an area where they were told to avoid. She has failed to show Defendant Officer Doe had "a purpose to cause harm *unrelated to the legitimate object of* the government action in question," removing protestors from an area they were ordered to move away from. Wilanksy's cause of action (2) is, therefore, dismissed.

ii.    *Defamation and Violation of North Dakota Century Code § 14-02-01 (Paul Laney, Thomas Iverson, Morton County, and Kyle Kirchmeier in both his official and personal capacities)*

[¶55]    Wilansky has brought defamation claims against County Defendants Sheriff Laney, Sheriff Kirchmeier, and Morton County. She has also brought a defamation claim against State Defendant Iverson. Because the County and State Defendants have moved for dismissal of the defamation claims on slightly different grounds, the Court will address them separately, starting with the County Defendants.

(1) <u>County Defendants</u>

[¶56]     Wilansky asserts the County Defendants made multiple defamatory statements about her, specifically that she caused her own injury by participating in the attempted use of improvised explosive devices against law enforcement officers. Doc. No. 1, ¶¶137, 147. Wilansky asserts the County Defendants made the following defamatory statements after the incident:

1. "In a news conference on November 21, Defendant Kirchmeier denied that law enforcement agents caused Sophia's injury, stating, 'We don't know where [the explosion] came from, but it wasn't law enforcement.'" Doc. No. 1, ¶127.
2. "Defendant Kirchmeier then accused the water protectors near Sophia of hurling explosive fuel canisters at law enforcement officers and suggested that Sophia may have been injured by one of these canisters." Doc. No. 1, ¶128.
3. "Maxine Herr, a spokesperson for Morton County Sheriff's Office, reiterated Defendant Kirchmeier's false accusations to other media outlets, stating that '[n]one of our equipment would cause an injury like that,' that the munition that injured Sophia 'wasn't from our law enforcement, because we didn't deploy anything that should have caused that type of damage to her arm,' and that Sophia may have been injured while protesters were 'rigging up their own explosives' to use against law enforcement." Doc. No. 1, ¶129.
4. "On December 3, Defendants Laney and Kirchmeier gave another news conference in which they again denied that law enforcement was responsible for Sophia's injury. Defendant Kirchmeier told the news media that he was unaware of any use of flashbangs by any law enforcement officers and that none of the weapons law enforcement used could have caused the injury Sophia suffered." Doc. No. 1, ¶136.
5. "At this conference, Defendants Laney and Kirchmeier accused Sophia of causing her own injury by participating in the attempted use of improvised explosive devices against law enforcement officers." Doc. No. 1, ¶137.
6. "Defendant Laney told the news media, 'There were explosive instruments being handled by people on that bridge that night. . . . Whether their intent was to throw them at us or whether their intent was to blow up that truck, I don't know. But I do know that they were handling explosive devices and they handled it wrong and something happened.'" Doc. No. 1, ¶138.
7. "In a legal filing on December 22, 2016, Defendants Kirchmeier and Morton County repeated the accusation that Sophia was injured by the premature explosion of an improvised explosive device created by DAPL protesters." Doc. No. 1, ¶139.
8. "In a May 2017 presentation that is still publicly available online, Defendant Laney displayed a picture of Sophia and publicly declared:
   > You can see the damage she did to her arm. What happened—our people saw her sneak up—the remaining five-ton vehicle that was left there, she had taken cover behind that. Whether she was going to use this propane bomb to throw at our lines or whether she was going to try to place it under the truck to blow it up, we don't know. We don't know what that intent was. But it went off in her arms and that's what did the damage and that's what

24

hurt her…. [T]here was nothing we had in our inventory that we would have launched at people that would do that." Doc. No. 1, ¶147.

[¶57]     Under North Dakota law, defamation is actionable through libel or slander. N.D.C.C. § 14-02-02. Libel is defined as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes the person to be shunned or avoided, or which has a tendency to injure the person in the person's occupation." N.D.C.C. § 14-02-03. Slander is defined as unprivileged and false publications, other than libel, which:

> 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;
> 2. Imputes to the person the present existence of an infectious, contagious, or loathsome disease;
> 3. Tends directly to injure the person in respect to the person's office, profession, trade, or business, either by imputing to the person general disqualifications in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to the person's office, profession, trade, or business that has a natural tendency to lessen its profits;
> 4. Imputes to the person impotence or want of chastity; or
> 5. By natural consequence causes actual damage.

N.D.C.C. § 14-02-04(1)-(5).

[¶58]     Wilansky asserts the statements made by the County Defendants are false because she never participated in the creation or deployment of any improvised explosive device, against law enforcement or anyone else. Doc. No. 1, ¶144. She also asserts her injuries were not due to a propane tank or other improvised explosive device; she contends her injuries were caused by "an explosive less-lethal munition, which was launched at her by Defendant John Doe." Doc. No. 1, ¶143. Wilansky maintains these alleged defamatory statements have harmed her reputationally, socially, and occupationally. Doc. No. 1, ¶185. She asserts she received threats of violence, has lost her privacy, people post hurtful messages about her online, and people scorn her on social media. Doc. No. 1, ¶186. A google search of her name, she asserts, will bring up news stories

25

accusing her of attempting to harm law enforcement with explosives. Doc. No. 1, ¶187. These stories refer back to the alleged defamatory statements made by Defendants, she contends. Doc. No. 1, ¶187. In her opinion, prospective employers would have a negative perception of her from these search results which would harm her chances of obtaining a job. Doc. No. 1, ¶188.

[¶59]    Despite Wilansky's assertion that the statements made by the County Defendants concerning her and the incident in question meet all the elements of defamation, the County Defendants assert the statements they made are privileged, and "[it] is well established that there is no liability for defamatory statements that are privileged." Soentgen v. Quain & Ramstad Clinic, P.C., 467 N.W.2d 73, 78 (N.D. 1991). The Court agrees.

[¶60]    "Privilege is based upon the sound public policy that some communications are so socially important that the full and unrestricted exchange of information requires some latitude for mistake." Id. "Privilege is either absolute or qualified." Id. "A privilege is absolute when the free exchange of information is so important that even evidence of actual malice does not destroy the privilege." Krile v. Lawyer, 2020 ND 176, ¶ 19, 947 N.W.2d 366, 374. A communication is absolutely privileged if (1) made in "the proper discharge of an official duty," or (2) made in "any legislative or judicial proceeding or in any other proceeding authorized by law." N.D.C.C. § 14-02-05(1)-(2). In contrast, a communication is only afforded qualified privilege if it is made:

> (3) In a communication, without malice, to a person interested therein by one who also is interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information; and
> (4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof.

