**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Sophia Wilansky, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18-cv-236 |
| | ) | |
| vs. | ) | **ORDER REGARDING PLAINTIFF'S** |
| | ) | **MOTION TO COMPEL** |
| Morton County, North Dakota, et al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Sophia Wilansky was injured in the early morning hours of November 21, 2016, and alleges her injury resulted from defendants' use of excessive force. Defendants moved to dismiss Wilansky's complaint, and the presiding judge dismissed some of Wilansky's claims. (Doc. 46). As to the claims not dismissed, the presiding judge converted the motion to dismiss to a motion for summary judgment and allowed the parties to conduct limited discovery addressing three distinct questions.

During the course of the limited discovery, the parties have had numerous disputes about the adequacy of Morton County's responses to Wilansky's interrogatories and requests for production of documents, and the court has held numerous informal dispute resolution conferences pursuant to Civil Local Rule 37.1. During a March 16, 2021 conference, the court authorized Wilansky to file a motion to compel Morton County to produce documents of five persons identified as public information officers (PIOs). Wilansky filed that motion, (Doc. 82), and Morton County filed its opposition to the motion, (Doc. 86).

### Background

The facts on which Wilansky bases her claims are detailed in an order addressing the motion to dismiss, (Doc. 46),  and so are described only briefly here. On November

20 and 21, 2016, Wilansky was engaged in a protest against construction of the Dakota Access Pipeline (DAPL) near the Backwater Bridge in Morton County, North Dakota. She alleges a law enforcement officer—identified as John Doe—intentionally fired a grenade-like explosive he knew to be dangerous directly at her, while she was unarmed, engaging in peaceful protest, and actively complying with law enforcement orders to retreat from a police barricade. She alleges the officer's action resulted in most of her left forearm being blown off. (Doc. 35, p. 7). It is defendants' position that Wilansky's "alleged injuries were caused by an improvised explosive device—a device not originating from law enforcement." (Doc. 60-2, p. 12).

> The presiding judge allowed limited discovery about three factual disputes:
>
> (1) whether Defendant Officer Doe used an explosive less-lethal munition at the time and place of Wilansky's injury; (2) if Defendant Officer Doe was acting in a defensive position when he or she used such munition if he or she did; and (3) whether protestors were handling improvised explosive devices at the time and location of Wilansky's injuries.

(Doc. 51, p. 2). The presiding judge limited discovery to each side (1) conducting two depositions of individuals or entities, (2) serving two subpoenas either for third-party depositions or for records and documents, and (3) serving two individuals each with up to twelve interrogatories and twelve requests for production of documents. Additionally, the parties were allowed to request law enforcement agencies having custody of shrapnel recovered from Wilansky's arm and the clothing she was wearing at the time of her injury to allow the parties access to those items for purposes of testing and examination. Id. at 6. This court later allowed Wilansky to serve an additional subpoena. (Doc. 80).

Protest activity against DAPL spanned many months and at times the number of protesters was estimated to be several thousand. As described by Morton County, the

2

North Dakota Department of Emergency Services (NDDES) organized the law enforcement response to the DAPL protests and dozens of law enforcement agencies—state, federal, and local—were involved in the response.

The current dispute centers on Morton County's responsibility to secure documents of five PIOs who were not Morton County employees but who were involved in disseminating information about the DAPL protests. Two of the five PIOs—Donnell Hushka and Maxine Herr—were employees of the North Dakota Association of Counties. Two other PIOs—Rob Keller and Amber Balken--were employees of the North Dakota National Guard (NDNG). The fifth PIO—Tom Iverson—was employed by the North Dakota Highway Patrol (NDHP). There is no dispute that each of the five had some involvement in communications about the DAPL protests and about the law enforcement response to the protests.

## Law and Discussion

Under Federal Rule of Civil Procedure 34(a)(1), a party may serve on any other party a request to produce relevant documents within "the responding party's possession, custody, or control." Wilansky alleges the five PIOs were acting as agents of Morton County during the times relevant to her claims and asserts documents of the PIOs are therefore within Morton County's control. (Doc. 82, p. 3).

