# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Vanessa Dundon, et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>Kyle Kirchmeier, et al., )<br>)<br>Defendants. ) | Case No. 1:16-cv-406<br><br>**ORDER ON IN CAMERA REVIEW** |
| Sophia Wilansky, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Morton County, North Dakota, et al., )<br>)<br>Defendants. ) | Case No. 1:18-cv-236<br><br>**ORDER ON IN CAMERA REVIEW** |

In both cases captioned above, the plaintiffs allege they suffered personal injuries while engaged in protest activities against construction of the Dakota Access Pipeline (DAPL) on November 20-21, 2016, near the Backwater Bridge, in Morton County, North Dakota. They allege their injuries resulted from illegal acts of law enforcement officers. This order addresses a dispute about a discovery matter common to both cases—whether the plaintiffs must produce intake forms that were either completed by lawyers who were at the protest site or completed by protesters themselves and given to the lawyers.

After converting motions to dismiss to motions for summary judgment in both cases, the presiding district judge allowed the parties in both cases to engage in limited discovery on discrete issues. There is partial commonality of defendants in the two

cases, and all defendants in both cases are represented by the same counsel. The plaintiffs in the two cases are represented by different counsel.

## Background

Protest activity against the DAPL spanned many months and at times the number of protesters was estimated to be several thousand. Protesters asserted the route of the DAPL violated treaties between the United States and the Standing Rock Sioux Tribe and that the route threatened the water supply to native lands. Protesters often referred to themselves as "water protectors." As described by the Dundon plaintiffs, lawyers from various other states came to North Dakota during the latter part of 2016 "to provide pro bono legal advice and representation to the water protectors." (Doc. 196, p. 1).[1] Some of those lawyers formed Water Protector Legal Collective (WPLC), a nonprofit organization incorporated under North Dakota law on October 25, 2016. N.D. Sec. of State, https://firststop.sos.nd.gov/search/business (business search "Water Protector Legal Collective"). According to the Dundon plaintiffs, many lawyers joined WPLC and "worked as volunteers, staff or cooperating attorneys for various periods of time." (Doc. 197, p. 1). The WPLC lawyers worked from a tent and recreational vehicle at a protesters' camp near the protest site.

The Dundon plaintiffs seek to represent a class of protesters alleged to have been injured on November 20-21, 2016. They state that soon after the events of those dates, many water protectors came to the WPLC tent "to give their accounts of the event and seek legal advice and representation." Id. at 2. After deciding to file this putative class action and to request a restraining order, the WPLC lawyers "interviewed the water

---

[1] Except as otherwise indicated, all docket cites in this order are to the Dundon case.

protectors and recorded their notes on the intake forms," though "some water protectors filled out the intake forms themselves and then handed them directly to one of the lawyers, who conducted a further interview and sometimes made additional notes on the form." Id. Plaintiffs state WPLC lawyers "took more than 60 intake interviews concerning the November 20-21 event" and also "received photos, videos, and spent munitions that water protectors had picked up, filling out Evidence forms regarding these items." Id.

Wilansky alleges she was injured on November 21, 2016, in an incident separate from that alleged by the Dundon plaintiffs.

WPLC lawyers used a "Potential Plaintiff/Witness Intake Form" that contains three sections. The first section recorded an individual's contact information. A second section is titled "Personal Information" and asked for a detailed description of "the incident," whether the person saw and can identify law enforcement involved, whether the person took photos or video, witnesses who saw the person injured, and whether there are photos or videos of the person's injuries. A third section is titled "For Potential Plaintiffs" and asked about medical treatment, impact of the injury, whether the person gave statements or posted on social media about the incident, whether the person had alcohol or drugs within 24 hours of the incident, the person's prior experience with legal matters, and whether the person had questions or concerns about being a potential plaintiff or witness. Id. at 4-6.

The WPLC lawyers also used a single-page Evidence Collection Form. The evidence form asked for a person's contact information and for details about images or videos the person obtained. A note in the top right corner of the evidence form states "Legal Collective Use Only." It appears to be a form that could be completed on a

computer, but the one in the record was handwritten with a computer-generated note attached. The attached note appears to concern communication between attorneys. Id. at 7.