N.D.C.C. § 14-02-05(3)-(4).

[¶61]    The Defendants seek to invoke the absolute immunity protections of N.D.C.C. § 14-02-05(1), arguing the statements they made pertaining to the incident involving Wilansky were in the

proper discharge of their official duties. The Defendants argue it was Sheriffs Kirchmeier and Laney's "official duty to disseminate information concerning the DAPL protests." Doc. No. 29, p. 34. The Defendants also point to an extrinsic exhibit offered by them in support of their Motion to further illustrate Sheriff Kirchmeier's duties, including the apparent designation as Chair of the Uniform Incident Command Policy Group. Doc. No. 30-13. The Defendants also state Sheriff Laney was the Operations Commander in Morton County during the protests. Doc. No. 29, p. 34. On this basis, the Defendants assert "[a]ll statements were made within the scope of their positions as Sheriff." Doc. No. 29, p. 35.

[¶62]    Wilansky counters the determination of whether the Defendants were properly discharging their official duties is a fact-intensive inquiry not ripe for resolution at this time, referencing the Defendants' reliance upon extrinsic information. Doc. No. 35, p. 24. She further asserts that even if the Court were to consider the Defendants' argument regarding Sheriffs Laney and Kirchmeier's specific job titles during the protest, "they tell us nothing about what Kirchmeier's and Laney's actual job duties were." Doc. No. 35, p. 28.

[¶63]    Upon review of the Complaint, the Court finds the statements made by the County Defendants were made in the proper discharge of their official duties and are thus protected by absolute immunity. Wilansky's Complaint admits her father "gave interviews to several news organizations to decry law enforcement's wanton use of excessive force" against her "in the middle of the night when no protest was occurring." Doc. No. 1, ¶125. Wilansky admits she publicly made serious allegations that a law enforcement officer caused her injuries. It comes as no surprise, the County Defendants issued public statements to respond to her accusation in an attempt to defend themselves and their respective agencies by explaining their version of events that night. Wilansky admits in her Complaint investigations immediately began into the cause of her injuries, including

27

FBI agents confiscating the clothing she was wearing that night and also the shrapnel removed from her arm. Doc. No. 1, ¶150. She was obviously the subject of a criminal investigation, which is the reason her request for all records pertaining to herself from the Morton County Sheriff's Office was denied. Doc. No. 1, ¶163. The County Defendants' statements regarding the potential cause of her injuries are defensive and were properly made.

[¶64]    In addition, despite Wilansky's assertion the statements made by the Defendants were "on a subject matter irrelevant to any common interest or duty," the statements were pertinent to the incident involving Wilansky. See Rykowsky v. Dickinson Pub. Sch. Dist. No. 1, 508 N.W.2d 348, 351 (N.D. 1993) ("Even in the case of an absolute privilege under § 14–02–05(1) or (2), N.D.C.C., however, a communication must be pertinent to be free of liability."); see also Doc. No. 1, ¶260.

[¶65]    Wilansky believes in order to determine if the County Defendants are entitled to absolute immunity a detailed factual record regarding the job duties of the County Defendants needs to first be developed. The Court disagrees. Wilansky admits Sheriffs Kirchmeier and Laney were "at all times relevant to this action" sheriffs of their respective counties. Doc. No. 1, ¶¶9, 10. She further avers in her Complaint that "Defendant Kirchmeier was responsible, on behalf of Defendant Morton County, for supervising and directing the conduct of the law enforcement officers who responded to DAPL protests." Doc. No. 1, ¶216. She also admits Sheriff Laney "personally participated in the law enforcement response to the Dakota Access Pipeline protests between August 2016 and March 2017." Doc. No. 1, ¶10. As Chief Law Enforcement Officers, who Wilansky admits were directly involved with the protests, it is a proper discharge of official duties

to issue statements of defense on behalf of an unnamed law enforcement officer potentially under their command who has been accused of using excessive force.[4]

(2) State Defendant Iverson

[¶66]    Wilansky also asserts Defendant Iverson made multiple defamatory statements about her. Defendant Iverson moves for dismissal on two separate grounds, including a lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)6). Because the Court cannot move forward with the claim against Defendant Iverson if it lacks subject matter jurisdiction over it, the Court will consider it first.

[¶67]    Federal Rule of Criminal Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Subject matter jurisdiction defines the court's authority to hear a given type of case." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). Jurisdictional issues are a matter for the Court to resolve prior to trial. Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990). A party who brings a motion pursuant to Rule 12(b)(1) may do so in one of two ways:

---

[4] See Johnston v. Borders, where the court found a sheriff was entitled to absolute immunity for press releases he issued responding to accusations that the local animal shelter under his control euthanized animals. No. 615CV936ORL40DCI, 2018 WL 8244336, at *5 (M.D. Fla. June 19, 2018). The Johnston Court noted:

> Here, Sheriff Boarders issued the press releases following intense public outcry resulting from the euthanasia of animals conducted by the Shelter. Because the Shelter was under the control of the Sheriff's Office at the time the euthanasia was conducted, the Sheriff's Office had a responsibility to respond to that outcry. The press statements the Sheriff's Office released in response to the outcry were, therefore, plainly within the scope of the Sheriff's Office's authority. That the statements made in the press releases proved to be untrue, or to harm Plaintiff's reputation, does not remove the statements from the protections afforded by the absolute privilege.

Id.

either by a facial attack or a factual attack. <u>Branson Label, Inc. v. City of Branson</u>, 793 F.3d 910, 914 (8th Cir. 2015).

[¶68]   A facial attack simply asserts the plaintiff has not pled a basis for subject matter jurisdiction.  <u>Id.</u> In a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." <u>Carlsen v. GameStop, Inc.</u>, 833 F.3d 903, 908 (8th Cir. 2016). Therefore, in a facial attack, the Court must accept as true all facts alleged in the complaint, and it may only consider the pleadings and "materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint.'" <u>Id.</u> (quoting <u>Cox v. Mortg. Elec. Registration Sys., Inc.</u>, 685 F.3d 663, 668 (8th Cir. 2012)). A factual attack, on the other hand, asserts the actual existence of subject matter jurisdiction is lacking "irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." <u>Branson Label</u>, 793 F.3d at 914-15 (quoting <u>Menchaca v. Chrysler Credit Corp.</u>, 613 F.2d 507, 511 (5th Cir. 1980)).