The issues raised in this motion are somewhat akin to those discussed in an earlier order addressing whether Morton County was required to produce documents of other law enforcement agencies who were part of the response to the DAPL protests. As discussed in the earlier order, "control" within the meaning of Rule 34 includes the practical ability to obtain the documents from a non-party. In the earlier order, the court rejected Wilansky's assertion that Morton County had a legal entitlement to documents

3

of other law enforcement agencies but concluded Morton County likely had the practical ability to obtain documents from the other agencies on request. (Doc. 65, p. 10). The court therefore directed that Morton County request certain documents from certain law enforcement agencies. Morton County made those requests. Morton County subsequently advised the court most, if not all of the agencies, provided the requested documents, which Morton County then produced to Wilansky.

### 1.    Relevance

Wilansky describes the internal PIO communications she seeks as relevant to the core issues on which discovery is authorized—whether Officer Doe used an explosive device or whether protesters were using improvised explosive devices at the time and place she was injured. Wilansky contends "[t]he PIOs crafted and published Morton County's allegation that Sophia Wilansky could not have been injured by a law enforcement munition and was instead injured by a protester-created propane tank bomb." (Doc. 82, p. 1). She cites email messages alleged to show the PIOs "schemed" to issue press releases "proclaiming the propane tank allegation and denying Sophia's account that she was injured by a law enforcement munition" before any fact-checking was conducted. Id. at 2. Wilansky alleges the PIOs' internal communications are relevant to (1) the extent of law enforcement investigations of the cause of her injury and (2) the credibility of law enforcement officers' assertions that she was injured by a propane tank rather than by a munition deployed by a law enforcement officer.

According to Morton County, the press releases which Wilansky cites were issued through the North Dakota Joint Information Center (NDJIC) and "were supported by information provided by numerous sources." (Doc. 86, p. 2). With its response to the motion, Morton County submitted reports of several law enforcement officers, asserting

the reports support the press releases. In so doing, Morton County challenges Wilansky's theory of the PIOs "scheming" to issue press releases favorable to law enforcement before adequate fact-checking had been completed. But whether the press releases are supported by those sources is a fact issue that will not to be decided in this motion. Morton County also notes Wilansky's defamation claims related to statements about the cause of her injuries have been dismissed. But dismissal of those claims does not lead to the conclusion the information sought from the PIOs is not relevant.

Documents concerning Wilansky's injury that were generated by the PIOs or received by the PIOs may be relevant to investigation of the cause of her injury, and thus relevant to whether her injury was caused by a law enforcement munition, an improvised device, or something else.

## 2.    Working Relationship Between Morton County and Public Information Officers

Morton County states the law enforcement response to the DAPL protests was organized through the NDDES. Though multiple entities were involved in the response, Morton County states "each agency was responsible for their own personnel." Id. at 1.

An organizational chart in evidence depicts the law enforcement command structure established to respond to the DAPL protests. The chart identifies defendant Kyle Kirchmeier—Morton County Sheriff—as one of four officials comprising a "Unified Command" of the law enforcement response. Sheriff Kirchmeier states he and the other three officials who comprised the Unified Command made joint decisions regarding overall objectives, after consulting among themselves and with others. (Doc. 64, p. 2).

The organizational chart and Sheriff Kirchmeier's deposition testimony confirm the PIOs reported directly to the Unified Command. (Doc. 82-8; Doc. 83, pp. 37-38).

The organizational chart identifies Hushka as one of two "Co-Lead PIOs"[1] operating

from a Joint Information Center. Sheriff Kirchmeier testified Hushka, and possibly also

Herr, was present with him at the [Technical Operations Center] on the date Wilansky

was injured. (Doc. 83, p. 26).