On November 28, 2016, Vanessa Dundon and six other plaintiffs filed case number 1:16-cv-406 as a putative class action. The same date, they filed motions for a temporary restraining order and for a preliminary injunction. In support of their motions, the Dundon plaintiffs filed declarations of each named plaintiff and of nine other putative class members. The declarations were based on information documented in the intake forms. A single intake form was filed with a declaration of plaintiff Frank Finan. (Doc. 14-15, pp. 4-7). The Dundon plaintiffs attribute that filing to a staff person's error.

Having learned about the two WPLC forms through the Dundon plaintiffs' filing error, the Dundon defendants served a request for production of "any and all completed 'Potential Plaintiff/Witness Intake Form(s)' and all 'Evidence Collection Form(s)' from any date completed by you or any eyewitness or participant to the DAPL protest activities from October 22, 2016 through November 22, 2016." (Doc. 202, p. 1). Plaintiffs' counsel in the Dundon case state they were not aware of their 2016 filing error until late 2020 when defendants served the discovery requests and attached a copy of the Finan form that had been erroneously filed. The Dundon plaintiffs objected to the request for production on grounds of attorney-client privilege and the work product doctrine.

In both cases, the parties have had a number of disputes about discovery, and the court has conducted numerous informal discovery dispute conferences pursuant to Civil Local Rule 37.1. Defendants raised issues about Wilansky's obligation to produce a

4

privilege log, and the court directed Wilansky to prepare a privilege log. (Wilansky, Doc. 75, pp. 9-10). During a March 16, 2021 Rule 37.1 conference, the court directed that Wilansky's log and the intake forms listed on it be submitted for in camera review. (Wilansky, Doc. 80, p. 3).[2]

During a March 19, 2021 Rule 37.1 conference in the Dundon case, defendants raised the question of whether plaintiffs' objection to production of the intake and evidence forms was proper, and the court directed both sides to file briefs on the question. As requested by the court, plaintiffs filed a brief and submitted a sampling of the intake forms for in camera review. (Doc 196; Doc. 197).[3] Defendants also filed a brief on the issue. (Doc. 202). Counsel in the Dundon case have not yet been required to produce a privilege log concerning the intake and evidence forms.

In camera review of the various intake forms submitted in both cases shows that each of the three sections was completed on most of the forms, indicating the individual was considered a potential plaintiff. Most of the forms identified an attorney who interviewed the person and most appear to have been completed by an attorney, since they are written in the third person. A few of the forms are written in the first person. A few of the forms include additional handwritten notes, some of which appear to have

---

[2] The intake forms which Wilansky submitted for in camera review have been added to the docket, with access limited to court users. (Wilansky, Doc. 81).

[3] The Dundon plaintiffs were directed to submit the representative intake forms to the court via email, which was not to be copied to the defendants. Plaintiffs instead filed the forms under seal. When filed under seal, the forms were not accessible to the public but were accessible to other parties in the case. The court restricted access to the forms, so they are no longer accessible to anyone other than court users. A letter from the clerk directed defendants to destroy any copies of the forms that plaintiffs erroneously filed under seal. (Doc. 197).

5

been written by an attorney and some of which appear to have been written by the person himself or herself.

The Dundon plaintiffs assert the intake forms are protected by the attorney-client privilege as "recordings of communications that took place between individuals seeking legal advice and representation regarding the law enforcement use of force on November 20-21, 2016, and attorneys preparing to represent them in a civil rights class action lawsuit." (Doc. 196, p. 3). Further, they argue their "inadvertent disclosure" of one intake form did not waive the privilege as to the forms completed for or by other protesters. Finally, they argue the intake forms were prepared by lawyers in anticipation of litigation and so are entitled to protection under the work product doctrine.

Wilansky does not assert the intake forms listed on her privilege log qualify for attorney-client privilege but contends all are covered by the work product doctrine.