[¶69]   As the basis for this Court's jurisdiction over the state-law defamation claim, Wilansky invokes supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and diversity jurisdiction pursuant to 28 U.S.C. § 1332. Defendant Iverson, however, contends he was acting within the scope of his employment when he made the allegedly defamatory statements. Doc. No. 27, p. 5. On this basis, he argues the Court lacks subject matter jurisdiction over Wilansky's defamation claim because it should be brought against the State of North Dakota in state court, as the State of North Dakota has not waived its Eleventh Amendment Immunity to be sued in federal court. Doc. No. 27, p. 5. Wilansky contends Defendant Iverson went outside of the scope of his employment when he made the alleged statements. This contention presents a factual attack, and therefore, the Court will

consider the three exhibits offered by Defendant Iverson to support his position that the alleged
defamatory statements were made within the scope of his employment.

[¶70]    Defendant Iverson asserts Wilansky's Complaint "makes no allegations that [his]
statements were anything other than made within the scope of his employment." Doc. No. 27, p.
5. For support, he points to Wilansky's Complaint wherein she states "[a]t all times relevant to this
action, Defendant Iverson was a Lieutenant in the North Dakota State Highway Patrol." Doc. No.
1, ¶11. On this basis, he argues N.D.C.C. § 32-12.2-03(2) mandates Wilansky's defamation claim
should instead be brought against his employer, the State of North Dakota. See N.D.C.C. § 32-
12.2-03(2) ("A state employee is not personally liable for money damages for an injury when the
injury is proximately caused by the negligence, wrongful act, or omission of the employee acting
within the scope of employment."); see also N.D.C.C. § 32-12.2-03(1) ("When the state employee
is acting within the scope of their employment, the action for negligence, wrongful act, or omission
must be brought against the State.").

[¶71]    Wilansky counters that her Complaint asserts Defendant Iverson's statements were "on
a subject matter irrelevant to any common interest or duty." Doc. No. 1, ¶260. Specifically, she
contends Defendant Iverson made the following statements:

1. "Over the next few days, Defendant Iverson issued several written statements to the news
   media, in which he repeated and elaborated on the false accusations made by Defendants
   Kirchmeier and Morton County." Doc. No. 1, ¶130.
2. "Defendant Iverson wrote that the injuries Sophia "sustained are inconsistent with any
   resources utilized by law enforcement and are not a direct result of any tools or weapons
   used by law enforcement." Doc. No. 1, ¶131.
3. "Defendant Iverson also told the news media that law enforcement officers present at
   Backwater Bridge on November 20–21 did not use flashbangs at any time." Doc. No. 1,
   ¶132.
4. "Defendant Iverson also wrote that protesters rolled metal cylinders toward Sophia
   immediately before she was injured, that 'Law Enforcement had received information that
   protest[e]rs were using one-pound propane cylinders as explosives,' and that 'small
   propane tanks rigged as improvised explosive devices' were recovered from the crime
   scene." Doc. No. 1, ¶133.

5. Defendant Iverson also wrote that at the time Sophia was injured, she and other protesters nearby exhibited 'strange mannerisms [that] led law enforcement to believe they were there for a purpose with a calculated effort to either cause harm or breach the line.'" Doc. No. 1, ¶134.

6. "Defendant Iverson also wrote that at the time Sophia was injured, water protectors were broadcasting over the radio that protesters were arriving at Backwater Bridge with guns, possibly to charge the police barricade." Doc. No. 1, ¶135.

[¶72]    Wilansky asserts these statements were made outside of the scope of Defendant Iverson's position. She argues "[n]either the Complaint, nor any of the documents referenced in Defendants' brief suggests that the State of North Dakota ever tasked Defendant Iverson with commenting on local law enforcement activities and investigations related to protests." Doc. No. 35, p. 24 (emphasis added). However, upon review of Defendant Iverson's extrinsic exhibits, which the Court may consider for purposes of determining subject matter jurisdiction and which Wilansky has invited the Court to consider, the Court disagrees.

[¶73]    Wilansky's opinion is Defendant Iverson's job position was *only* related to "the reduction of motor vehicle crashes" and because her injury didn't relate to the same, Defendant Iverson was not acting pursuant to is official duty when he made statements related to her injury. Doc. No. 35, p. 26 (citing Defendant's Ex. at 27-2, ¶12.). She asserts Defendant Iverson's "express duty to provide information to the public on traffic safety cannot possible be deemed to imply a duty to provide information on purported bomb-rigging activity." Doc. No. 35, p. 27. The Court disagrees and finds Defendant Iverson's position tasked him with disseminating information to the public, including on major incidents such as the DAPL protests.

[¶74]    Defendant Iverson was designated the Public Information Officer for the North Dakota Highway Patrol at the time. Doc. No. 27-2, p. 4. Part of these duties included "collect[ing], verify[ing], and disseminat[ing] information to the public through effective communication with the news media." Id. Another task required Defendant Iverson to "[o]perate within the Incident

32

Command System framework during large scale incidents, reporting to the incident commander." Id. Defendant Iverson was required to be "knowledgeable about all aspects relating to department functions, the community [] serve[d], emergency management concepts, news media and incident characteristics." Id. He was also required to "[b]rief the Governor's Office on sensitive public information topics." Id. Defendant Iverson was also responsible for supervising the homeland security coordinator whose "primary duty is the active participation in the North Dakota State and Local Intelligence Center." Id. In addition, the North Dakota Highway Patrol Policy Manual 2-11 specifies Defendant Iverson was to "prepare and issue timely news releases," "supervise the public information specialist", and supervise the homeland security coordinator, among other tasks. Doc. No. 27-3, p. 1.

[¶75]    Wilansky's Complaint describes the DAPL protests in question and her injuries as occurring on a public highway in North Dakota. Doc. No. 1, ¶44. By her own description, situations between protestors and law enforcement continued to grow tense over multiple months, with law enforcement presence at protests swelling. Doc. No. 1, ¶¶30-34. In fact, she alleges the Governor of North Dakota activated the North Dakota National Guard to assist in September 2016, and she notes the North Dakota State Highway Patrol began routinely assisting other enforcement agencies at the protest site. Doc. No. 1, ¶33. Defendant Iverson, the Public Information Officer for the North Dakota Highway Patrol, was tasked with providing the public with information on largescale incidents, especially those involving his own agency. The Court agrees with Defendant Iverson that Wilansky's Complaint emphasizes "the DAPL protests were widely publicized, involved inter-agency law enforcement cooperation, affected members of the public, and closed a highway for several months," and on this basis, " "[i]n his role as the Public Information Officer, Maj. Iverson's statements regarding an explosive device causing Wilansky's injuries were

unquestionable pertinent." Doc. No. 27, p. 12 (citing Doc. No. 1, ¶¶40, 81, 86). Defendant Iverson was acting within the scope of his employment when he issued the statements concerning Wilansky. On this basis, the Court does not have subject matter jurisdiction.