Both Wilansky and Morton County cite deposition testimony of Sheriff

Kirchmeier concerning the relationship between Morton County and the PIOs:

> Q. . . . When the JIC issues a press release, generally speaking, who are they issuing it on behalf of?
>
> A. Well, from, from my understanding of what your question is, the, that would be under the state because it's the Joint Information Center under the state.
>
> Q. So there, those press releases are on behalf of the State of North Dakota?
>
> A. I'm just trying to figure out what, what, North, we have, Morton County had press releases and the joint, the Joint Information Center had press releases but they were working together. I don't know how else I can answer it.
>
> Q. Okay. Whose job was it to issue the press releases on behalf of Morton County during the DAPL protests?
>
> A. At the beginning, it was no one because I didn't have a, a, a press release person because this, the, the, the whole protest and every, the events leading up to this was not planned, it just, it, it came out of the blue type of thing, so at the very beginning, I did, there was no PIO, but as we got into this, then the association of counties lent me a, a PIO that they had and that was Donnell Preskey.
>
> Q. Donnell, say that again.
>
> A. Donnell Preskey, Donnell, yeah. Yes, Preskey Hushka.

Id. at 6-7 (objection omitted).

---

[1] The other person identified as a "co-lead PIO" is not among the five PIOs that are the subject of this motion. (Doc. 82-8).

Concerning PIO Hushka, Sheriff Kirchmeier testified:

 Q.  And was [Donnell] Hushka issuing press releases on behalf of Morton County by November 20, 2016?

 A.  At November 20th, she was still involved with this, with this incident, but it was being switched over due to the fact that she was with the association of counties and the legislative session was starting up, so she had to go back to her normal duties.

 Q.  And when did she go back to her normal duties?

 A.  It would have been right during that, this time that this happened, on, on November 20th, 21st, and then, after that, there was another PIO by the name of Maxine, [Herr], that, that was taking her position.

Id. at 7.

 Q.  . . . [A]s of this time, Donnell had been lent to you to do public relations for Morton County. Correct?

 A.  She was assisting Morton County with news releases and public information.

 Q.  Okay. And at this time she reported to you. Correct?

 A.  Well, well she didn't necessarily work for me. She works for the association of counties but we talk.

 Q.  Okay. But did she report to you during this time?

 A.  Well, what do you mean by report? I mean, she—

 Q.  Well, you're familiar with the idea of a chain of command in law enforcement or – correct?

 A.  Right. If you're using it in that context then, then no.

 Q.  Well, who did she report to then?

 A.  Well, she didn't she didn't work for me. She works for the association of counties.

 Q.  I understand who she was employed by. I guess, if you told her to do something related to the DAPL protests, would she do it?

A.   You, in our conversations with, with press releases, yes, we worked together.

Q.  Okay. And if you told her to put out a press release, she would do it. Correct?

A.  From what I'm understanding of the question, it would be yes.

Q.  Okay. And if you told her not to put out a press release, she would refrain from putting it out. Correct?

A.  Correct. It would be the same answer, so, yes, as far as working together and, that would be true.

Q.  Okay. But it wasn't just that you worked together, it was that you gave her directions and she would follow those directions. Correct?

A.  As, as far as what I'm understanding your question is, that, you know, I you know, she doesn't—we work together, and that's the best way I could say it, is getting the information out, so we did talk but she was still not employed by Morton County and was part, was also part of the [Joint Information Center].

Q.  Understood. But you said she was lent to you by the Joint Association of Counties. Correct?

A.  Correct.

Q.  So she was lent to you to do public relations on behalf of Morton County. Correct?

A.  On Morton County.

Q.  Okay.

A.  Yes.

Id. at 10 (objections omitted).

Q.  . . . Did you ever personally work with Donnell Hushka on a press release related to the DAPL protests?

A.  Yes.

Q.  Okay. Did you ever personally work with Donnell Hushka on a press release related to Sophia Wilansky's injury?

A.  I would say that, if, if there was a press release, it probably was, but there was a lot of information with the, the joint information. I can't sit here and say a hundred percent on, on how that came about here at this point.

Q.  Would you be surprised to see e-mail communications between you and Donnell Hushka about a press release related to Sophia Wilansky's injury?

A.  Well—

A.  Probably not.

Id. at 11 (objections omitted). Morton County would distinguish between public relations "on behalf of Morton County" and public relations "on Morton County." (Doc. 86, p. 4). The court does not view that distinction as determinative of the working relationship between Hushka and Morton County.