Contending the forms are not covered by attorney-client privilege, defendants assert (1) no attorney-client relationship exists between the persons whose information is recorded in the forms and plaintiffs' current counsel; (2) if an attorney-client privilege once existed, it was waived when the forms were disclosed to plaintiffs' current counsel because plaintiffs' current counsel were not involved in completion of the forms; and (3) even if an attorney-client privilege exists, it does not cover factual information contained within the forms. (Doc. 202, p. 2). Defendants did not respond to plaintiffs' assertions of work product protection.

**Law and Discussion**

Federal Rule of Civil Procedure 26(b) defines the scope of permissible discovery as encompassing "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Communications protected under

the attorney-client privilege, as well as information protected by the work product doctrine, are not discoverable under Rule 26, unless an exception applies.

The <u>Dundon</u> plaintiffs' claim of attorney-client privilege is governed by Federal Rule of Evidence 501, which provides, "The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court." The attorney-client privilege applies to communications, between an attorney (or the attorney's representative) and a client, made in confidence, for the purpose of seeking or providing legal advice. 1 Edna Epstein, <u>The Attorney-Client Privilege and the Work-Product Doctrine</u> pp. 3-4 (5th ed. 2007). In this circuit, the attorney-client privilege is interpreted broadly, "treat[ing] confidential communications from an attorney as privileged if made for the purpose of rendering legal advice, regardless of whether they would tend to reveal a confidential communication from the client to the attorney and regardless of whether they were 'based upon' . . . such communication of confidential information." <u>North Dakota v. United States</u>, 64 F. Supp. 3d 1314, 1335 (D.N.D. 2014). However, the attorney-client privilege does not protect factual information. <u>City of Phila., Pa. v. Westinghouse Elec. Corp.</u>, 205 F. Supp. 830, 831 (E.D. Pa. 1962). A party claiming attorney-client privilege has the burden of proving its application. <u>Hollins v. Powell</u>, 773 F.2d 191, 196 (8th Cir. 1985).

The work product doctrine protects documents, "otherwise discoverable," prepared in anticipation of litigation or for trial. Fed. R. Civ. Pro. 26(3)(A). As with the attorney-client privilege, the party asserting the protection has the burden of establishing a document should be protected as attorney work product. <u>Nodak Mut. Ins.</u>

7

Co. v. Case New Holland, LLC, No. 3:14-cv-86, 2015 WL 11438181, at *5 (D.N.D. June 16, 2015).

In arguing no attorney-client privilege came into existence between the WPLC lawyers and the protesters, defendants assert the Dundon plaintiffs have not shown "that anyone actually present at and who received the Intake Forms at the tent in the protester camp was actually a licensed attorney." (Doc. 202, p. 3). But the Dundon plaintiffs filed a declaration stating the WPLC forms were either completed by licensed attorneys or completed by protesters who gave the forms directly to licensed attorneys. (Doc. 197). For purposes of this motion, the court assumes the forms not completed by the protesters themselves were completed by licensed attorneys and the forms completed by protesters themselves were given directly to licensed attorneys.

Defendants also question whether WPLC lawyers, if not licensed to practice in North Dakota, engaged in the unauthorized practice of law when they completed or received the intake forms. North Dakota Rule of Professional Conduct 5.5 addresses the unauthorized practice of law. Rule 5.5 describes several "safe harbors" for lawyers admitted to practice in another jurisdiction, but not admitted in North Dakota, who perform legal services in North Dakota on a temporary basis. One of the safe harbors addresses a lawyer who is preparing for a matter in which the lawyer reasonably expects to be admitted to practice in North Dakota on a pro hac vice basis.

While Rule 5.5 does not address the precise facts of this case, the policy behind the rule can be applied to this case. WPLC lawyers were licensed in other jurisdictions and not in North Dakota. They were preparing for a case they planned to file in this court. A lawyer who is not admitted to practice in this district may be admitted pro hac vice under General Local Rule 1.3(D), and WPLC lawyers could reasonably have

8

expected to be admitted pro hac vice in this district at the time they documented the communications reflected in the intake forms. Thus, the court cannot conclude the WPLC lawyers engaged in the unauthorized practice of law. Moreover, other courts have held an attorney-client privilege can arise even if the attorney is not authorized to practice in the jurisdiction in which he or she communicated with an individual seeking legal advice. Gucci America, Inc. v. Guess?, Inc., No. 09 Civ. 4373, 2011 WL 9375, at *2 (S.D.N.Y. Jan. 3, 2011) (communications to a person who is not a licensed attorney may be privileged if the client reasonably believed that the person to whom the communications were made was an attorney); (Parimal v. Manitex International, Inc., Civ. No. 3:19CV01910(MPS), 2021 WL 363844, at *9 (D. Conn. Feb. 3, 2021) (communications to a retired attorney were entitled to protection under attorney-client privilege).