[¶76]     However, even if the Court did have subject matter jurisdiction, for largely the same reasons as annotated above, the Court would find Defendant Iverson's statements are protected by absolutely immunity under N.D.C.C. § 14-02-05(1). Defendant Iverson made these statements in the proper discharge of an official duty, as they were in the scope of his employment. It was within Defendant Iverson's official duties as Public Information Officer of the North Dakota State Highway Patrol to disseminate information regarding public safety on public roadways, which includes potential bomb-rigging activity at a large-scale incident to which his own agency was responding.

> iii.    *Monell v. Dep't of Social Serv., 436 U.S. 658 (1977)(Morton County and Kyle Kirchmeier in his official capacity)*

[¶77]     Wilansky asserts <u>Monell</u> claims against Morton County and Sheriff Kirchmeier in his official capacity. First, she asserts "Defendant Kirchmeier directed, approved, or ratified the objectively unreasonable and unconstitutional use of explosive less-lethal munitions by his subordinates." Doc. No. 1, ¶¶208-211. Next, she asserts "Defendant Morton County had a policy or custom of using explosive less-lethal munitions in an objectively unreasonable and unconstitutional manner against DAPL protestors." Doc. No. 1, ¶¶212-215. Lastly, she asserts "Defendants Kirchmeier and Morton County failed to adequately train and supervise the law enforcement officers who responded to the DAPL Protests." Doc. No. 1, ¶¶216-222.

[¶78]     In support of dismissal, the Defendants assert Wilansky has failed to plead facts showing Defendant Officer Doe violated her Fourth or Fourteenth Amendment Rights, a prerequisite they maintain must be met in holding Morton County and Sheriff Kirchmeier liable for actions under

Monell. Doc. No. 29, p. The Court, as noted below, finds Wilansky has sufficiently alleged facts to support a Fourth Amendment excessive force claim. Therefore, the Court must only determine if Wilansky has alleged facts to support her specific Monell claims against Morton County and Sheriff Kirchmeier. The Court finds she does not.

(1) Unconstitutional Policies, Customs, or Practices

[¶79]     "A municipality may be liable under § 1983 when an official municipal policy or custom caused a violation of a plaintiff's substantive due process rights." Russell v. Hennepin Cty., 420 F.3d 841, 846 (8th Cir. 2005)." "Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability.'" Id. (citing Angarita v. St. Louis County, 981 F.2d 1537, 1546 (8th Cir.1992)). "Before a municipality can be held liable, however, there must be an unconstitutional act by a municipal employee." Id.

[¶80]     "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." Malone v. Hinman, 847 F.3d 949, 955 (8th Cir. 2017) (citations omitted). "Policy and custom are not the same thing." Id. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Id. "[T]he plaintiff must prove that the policy was the "moving force" behind a constitutional violation." Schaffer v. Beringer, 842 F.3d 585, 596 (8th Cir. 2016).

[¶81]     In the alternative, "a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating:

> 1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was

35

> injured by acts pursuant to the governmental entity's custom, i.e., that the custom
> was a moving force behind the constitutional violation.

Id.

[¶82]     Wilansky has not pled sufficient facts to establish Morton County may have had an unconstitutional policy or custom of using explosive less-lethal munitions in an unconstitutional manner which was the moving force behind Defendant Officer Doe's alleged violation of her rights. As to policy, Wilansky has failed to point to "an official policy, a deliberate choice of guiding principle or procedure" of Morton County made by Sheriff Kirchmeier authorizing the use of unreasonable force. Wilansky has failed to point to an official policy either in writing or orally issued by the County Defendants authorizing law enforcement officers to use explosive less-lethal weapons in an unconstitutional manner. Furthermore, she has failed to put forth facts showing County Defendants established a guiding principle or procedure wherein law enforcement officers were authorized or encouraged to utilize explosive less-lethal weapons in an objectively unreasonable manner. Simply asserting the County Defendants allegedly equipped officers with explosive less-lethal weapons, even if some were allegedly untrained in their use, does not suffice to show these officers who allegedly used explosive less-lethal weapons did so at the direction of the County Defendant's policy. Therefore, her allegation that law enforcement officers "repeatedly aimed and launched flashbangs and other explosive less-lethal munitions at individuals and/or into crowded areas" does not suffice to establish that these officers were acting pursuant to a policy promulgated by the County Defendants. Doc. No. 1, ¶76. Furthermore, Wilansky has failed to put forth facts showing an alleged policy was the driving force behind her injury. Generally asserting "Defendant Doe acted pursuant to this policy or custom and under the color of state law when s/he launched an explosive munition at" her is not strong enough to tie Defendant Doe's actions to the County Defendants. Doc. No. 1, ¶214.

[¶83]     As to custom, Wilansky has failed to point to "the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." Mettler, 165 F.3d at 1204. Wilansky asserts "[i]n September 2016, North Dakota law enforcement agencies purchased . . . one hundred flashbangs expressly for use at DAPL protests." Doc. No. 1, ¶141. Wilansky further asserts that throughout "October and November 2016, Morton County routinely distributed flashbangs and other explosive less-lethal munitions to law enforcement officers who lacked sufficient training in the proper use of such devices." Doc. No. 1, ¶75. However, there is nothing unconstitutional about law enforcement purchasing explosive less-lethal weapons nor does the fact that law enforcement were equipped with them, on its own, mean a pattern of constitutional violations occurred.

[¶84]     Moreover, Wilansky's statements that law enforcement officers routinely used explosive less-lethal munitions unreasonably prior to her alleged injury is far too generalized to make the finding that law enforcement officers were engaging in a continuing, widespread, persistent pattern of unconstitutional misconduct. See Doc. No. 1, ¶76 ("Prior to [her] injury, law enforcement officers responding to DAPL protests in Morton County . . . repeatedly aimed and launched flashbangs and other explosive less-lethal munitions at individuals and/or into crowded areas."); see also Doc. No. 1, ¶217 ("Defendant Kirchmeier knew that the officers under his direction and supervision were routinely using explosive less-lethal munitions in an objectively unreasonable manner against protestors."). In fact, her discussions of prior protests on October 22, 2016, October 27, 2016, and November 2, 2016, do not discuss law enforcement's use of explosive less-lethal munitions. Doc. No. 1, ¶¶47 – 49.

[¶85]     Additionally, the more specific instance she provides in her Complaint to support her belief law enforcement officers unreasonably used explosive less-lethal munitions relates to one

particular protest on November 20, 2016. <u>See</u> Doc. No. 1, ¶95 (asserting that on November 20, 2016, "law enforcement officers . . . launched numerous explosive less-lethal munitions, including flashbangs, directly into crowds of protestors."); Doc. No. 1, ¶142 ("Videos taken at the protest on November 20 show law enforcement officers launching flashbangs at protestors."). This instance does not show a widespread, continuing, and persistent pattern.