Though the court does not share Wilansky's characterization that Hushka acted as Sheriff Kirchmeier's "personal press agent," (Doc. 82, p. 3), Sheriff Kirchmeier's deposition testimony shows a very close working relationship between Hushka and the sheriff. She followed his directions in issuing, or not issuing, press releases. Because Sheriff Kirchmeier described Herr as taking the position Hushka had held, the court will assume the working relationship between Herr and Morton County was analogous to that between Hushka and Morton County.

**3.    Agency**

Wilansky cites case law and statutes in support of her position that the PIOs acted as agents of Morton County during the DAPL protest activity. (Doc. 82, pp. 4-5). Morton County responds that none of the PIOs were paid by Morton County, Sheriff Kirchmeier was one of four officials that comprised the Unified Command, and all press

releases and internal communications in relation thereto in its possession have been produced. (Doc. 86, p. 5).

As to any assertion that it need not collect documents from the PIOs because those documents are not stored on Morton County's servers, Wilansky points out that storage of electronic documents on third-party servers is common and does not negate an obligation to search for and produce relevant documents. See Flagg v. City of Detroit, 252 F.R.D. 346, 353-66 (E.D. Mich 2008) (concluding the City had control over electronic communications stored by a third party because the City could consent to their disclosure).

Morton County analogizes Wilansky's position to arguing a newspaper reporter should be considered an agent of a person who is interviewed for a news story or a person who asks a newspaper to print a story including information the person provides. (Doc. 86, p. 4). The analogy fails. A newspaper reporter cannot be likened to a PIO whose responsibility is to provide information on behalf of a public entity.

Whether any of the five PIOs was an agent of Morton County for purposes of holding Morton County responsible for their actions need not be decided in this motion. As discussed in connection with the earlier motion concerning law enforcement agencies, for purposes of Rule 34, "control" includes the practical ability to obtain documents from a non-party. The court thus considers whether Wilansky has shown Morton County has that practical ability.

**4.    Practical Ability to Obtain Documents and Evidence from Other Agencies**

As discussed above, PIO Hushka, though employed by the North Dakota Association of Counties, had a close working relationship with the Morton County

Sheriff. More than thirty law enforcement agencies that responded to the DAPL protests voluntarily provided documents to Morton County, and there is no evidence any of those agencies was unwilling to provide documents at Morton County's request. Additionally, the agencies whose personnel worked as PIOs would have an obligation to respond to a document subpoena.

Given the evident degree of cooperation between Morton County and the North Dakota Association of Counties in responding to the DAPL protests, the court will order Morton County to request documents from that entity, as detailed below.

As to the PIOs employed by the NDNG and the NDHP, Wilansky has not presented evidence about their working relationship with Morton County. One might assume the working relationship between those agencies and Morton County was analogous to that of Hushka and Morton County. But the court is aware that both the NDNG and the NDHP received requests for documents pursuant to the court's February 1, 2021 order, and both agencies should have included documents of the PIOs in responding to those requests. At this time, the court will not order that Morton County request PIO documents from the NDNG or the NDHP.

The court therefore orders Morton County to request the following documents and evidence from the North Dakota Association of Counties: any documents received by or generated by PIOs Hushka and Herr which relate in any way to Wilansky's injuries, including any internal communications, emails, and text messages. Counsel for Morton County must make the request for responsive documents within three days of today's date and must simultaneously send a copy of the request to Wilansky's counsel. A copy of this order must be included with the request. The association must be asked to respond to the request within five days of receipt. Counsel for Morton County must

provide copies of any documents received to Wilansky's counsel within three days of counsel for Morton County receiving the documents. In the event Morton County asserts privilege as to any documents it receives, it must provide a privilege log simultaneously with its production of documents to Wilansky's counsel.

### Conclusion

Wilansky's motion to compel, (Doc. 82), is **GRANTED** to the extent described above.

**IT IS SO ORDERED**.

Dated this 14th day of April, 2021.

/s/ Alice R. Senechal
Alice R. Senechal
United States Magistrate Judge