Defendants argue WPLC is not a law firm such that WPLC attorneys could be viewed as sharing the same clients. Based on available information, the court agrees. Indeed, plaintiffs do not argue that WPLC should be considered a law firm.

Defendants also contend plaintiffs have not shown the forms were completed for the purpose of obtaining legal advice. In support of that position, defendants point to deposition testimony of two named Dundon plaintiffs who stated they had not hired lawyers while at the DAPL protests. (Doc. 203). David Demo testified:

> Q. So, Mr. Demo, during the DAPL protest, did you hire an attorney?
>
> A. No.
>
> Q. What was the first time -- well, let me ask you this. When did you make a determination to get involved in this lawsuit?
>
> A. I had -- there had been questions asked about who was involved that night and if anybody had the night of the Backwater Bridge incident, if

9

anybody had been injured, to come and fill out paperwork giving their side of things. And so I had filled that out, and since then, it has been an ever-evolving thing.

Q. Okay.

A. I cannot give you the exact time where I was like, "Okay. I'm on board." I couldn't give you the exact date or the exact month where I was asked to be a part of this or I had asked to be a part of this; but the day following was the very first day that I filled out any information given to the legal team for this incident.

Q. Okay. So your attorneys in this case, Ms. Hoft, is here today. When did you first speak to her?

A. I don't recall at this time. I couldn't give you and exact date or time, roughly.

Q. Would it have been sometime after the—you left the DAPL protests?

A. It was obviously, sometime after the protest.

Q. Okay. In other words, after you left North Dakota?

A. I don't recall at this time. I believe so.

Q. Okay. And then, one of your other attorneys is Rachel Lederman?

A. Yes.

Q. When did you first speak to Ms. Lederman?

A. I don't recall the exact date or time.

Q. Was it sometime after the protest?

A. I don't recall at this time.

Q. Okay. And how about Melinda Powers, do you know when you first spoke with her?

A. I cannot give you the exact date or time.

Q. You mentioned the paperwork that you filled out the day following this incident on November 20, 2016. Is that correct?

A. The days following the incident, yes.

10

> Q. Okay. And on the date you filled out that paperwork, you did not have an attorney representing you; is that correct?
>
> A. I did not hire an attorney to represent me.
>
> . . . .
>
> Q. . . . .What form or forms did you fill out the day following the November 20, 2016 incident?
>
> A. I can't give you the exact information on what the questions were; but a generalized remembrance was information about what had happened, why I was there, what we were doing, what we, as in the protesters, were doing, what I was doing, what had happened to me.

(Doc. 203-1, pp. 19-20) (objections omitted).

Demo described completing a form at a "legal tent" set up at a protester camp and described people having gathered at the legal tent "to talk to people that could help." Id. at 21. After he was shown the Finan intake form erroneously filed in 2016, he testified some of the questions on that form were the same as those on a form he had completed. Id. at 20.

Finan also testified he had not hired an attorney to represent him during the time he was at the DAPL protests. Nor did he meet any of the attorneys representing the plaintiffs in the Dundon case, or anyone associated with those attorneys' law firms, during the time he was at the DAPL protests. (Doc. 203-2, pp. 14-15). Finan further testified:

> Q. And so at some point after you left the DAPL Protests in mid December, 2016, did you retain an Attorney to represent you in relation to the injuries you sustained on November 20, 2016 while at the DAPL Protests?
>
> A. No.
>
> Q. So how did it come back to your understanding, Mr. Finan, that you got involved in this lawsuit?

11

. . . .

A. I'm going to answer. When I was at the Medical Tent, they told me I should file a Complaint at the Legal Tent. I don't know who they represented.