[¶86]    Furthermore, Wilansky has failed to allege facts showing Defendant Kirchmeier and Morton County had notice of a pattern of alleged constitutional violations and tacitly authorized or were deliberately indifferent to their use or that this custom was the driving force behind her alleged injury. Wilansky asserts Morton County routinely equipped law enforcement officers with less-lethal weapons, including the night of November 20 and early morning of November 21. Doc. No. 1, ¶¶75, 89. She asserts some of these officers lacked sufficient training in their use, including Defendant Officer Doe, further alleging Defendant Kirchmeier was aware of this fact. Doc. No. 1, ¶218. However, equipping officers with less-lethal weapons does not equate to the Defendants having notice that any of these officers were using these weapons routinely in an unconstitutional manner. Wilansky's statement, "Defendant Kirchmeier knew that the officers under his direction and supervision were routinely using explosive less-lethal munitions in an objectively unreasonable manner against protestors," is again far too generalized to establish notice. Again, Wilansky has failed to establish a "routine" to strengthen this statement.

[¶87]    In addition, Wilansky has failed to establish the alleged custom or policy was the "driving force" behind her injury. In a conclusory fashion, she asserts "Defendant Morton County established a policy or custom of using explosive less-lethal munitions in an objectively unreasonable and unconstitutional manner against DAPL protesters." Doc. No. 1, ¶212. She avers "Defendant Doe acted pursuant to this policy or custom and under the color of law when s/he

launched an explosive munition at [Wilansky]." Doc. No. 1, ¶214. Wilansky's conclusory statement, however, is far too generalized to assert Defendant Officer Doe's alleged actions were driven by such an alleged policy or custom.

(2) <u>Violations Resulting from Training, Supervision, or Discipline</u>

[¶88]   Wilansky also asserts a <u>Monell</u> claim against Sheriff Kirchheimer and Morton County on a failure to train, supervise, or discipline theory. "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." <u>Jackson v. Nixon</u>, 747 F.3d 537, 543 (8th Cir. 2014). "While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." <u>Id.</u> "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." <u>Id.</u>

[¶89]   The County Defendants may therefore be liable under § 1983 if they "(1) had 'notice of a pattern of unconstitutional acts committed by subordinates'; (2) [were] deliberately indifferent to or tacitly authorized those acts; and (3) failed to take 'sufficient remedial action'; (4) proximately caus[ed] injury to the Plaintiffs." <u>Livers v. Schenck</u>, 700 F.3d 340, 355–56 (8th Cir. 2012) (quoting <u>Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty</u>, 901 F.2d 642, 645 (8th Cir.1990)).

[¶90]   For largely the same reasons as noted above, Wilansky has failed to show a pattern of unconstitutional acts to which the County Defendants had notice. Her general allegations that "prior to her injury" officers used explosive less-lethal munitions unreasonably is inadequate to aid in the establishment of a pattern. Additionally, the previous protests her Complaint elaborates

on do not discuss law enforcement using <u>explosive</u> less-lethal munitions. The specific instance she discusses wherein law enforcement officers used explosive less-lethal weapons occurred at the protest on November 20-21, 2016. Simply asserting these officers acted "under the direction, supervision, and authority of Defendants Kirchmeier and Morton County" is too generalized to establish the County Defendants had notice law enforcement officers were going to use or did use these explosive less-lethal weapons in an objectively unreasonable manner.

[¶91]    Wilanksy has also failed to show the County Defendants failed to take sufficient remedial action. She therefore cannot show it was the Defendants' alleged failure to train, supervise, or discipline that was the proximate cause of her injuries because there was not a pattern of unconstitutional conduct of subordinates that the County Defendants' had knowledge of and tacitly authorized or were deliberately indifferent to.  Cause of action three (3) will be dismissed.

*iv.    <u>Injunctive Relief</u>*

[¶92]    Wilansky requests injunctive relief in two aspects in this matter. She requests the Court issue Orders and Permanent Injunctions requiring the Morton County Sheriff's Office:

> to train all of its law enforcement officers in the proper and appropriate use of less-lethal weapons and prohibiting all law enforcement officers acting under the authority of Morton County from handling, possessing, or deploying any less-lethal weapons until they have successfully completed such training;
>
> and
>
> to issue a press release to local and national news media in which it retracts the false and defamatory statements made by Defendants about Sophia, identifies the law enforcement officer who injured her, and accepts responsibility for her injury.

Doc. No. 1, Prayer for Relief, pp. 47-48, ¶¶C-D.

[¶93]    Defendants have asserted Wilansky does not possess standing to bring injunctive relief to the request for Morton County to train officers in the use of less-lethal weapons. "For an injunction to be appropriate, 'a party must show that the harm is certain and great and of such

imminence that there is a clear and present need for equitable relief.'" Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers, 826 F.3d 1030, 1037 (8th Cir. 2016). "[I]t is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] 'certainly impending.'" Park v. Forest Serv. of U.S., 205 F.3d 1034, 1037 (8th Cir. 2000) (alterations to original) (citations omitted).

[¶94]    Wilansky asserts her Complaint alleges facts to "imply such a threat." Doc. No. 35, p. 28. Specifically, she asserts her Complaint states she is a "passionate environmentalist and committed social justice advocate." Id. (citing Doc. No. 1, ¶78). She also states "[s]he has protested DAPL in Morton County in the past, but she is afraid to do so in the future because of the safety threat to even peaceful protestors posed by Morton County's practice of equipping inadequately trained officers with flashbangs." Id. (citing Doc. No. 1, ¶¶75-76) ("Upon information and belief, throughout October and November 2016, Morton County routinely distributed flashbangs and other explosive less-lethal munitions to law enforcement officers who lacked sufficient training in the proper use of such devices."); ("Upon information and belief, prior to Sophia's injury, law enforcement officers responding to DAPL protests in Morton County and acting under the authority, direction, and supervision of Defendants Kirchmeier and Morton County repeatedly aimed and launched flashbangs and other explosive less-lethal munitions at individuals and/or into crowded areas."). She asserts the facts in her Complaint imply "Morton County's ongoing practice of inadequately training officers equipped with flashbangs makes her uncomfortable continuing her desired protest activities." Doc. No. 35, p. 29.