I thought I was just putting something on the record that I was injured. I didn't expect anything to come from it.

Q. And is that when you prepared the potential Plaintiff Witness Intake Form?

A. I guess that's what you call it.

. . . .

Q. Why have you become a party in this lawsuit, Mr. Finan?

A. When I was examined by the medical people, they told me I should go over and file a note that this happened. And I just thought it was going to go on the record that this happened. I didn't know it was going to be anything like this.

Q. So was there any other reason you're involved in this lawsuit other than that's what you were told at the camps?

A. I thought my filling that paper out was to file criminal against whoever shot me. I didn't know it was going to be -- whatever this is.

Q. Okay. So did you ever give anyone permission to include you in a civil lawsuit - -

A. And I don't understand even what's going on, as far as what the question is? I don't know who the attorneys were, who I talked to, what was going to become of it.

I just wanted it for the record that I got shot, and I thought it was over.

Id. at 15, 52-53 (objections omitted). Finan testified the Evidence Collection Form that was filed in error is not in his handwriting. Id. at 17. Asserting attorney-client privilege and the work product doctrine, plaintiffs' counsel advised Finan to answer no other

deposition questions about the intake form, the evidence form, or his decision to be involved in this litigation. Id. at 18, 52-53.

Defendants would interpret Finan's testimony to be a denial of his agreement to be a plaintiff in this lawsuit. (Doc. 202, p. 4). This court does not share that interpretation. Finan appeared for deposition testimony, and there is nothing in the record suggesting he is not a willing participant in the lawsuit at this time. At the time he spoke with WPLC attorneys during the DAPL protests, Finan apparently did not plan to be a plaintiff in this case. But that does not mean he was not seeking legal advice when he talked with the WPLC attorneys. Nor does Demo's testimony contradict the assertion that he was seeking legal advice when he talked with the WPLC attorneys.

Existence of an attorney-client privilege is not dependent on payment of fees, agreement to terms of a representation, or actual engagement of a lawyer. Escamilla v. SMS Holdings Corp., No. 09-2120, 2011 WL 13243580, at *6 (D. Minn. June 28, 2011); see also Banner v. City of Flint, 99 F. App'x 29, 36 (6th Cir. 2004) ("When a potential client consults with an attorney, the consultation establishes a relationship akin to that of an attorney and existing client[.]"). North Dakota Rule of Professional Conduct 1.18, and a similar model rule, recognize that "[e]ven when no lawyer-client relationship ensues, a lawyer who learned information from a prospective client" has an obligation to keep that information confidential. The fact that neither Demo nor Finan hired lawyers while at the DAPL protests does not negate the existence of an attorney-client privilege.

As to those forms concerning persons who are not identified as "potential plaintiffs," it is more difficult to determine whether they were seeking legal advice, or only providing information as witnesses, when they spoke with WPLC attorneys. But their statements were taken by or for lawyers who were preparing for litigation. Thus,

13

the court views the lawyers' documentation of those statements as attorney work product.

As Wilansky asserts, courts commonly recognize a "common interest" privilege, which effectively negates what might otherwise be considered a waiver of the attorney-client privilege. According to the Restatement (Third) of the Law Governing Lawyers, "If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged . . . that relates to the matter is privileged as against third persons." Restatement (Third) of the Law Governing Lawyers § 76 (March 2021 update). See also Epstein, supra, at 476-83. To the extent either of these cases includes claims under state law, the court also notes North Dakota Rule of Evidence 502(b) provides the attorney-client privilege encompasses confidential communications, made to facilitate rendition of legal services, "to a lawyer . . . representing another party in a pending action and concerning a matter of common interest therein." (See also Wilansky, Doc. 75, p. 9). As to work product, the Eighth Circuit has held that disclosure to a third party does not constitute a waiver unless the disclosure is made to an adversary or with the intention that an opposing party see it. Gundacker v. Unisys Corp., 151 F.3d 842, 848 (8th Cir. 1998). In this court's opinion, the fact that plaintiffs' current counsel were not involved when the intake forms were completed does not waive the attorney-client privilege or waive protection under the work product doctrine.