[¶95]    The Defendants assert these facts do not establish Wilansky is faced with a threatened injury that is "certainly impending." Doc. No. 29, p. 36. The Court agrees. Wilansky is asserting a

41

"mere possibility" if she were to return to Morton County at some point in the future under unspecified circumstances allegedly untrained law enforcement officers would use or handle an explosive less lethal munition in a way that would potentially injure her. This hypothetical is too attenuated to warrant injunctive relief. See Murphy by Murphy v. Minnesota Dep't of Human Servs., 260 F. Supp. 3d 1084, 1101 (D. Minn. 2017) (citing O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) ("[A] plaintiff's speculation that a future injury may occur is not sufficient to warrant injunctive relief.")); see also Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982) ("The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law.").

[¶96]    The Court will dismiss Wilansky's injunctive relief request under Doc. No. 1, Prayer for Relief, ¶C. Additionally, the Court will deny Wilansky's injunctive relief request under Doc. No. 1, Prayer for Relief, ¶D on the basis that the defamation claims are dismissed.

### 2.   Surviving Causes of Action

[¶97]    The Court now moves to Wilansky's causes of action which will not be dismissed. These claims include: cause of action (1) Excessive Force in Violation of 42 U.S.C. § 1983 (Fourth Amendment) (John Doe Law Enforcement Officer), cause of action (4) Assault and Battery (John Doe Law Enforcement Officer and Morton County); cause of action (5) Intentional Infliction of Emotional Distress (John Doe Law Enforcement Officer and Morton County); cause of action (6) Negligent Infliction of Emotional Distress (John Doe Law Enforcement Officer and Morton County); and cause of action (7) Negligence and Violation of North Dakota Century Code §§ 9-

10-01 and 9-10-06 (John Doe Law Enforcement Officer, Morton County, and Kyle Kirchmeier in his official capacity). Doc. No. 1.

    A.   Causes of Action

        i.   *Causes Four (4) – Assault and Battery; Five (5) – Intentional Infliction of Emotional Distress; Six (6) – Negligent Infliction of Emotional Distress; Seven (7) – Negligence and Violation of North Dakota Century Code §§ 9-10-01 and 9-10-06*

[¶98]    Wilansky has asserted state-law claims against Defendant Officer Doe: assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Doc. No. 1, pp. 41-45. Wilansky argues "[d]efendants do not dispute the legal sufficiency of any of [her] state law causes of action against Officer Doe," and therefore, these claims "automatically survive Defendants' motion to dismiss." Doc. No. 35, p. 23.

[¶99]    Wilansky also brings vicarious liability claims against Morton County for her state-law based causes of action against Defendant Officer Doe (assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence). While the Defendants are correct that Wilansky's Monell claims are dependent upon the viability of her federal excessive force claims, they neglect to address Wilansky's claims for supervisory liability of Morton County under North Dakota state law.

[¶100]    Upon review of the State and County Defendants' briefs, it appears neither contested the merits of these state-law claims against Defendant Officer Doe or Morton County. In addition, Wilansky pled diversity jurisdiction in her Complaint regarding these state-law claims. Therefore, causes of action four (4), five (5), six (6), and seven (7) will proceed against Defendant Officer Doe and Morton County in the manner more fully discussed in the section below addressing discovery moving forward. Fox v. Wardy, No. EP-04-CV-439-PRM, 2005 WL 1421514, at *5

43

(W.D. Tex. June 16, 2005) ("The Court denies the Defendant's Motion as to certain claims based upon Defendant's failure to address those claims.").

ii. *Excessive Force in Violation of 42 U.S.C. § 1983 (Fourth Amendment) (John Doe Law Enforcement Officer)*

[¶101]   "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham, 490 U.S. at 394. "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." Id. "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Id. (citation omitted).

[¶102]   The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "All claims that law enforcement officers have used excessive force . . . in the course of . . . [a] 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" Id. at 395. In order to state a viable claim for excessive force under the Fourth Amendment, Wilansky must allege facts showing Defendant Officer Doe (1) seized her under the Fourth Amendment;  (2) this seizure was objectively unreasonably, and (3) Defendant Officer Doe is not entitled to qualified immunity. Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1207 (8th Cir. 2013).

(1) Seizure

[¶103]   "A Fourth Amendment seizure occurs when there is 'meaningful interference, however brief, with an individual's freedom of movement.'" United States v. Dolson, 673 F. Supp. 2d 842, 864–65 (D. Minn. 2009). "A person has been 'seized' within the meaning of the Fourth

Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Dortch, 868 F.3d 674, 677 (8th Cir. 2017).

[¶104]   A seizure can occur through law enforcement's show of authority or through law enforcement's use of physical force. See Oglesby v. Lesan, 929 F.3d 526, 532 (8th Cir. 2019) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred.") (emphasis added) see also Atkinson, 709 F.3d at 1208 ("Because the Supreme Court has directed us to apply this common law dichotomy to seizure of the person under the Fourth Amendment, we similarly require either physical force or where that is absent, submission to the assertion of authority.") (alterations). "A seizure does not require any magic words, rather physical force can suffice." See United States v. Cook, 842 F.3d 597, 600 (8th Cir. 2016). The Eighth Circuit further outlined the parameters of when physical force may constitute a seizure:

> To constitute a Fourth Amendment seizure, an application of physical force must be willful because the word seizure can hardly be applied to an unknowing act. Whether physical force was intentionally applied, is determined by the officer's objective behavior, not his subjective motive. Also implicit in the term seizure is a requirement that the application of physical force restrain freedom of movement. This restraint need not actually succeed in stopping or holding the person even for an instant. But the seizure does not outlast the restraint on free movement.

Atkinson, 709 F.3d at 1208 (citations omitted) (alterations to original).

[¶105]   The Defendants argue Wilansky could not have been seized because she has not alleged facts showing the alleged force used upon her by Defendant Officer Doe "was applied for the purpose of law enforcement gaining physical control over" her. Doc. No. 29, p. 23. They argue Wilansky did not allege she did not feel free to terminate her encounter with law enforcement, did not allege she was arrested, was not advised she was not free to leave, or was not told to remain

45

where she was. Doc. No. 29, p. 23. Instead, they assert she could have walked away, and the facts in her Complaint "objectively manifest law enforcement's intention in applying the alleged force of keeping Plaintiff and other protestors away from law enforcement – the exact opposite of what is required for a seizure under the Fourth Amendment." Doc. No. 29, p. 23.