The Dundon defendants contend the filing of Finan's intake and evidence forms operates as a waiver as to all forms completed by or given to WPLC attorneys. They argue the erroneous filing was an express waiver of any attorney-client privilege and the

14

scope of an express waiver includes not only the communication that was actually disclosed but also other communications on the same subject matter. (Doc. 202, pp. 9-10). The cases on which defendants rely, however, do not involve unintentional disclosure. Nor do defendants address Federal Rule of Evidence 502, which governs waivers of attorney-client and work product privileges and which was adopted well after the cases which defendants cite.

Rule 502 distinguishes between intentional and inadvertent waivers. Black's Law Dictionary defines "intentional" as "done with the aim of carrying out the act," and defines an "inadvertent disclosure" as "the accidental revelation of confidential information, as by sending it to a wrong e-mail address or by negligently allowing another person to overhear a conversation." Intentional and Inadvertent Disclosure, Black's Law Dictionary (11th ed. 2019). Here, the court views the filing of Finan's intake and evidence forms as inadvertent rather than as intentional. The filing resulted from carelessness; it was not done with a goal of the Finan intake and evidence forms becoming part of the court record.

Under Rule 502(b), an inadvertent disclosure does not operate as a waiver—of either attorney-client privilege or the work product protection—if the holder of the privilege or protection took reasonable steps to prevent disclosure and the holder promptly took reasonable steps to rectify the error after learning of the error. Responsibility for erroneous filing of Finan's intake and evidence forms lies with plaintiffs' counsel in the Dundon case, regardless of whether someone on counsel's staff did the actual filing. As described in a declaration of the Dundon plaintiffs' counsel, the error resulted from working in haste under less than ideal conditions. (Doc. 197, pp. 2-3). While it is difficult to explain why counsel did not recognize the error for four years,

15

when they did recognize it, they promptly notified defendants of their assertion of attorney-client privilege and requested return of the documents. As is likely true of almost every inadvertent disclosure, counsel could have avoided the error by exercising more care. But this court views counsels' error as coming within the parameters of Rule 502(b) and so will not find the filing of the Finan intake and evidence forms to have waived attorney-client privilege or work product protection as to the remainder of the intake and evidence forms.

Dundon counsel are not, as defendants assert, attempting to use attorney-client privilege as both a sword and shield. And even if the filing had been intentional, Finan held the privilege, and nothing suggests he had authority to waive the privilege of all the other protesters whose information was documented on WPLC intake and evidence forms.

Finally, the court addresses the factual information the protesters provided to WPLC attorneys on the intake and evidence forms. It is well-established that the attorney-client privilege does not protect factual information conveyed by a client or prospective client to an attorney. (See Wilansky, Doc. 92, pp. 3-4). Nor can the work product protection be asserted to prevent disclosure of underlying facts. Epstein, supra, at 802. Dundon counsel will be required to produce a privilege log that identifies each of the intake forms in counsel's possession. Plaintiffs in both cases will be required, to the extent they have not yet done so, to provide defendants with factual information included in the intake and evidence forms.

**Conclusion**

As discussed above, the WPLC intake and evidence forms are covered by the attorney-client privilege and/or the work product doctrine. To the extent the forms include factual information, however, that factual information is not protected by either the attorney-client privilege or the work product doctrine. Because of the need to expedite completion of discovery, plaintiffs will be given only a short time to disclose factual information contained in the forms.

**Within three business days of today's date**, the Dundon plaintiffs must provide a privilege log to defendants, listing each intake and evidence form over which they claim attorney-client privilege or work product protection.

**Within five business days of today's date**, plaintiffs in both cases must submit for in camera review proposed redacted versions of each of the forms over which they claim attorney-client privilege or work product protection, with the proposed redactions highlighted or otherwise identified in a manner that enables the court to easily review the proposed redactions. Proposed redacted versions must be submitted to NDD_J-Senechal@ndd.uscourts.gov, without copies to any other party. The Dundon plaintiffs must also provide the court a copy or their privilege by the same date.

**IT IS SO ORDERED**.

Dated this 26th day of April, 2021.

> */s/ Alice R. Senechal*
> Alice R. Senechal
> United States Magistrate Judge