[¶106]    Wilansky asserts the intent required is the officer's intent "to apply physical force, not that the officer intend the force to generate a particular outcome." Doc. No. 35, p. 7. Caselaw supports Wilansky's view. As explained by the Ninth Circuit in Nelson v. City of Davis, 685 F.3d 867 (9th Cir. 2012):

> The Supreme Court has repeatedly held that the Fourth Amendment analysis is not a subjective one. *See, e.g.,* Ashcroft v. al–Kidd, —— U.S. ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011); Brendlin, 551 U.S. at 261, 127 S.Ct. 2400; Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "The intent that counts under the Fourth Amendment is the intent [that] has been conveyed to the person confronted, and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized." Brendlin, 551 U.S. at 260–61, 127 S.Ct. 2400 (alterations in original) (internal quotation marks and citation omitted). Recently, the Court again emphasized that "the Fourth Amendment regulates conduct rather than thoughts." al–Kidd, 131 S.Ct. at 2080.

Id.

[¶107]    In fact, Nelson provides an example of the intent inquiry required in physical-force seizure cases. In Nelson, law enforcement officers deployed pepper balls at a group of party-goers in an attempt to get them to disperse from an apartment building, causing permanent injuries to one individual who was shot in the eye. Nelson, 685 F.3d at 874. The officers in Nelson argued "their actions could not constitute a seizure because their intent was to disperse the crowd." Id. at 877. The Court rejected this notion, stating "the officers took aim and fired their weapons towards Nelson and his associates," so "[w]hether the officer intended to encourage the partygoers to disperse is of no importance when determining whether a seizure occurred." Id. Instead, the Court

noted "[r]egardless of their motives, their application of force was a knowing and willful act that terminated Nelson's freedom of movement." Id.

[¶108]   This mirrors the Eighth Circuit's mandate that a seizure occurs by law enforcement's intentional acquisition of physical control terminating an individual's freedom of movement through means intentionally applied. Johnson v. City of Ferguson, Missouri, 926 F.3d 504, 506 (8th Cir.), cert. denied, 140 S. Ct. 553, 205 L. Ed. 2d 357 (2019). The Court finds based on the allegations outlined in Wilansky's Complaint, she has alleged Defendant Officer Doe may have seized her. Her facts support a plausible finding Defendant Officer Doe intended to control her physical movement, and he succeeded in doing so when he terminated her freedom of movement by intentionally throwing an explosive less-lethal munition at her.

[¶109]   Wilansky alleges the only two people on the Backwater Bridge at the time of the incident were herself and one other protestor. Doc. No. 1, ¶104. She asserts law enforcement officers verbalized the order to back away from the burned-out vehicle specifically to the two of them. Doc. No. 1, ¶104. She asserts without being given the opportunity to react to the order, law enforcement officers started to fire sponge bullets at the two of them, hitting her in the upper left arm. Doc. No. 1, ¶105. While speaking directly to the law enforcement officers and retreating away from the barricade, she alleges she verbalized a plea for them to stop firing at her. Doc. No. 1, ¶107. In the process of her attempting to move away from the barricade, she asserts Defendant Officer Doe fired an explosive less-lethal munition at her person. Doc. No. 1, ¶108. She asserts the explosive hit her left forearm, exploding and causing her to fall to the ground. Doc. No. 1, ¶113-114. Instead of helping her, she asserts law enforcement officers congratulated Defendant Doe. Doc. No. 1, ¶114. She asserts she had to be carried away by other protestors. Doc. No. 1, ¶117.

[¶110]   Her facts support a plausible finding that Defendant Officer Doe intended to control her physical movement, and he succeeded in doing so when he terminated her freedom of movement by intentionally throwing an explosive less-lethal munition at her person. Wilansky asserts she was stopped in her tracks from the force applied to her by law enforcement. Her arm was severely injured by the blast, as her arteries, skin, tissue, muscle, nerve, tendons, and bone in her left forearm were destroyed. Doc. No. 1, ¶111. As the Atkinson Court noted "[i]t would make little sense to ask whether a person felt 'free to leave' while an officer restrained the person's freedom of movement through physical force because the force itself necessarily —if only briefly— 'restrained [the person's] liberty.'" Atkinson, 709 F.3d at 1209.

(2) Objective Reasonableness

[¶111]   Wilansky must also show Defendant Officer Doe's seizure was unreasonable. "When evaluating a Fourth Amendment excessive force claim under § 1983, [a court] consider[s] 'whether the amount of force used was objectively reasonable under the particular circumstances.'" Kohorst v. Smith, 968 F.3d 871, 876 (8th Cir. 2020) (citation omitted). The Court evaluates "the reasonableness of the force used from the perspective of a reasonable officer on the scene, not with the benefit of hindsight." Id. "This evaluation entails careful consideration of the case's particular facts and circumstances, including: '(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham, 490 U.S. at 396). The court may "also consider the result of the use of force." Id.

[¶112]   Wilansky asserts that after the larger gathering of protestors calmed down around 2:00 a.m. on November 21, 2016, only a few protestors remained at the Backwater Bridge. Doc. No. 1, ¶98. She maintains the area was "quiet and tranquil" and there was no active protesting occurring.

Doc. No. 1, ¶¶98, 99. She states her allegations of tranquility around this time are corroborated by a dashcam video from the North Dakota State Highway Patrol provided to her through counsel for Morton County. Doc. No. 1, ¶¶155, 156. She asserts the video shows law enforcement officers relaxed, exhibiting no concern "that protestors with guns might be approaching the bridge to storm the barricade." Doc. No. 1, ¶157. More importantly, she asserts, "the officers do not appear scared or worried that there might be an explosive device nearby, even when they ordered protestors away from the burned-out vehicle." Doc. No. 1, ¶157. This shows an inconsistency, she argues, "with the public accusations made by Defendants that protesters were throwing Coleman propane tanks rigged to explode at law enforcement and that [she] was planting such an explosive at the barricade." Id.

[¶113]    In contrast, she asserts that when she approached the burned-out vehicle on the barricade around 4:00 a.m. she was not carrying any weapons nor was she yelling at, menacing, or threatening officers. Doc. No. 1, ¶102. She maintains only herself and another protestor were on the Backwater Bridge quietly chatting when law enforcement officers began using force on them, including Defendant Officer Doe allegedly throwing the explosive at her while she was attempting to retreat from the barricade in compliance with the officers orders.

[¶114]    The Defendants assert Defendant Officer Doe was acting in a defensive position when he or she allegedly acted and given the totality of the circumstances he or she acted objectively reasonable. To support this assertion, the Defendants request the Court to consider a number of facts not contained on the face of the Complaint. The Court appreciates that many of these extrinsic facts may go directly to the heart of whether Defendant Officer Doe's actions were objectively reasonable.

[¶115]    The Court could go through each and every extrinsic fact offered by the Defendants, explaining why some may be considered and why others may not. However, in the interests of efficiency and justice, the Court deems it more appropriate to  convert the Defendants' Motion to Dismiss as it pertains to Wilansky's remaining claims into a Motion for Summary Judgment, consider all of the extrinsic facts thereafter, and allow further limited discovery as outlined below. See Fed. R. Civ. P. 12(d) (If "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); see also Brooks v. Midwest Heart Grp., 655 F.3d 796, 800 (8th Cir. 2011) ("Upon conversion to a motion for summary judgment, '[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.'").

[¶116]    Wilansky's remaining Fourth Amendment and state-law claims largely turn on the resolution of a limited number of factual disputes, including (1) whether Defendant Officer Doe used an explosive less-lethal munition at the time and place of Wilansky's injury; (2) if Defendant Officer Doe was acting in a defensive position when he or she used such munition if he or she did; and (3) whether protestors were handling improvised explosive devices at the time and location of Wilansky's injuries. These facts will aid a factfinder in determining if Defendant Officer Doe used an explosive less-lethal munition in an objectively unreasonable manner.

(3) Qualified Immunity

[¶117]    In addition, these facts must first be developed in order to determine if Defendant Officer Doe is entitled to qualified immunity. "Qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would know." Ferguson v. Short, 840 F.3d 508, 510 (8th Cir. 2016). "The determination of whether qualified immunity is applicable in given circumstances is one of

'objective reasonableness.'" <u>Herts v. Smith</u>, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." <u>Id.</u> (citing <u>Sparr v. Ward</u>, 306 F.3d 589, 593 (8th Cir. 2002)). The defendant bears the burden of proof on this affirmative defense. <u>Id.</u>

[¶118]    A two-step inquiry is undertaken to determine if qualified immunity is invoked: "(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation." <u>Jones v. McNeese</u>, 675 F.3d 1158, 1161 (8th Cir. 2012). "For the purposes of step two, "clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Id.</u> While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." <u>White v. Pauly</u>, 137 S. Ct. 548, 551 (2017) (citations omitted). "We . . . look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." <u>Meloy v. Bachmeier</u>, 302 F.3d 845, 848 (8th Cir. 2002). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning so long as the unlawfulness is apparent." <u>Dean v. Searcey</u>, 893 F.3d 504, 518 (8th Cir. 2018), <u>cert. denied,</u> 139 S. Ct. 1291, 203 L. Ed. 2d 414 (2019)

[¶119]    The Defendants assert Wilansky has failed to cite "case law involving the use of less-lethal munitions <u>from a strictly defensive position</u> by law enforcement under a totality of the circumstances similar to those in the present case in which such deployment constituted excessive force." Doc. No. 29, p. 32 (emphasis added). The Defendants assert in the inverse there is case law

which supports the finding that a law enforcement officer may use less-lethal munitions to prevent unlawful access to property, protecting public, and protecting private property rights without running afoul of the Fourth or Fourteenth Amendments. Id. These assertions, however, rely upon facts not found on the face of Wilansky's Complaint. In fact, her Complaint asserts the opposite of law enforcement being in a defensive position – she asserts she was peacefully standing near the barricade, breaking no laws, when Defendant Officer Doe, who was calm and had no threat of harm, threw the flashbang at her. Limited discovery is needed to establish the facts as they relate to the excessive force claim in order to determine if Defendant Officer Doe is entitled to qualified immunity.

[¶120]   Indeed, this case is an example of why "qualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." Walker v. Schult, 717 F.3d 119, 130 (2d Cir. 2013) As the United States Supreme Court has noted, "when qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify" and "the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." Pearson v. Callahan, 555 U.S. 223, 238–39, 129 S. Ct. 808, 819, 172 L. Ed. 2d 565 (2009).

### B.  Limited Discovery

[¶121] The Defendants' converted Motion for Summary Judgment narrows what factual disputes are present for purposes of resolving their specific converted Motion. As noted above, these disputes largely include (1) whether Defendant Officer Doe used an explosive less-lethal munition at the time and place of Wilansky's injury; (2) if Defendant Officer Doe was acting in a defensive position when he or she used such munition if he or she did; and (3) whether protestors were handling improvised explosive devices at the time and location of Wilansky's injuries.

[¶122] As a result, the Court will limit the discovery to address the Defendants' specific Motion. Both parties shall provide to the Court, and serve upon the other, a detailed list of the discovery each seeks. This includes a list of each individual to be deposed (not to exceed two (2) persons or entities), a list of each third-party intended to be subpoenaed (not to exceed two (2) persons or entities), a list of each individual or entity (not to exceed two (2) individuals or entities, including named parties) to be served with interrogatories and production of document requests (not to exceed twelve (12) in total, including subparts), and a detailed list of any other discovery sought. This list shall be filed and served within seven (7) days of the date of this Order.

[¶123] The Court will then review each submitted list and issue an Order outlining what discovery will be permitted for each party. After the issuance of the limited discovery order, the Court will schedule a status conference with the parties to address the scheduling order in this matter as it pertains to this Motion for Summary Judgment and other pertinent deadlines.

## III.   CONCLUSION

[¶124] The Court ORDERS State Defendant Iverson's Motion to Dismiss [Doc. No. 26] is **GRANTED**. Cause of Action Eight (8) as to Defendant Iverson is **DISMISSED WITH PREJUDICE.**

[¶125] In addition, the Court ORDERS County Defendants' Motion to Dismiss [Doc. No. 28] is **GRANTED**, in part, and **CONVERTED TO SUMMARY JUDGMENT AND DEFERRED**, in part. County Defendants' Motion to Dismiss Causes of Action Two (2) as to Defendant John Doe Law Enforcement Officer; Three (3) as to Defendants Morton County and Kyle Kirchmeier in his official capacity; and Eight (8) as to Defendants Laney, Morton County, and Kyle Kirchmeier in both is official and personal capacities is **GRANTED**. Causes of Action (2), (3), and (8) are **DISMISSED WITH PREJUDICE**.

[¶126] County Defendants' Motion to Dismiss Causes of Action One (1) as to John Doe Law Enforcement Officer; Four (4) as to Defendants John Doe Law Enforcement Office and Morton County; Five (5) as to Defendants John Doe Law Enforcement Office and Morton County; Six (6) as to Defendants John Doe Law Enforcement Office and Morton County; and Seven (7) as to Defendants John Doe Law Enforcement Office, Morton County, and Kyle Kirchmeier in his official capacity is **CONVERTED TO SUMMARY JUDGMENT AND DEFERRED.** The parties shall be allowed to conduct limited discovery as discussed above.

[¶127]   **IT IS SO ORDERED.**

DATED October 29, 2020.

Daniel M. Traynor, District Judge
United States District Court