UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Sophia Wilansky,<br><br>                       Plaintiff,<br><br>vs.<br><br>Morton County, North Dakota;<br>Kyle Kirchmeier, in his official capacity;<br>Adam J. Dvorak in his personal capacity;<br>Jonathan R. Moll in his personal capacity,<br><br>                       Defendants. | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Case No. 1:18-cv-00236 |

**INTRODUCTORY STATEMENT**

Plaintiff's Second Amended Complaint sets forth six claims against State Defendant Adam Dvorak of the North Dakota Highway Patrol. *See* ECF 259. Specifically, she brings a claim for excessive force under the Fourth Amendment, a claim for excessive force under the Fourteenth Amendment, and a series of state-law claims. All Plaintiff's claims are fatally flawed, entitling Dvorak to dismissal on the face of the pleadings alone.

The Fourth Amendment claim fails because Wilansky does not allege facts that constitute a seizure. Accordingly, she has failed to allege a violation of a Constitutional right and cannot overcome Dvorak's qualified immunity. But even if Wilansky did state a claim for relief under the Fourth Amendment, Dvorak would still be entitled to qualified immunity based on the lack of clearly established law specific to Wilansky's allegations.

The Fourteenth Amendment claim fails because it was, in essence, already dismissed by this Court. Even if it were not, Wilansky fails to state a claim under the Fourteenth Amendment because she does not allege any conduct that shocks the conscience, which also renders Dvorak protected by qualified immunity . Lastly, her state law claims were already dismissed by this Court, and even if they were not, they would be barred by state sovereign immunity.

For all of these reasons, Dvorak respectfully requests that this Court dismiss the claims against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

1

# BACKGROUND

Plaintiff bases her Constitutional claims against Adam Dvorak on three factual allegations. But these three allegations, even taken as true, do not state a claim for violation of a Constitutional right.

In context, the paragraphs regarding Dvorak occur in her description of the night in question. After a description of Plaintiff and another protestor named Stephen Joachinson standing by the burned-out vehicle at the law enforcement barricade, ¶¶ 124-130, she alleges the following:

> 131. At approximately 3:57 a.m., law enforcement officers ordered them to move away from the burned-out vehicle and accused them of having someone under the truck.
>
> 132. Stephen yelled back that no one was under the truck.
>
> 133. Instead of responding to Stephen's explanation, numerous law enforcement officers began rapidly firing less-lethal munitions at Sophia and Stephen.
>
> 134. To avoid getting hit, Sophia and Stephen cowered behind the metal sheet.
>
> **135. While Sophia and Stephen were pinned behind the sheet unable to move or leave, Defendant Dvorak lobbed two Stinger Ball toward them.**
>
> **136. In a blatant violation of his less-lethal training and appropriate police tactics, Defendant Dvorak did not inspect the likely detonation area to ensure no one would be hit by the grenades. Instead, he actively aimed the grenades toward Sophia.**
>
> **137. The Stinger Ball Grenades landed and exploded within a few feet of Sophia.**

Second Amended Complaint, ¶¶ 131-37.

Based solely on these three bolded paragraphs, Plaintiff brings claims against Dvorak for violations of the Fourth Amendment and Fourteenth Amendment, as well as several state-law grounds. Regarding the Fourth Amendment claim, she specifically claims:

> 193. While acting under the color of law, Defendant Moll and Defendant Dvorak aimed and deployed explosive munitions directly at Sophia.
>
> 194. Via these munitions, Defendant Moll and Defendant Dvorak applied physical force to Sophia.

> 195. Defendant Moll's intentional application of force terminated Sophia's movement and detained her by knocking her to the ground and grievously injuring her left arm.
>
> 196. Defendant Moll's and Defendant Dvorak's uses of force against Sophia—both when she was cowering behind the metal sheet and when she was running south away from the police barricade—were objectively unreasonable and therefore excessive under the totality of the circumstances.

Second Amended Complaint, ¶¶ 193-96.

Regarding the Fourteenth Amendment claim, she writes:

> 201. While acting under color of law, Defendant Moll and Defendant Dvorak launched exploding munitions at Sophia, which deprived her of her liberty without due process of law and grievously injured her left arm.
>
> 202. Defendant Moll's and Defendant Dvorak's deprivations of Sophia's liberty were objectively unreasonable.
>
> 203. The conduct of Defendant Moll and Defendant Dvorak was sufficient to shock the conscience.
>
> 204. Sophia was acting peacefully and complied with law enforcement commands.
>
> 205. Sophia presented no safety threat to Defendant Moll and Defendant Dvorak and was actively complying with law enforcement commands.

Second Amended Complaint, ¶¶ 201-05.

Plaintiff also brings a series of state law claims against Dvorak for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Second Amended Complaint, ¶¶ 227-32.

## LAW AND ARGUMENT

### I.   Legal Standards Applicable to a Motion to Dismiss

#### A.   General Standard Under Rule 12(b)(6)

Dvorak moves to dismiss all the claims brought against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), a defendant can test the legal sufficiency of a complaint in order to eliminate those actions "which are fatally flawed in their legal premises and

3

deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). Although a court must accept the complaint's allegations as true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), and view them in the light most favorable to the nonmoving party, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009), the complaint must still "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face. Thus . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (internal citations and quotation marks omitted). Indeed, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). For purposes of analyzing a motion to dismiss pursuant to 12(b)(6), this Court must accept Plaintiff's factual allegations as true, but the Court is not required to accept her legal conclusions. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010) (citing *Twombly*, 550 U.S. at 556.

In general, a court's analysis of a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 744 (8th Cir. 2022) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Relevant to this case in particular, "[l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Faulk*, 30 F.4th at 744.

### B.  Motions to Dismiss on Qualified Immunity Grounds

As a general rule, government officials such as Dvorak are protected by qualified immunity unless "a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Faulk*, 30 F.4th at 744 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). When considering qualified immunity at the motion to dismiss stage, then, a court considers "whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and whether the right was clearly established at the time of the alleged infraction." *Dadd v. Anoka Cnty.*, 827 F.3d 749, 754-55 (8th Cir. 2016).

### C. Consideration of Matters Outside the Pleadings

Here, general background of the events of the night in question may be considered by the Court even at the motion-to-dismiss stage. Although a Rule 12 motion tests the legal sufficiency of the pleadings, some matters outside the pleadings can be considered. *State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999) (citing *Martin v. Sargent*, 780 F.2d 1334, 1336-37 (8th Cir. 1985)); *see also Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record[.]").

Items subject to judicial notice, as well as matters of public record, generally include court records, *see Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) ("In Missouri, **as in other states**, court records are public records.") (emphasis added), and more specifically, "court filings" from related proceedings. *See Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685 n.6 (8th Cir. 2011) (citing *Biomedical Patent Mgmt. Corp. v. Cal., Dep't of Health Servs.*, 505 F.3d 1328, 1331 n.1 (Fed. Cir. 2007)); *see also Freshman v. Atkins*, 269 U.S. 121, 124 (1925) (holding that a court may "take judicial notice of, and give effect to, its own records in another, but interrelated proceeding"); *Enter. Bank v. Magna Bank of Mo.*, 894 F. Supp. 1337, 1341 (E.D. Mo. 1995), aff'd, 92 F.3d 743 (8th Cir. 1996).

Based on this body of law, Dvorak asks that the Court consider one additional source: its previous analysis of the events of November 20, 2016. Wilansky's Second Amended Complaint[1] acknowledges that the Backwater Bridge on the evening of November 20, 2016, and early morning of November 21, 2016 was the location where her constitutional rights were allegedly violated. *See* ECF 259 at ¶ 7, Significantly, this Court has examined "the existence of and basic facts surrounding" the events at the Backwater Bridge prior to and on November 20/21 on several previous occasions. *See Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sep. 16, 2016)

---

[1] As the Court is aware, Wilansky had previously removed the detail that the removal of the first burned-out truck was facilitated by protestors, but has since reinserted it. See Second Amended Complaint at ¶ 98. Dvorak asks that the Court consider this detail as contributing to a reasonable officer's perception of the overall circumstances involved on the evening in question for purposes of a qualified immunity analysis. The Court should also consider other admissions/allegations made in the original complaint that may be relevant to the dispositive defense of qualified immunity.

5

(hereinafter *Archambault*); *Dundon v. Kirchmeier*, No. 1-16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) (hereinafter *Dundon I*); *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007 (D.N.D. 2021) (hereinafter *Dundon II*). Not only may this Court take judicial notice of "the existence of and basic facts surrounding" the closure of the Backwater Bridge as demonstrated by matters filed in these related proceedings, *Insulate SB, Inc. v. Advanced Finishing Sys., Inc*, 797 F.3d 538, 543 n.4 (8th Cir. 2015), but it "may take judicial notice of judicial opinions, especially [its] own," and thus may reference those facts and its own opinions "in [its] consideration of this case." *Rosemann v. Sigillito*, 785 F.3d 1175, 1177 n.3 (8th Cir. 2015).

In *Dundon II*, this Court specifically noted many facts leading up to and including the evening/early morning hours of November 20/21 at the Backwater Bridge that it referred to as "undisputed facts," including facts whose accuracy cannot seriously be questioned because they are recorded on videotape. 577 F. Supp.3d at 1018-23. Many of those undisputed facts are relevant to the State Defendants' qualified immunity defense in this case because they put in context the overall circumstances that would be perceived by a reasonable police officer on the evening/early morning in question. Those facts include, for example, the rising tension between law enforcement and protestors that preceded November 20/21 (including one protestor arrested for attempted murder for firing three shots at law enforcement officers), the fact that two vehicles had been placed on Backwater Bridge and disabled as part of a barricade, that within minutes protestors set the vehicles on fire, that Backwater Bridge was deemed unsafe because of the fires and closed to all access due to damage, that the burned-out trucks were interconnected to the jersey barrier and concertina wire barricades located on the north side of the Bridge. These facts are also implicit in the original complaint.

The factual findings made by this Court in *Dundon I* were examined on appeal, with the Eighth Circuit affirming the district court's decision. *See Dundon v. Kirchmeier*, 701 F. App'x 538 (8th Cir. 2017).

Along similar lines, the Court should also consider its own comments and analysis in *this* case, including its previous order granting, in part, a motion to dismiss Wilansky's original complaint. *See* ECF 46, ¶¶ 51-53.

6

**II.      Plaintiff Cannot Defeat Dvorak's Qualified Immunity on Her Fourth Amendment Claims.**

Wilansky's claims against Dvorak under the Fourth Amendment are fatally flawed. Dvorak is entitled to dismissal on qualified immunity grounds unless Plaintiff can meet two elements: first, she must state "a plausible claim for violation of a constitutional or statutory right," and, second, show that the right was "clearly established at the time of the alleged infraction." *Dadd*, 827 F.3d at 754-55.  Plaintiff's failure to meet either of these requirements mandates dismissal in Dvorak's favor; here, she meets neither.

**A.      Plaintiff Does Not State a Plausible Claim for Violation of her Fourth Amendment Rights.**

The deficiency of Plaintiff's Fourth Amendment claim against Dvorak is clear from the face of the Complaint. First, she fails to allege a seizure as required to state a claim for a violation of the Fourth Amendment. Further, she fails to allege any conduct that was objectively unreasonable in light of the facts and circumstances confronting Dvorak. Last, she fails to allege any injury resulting from her non-seizure. For all of these reasons, she fails to meet the first prong of the qualified immunity test.

**1.      Plaintiff Fails to Allege a Seizure, Undermining Her Claim under the Fourth Amendment**

The most striking absence in Plaintiff's Complaint is her failure to allege a seizure. The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. amend. IV. "[A] person is seized within the meaning of the Fourth Amendment 'when the officer, *by means of physical force* or show of authority, terminates or restrains [the person's] freedom of movement.'" *United States v. Warren*, 984 F.3d 1301, 1303 (8th Cir. 2021) (quoting *Brendlin v. California*, 551 U.S. 249, 254(2007)). Here, Plaintiff is apparently proceeding under a "physical force" theory. *See* Second Amended Complaint at ¶ 194 ("Via these munitions, Defendant Moll and Defendant Dvorak applied physical force to Sophia.")

Even without a review of the governing law, the absence of a seizure is plain from Wilansky's allegations, which claim that law enforcement ordered Wilansky to move away from the barricade and Dvorak deployed two Stinger Grenades within several feet of her. This is not a

7

"seizure" within the plain-language sense of the word. Unsurprisingly, the relevant law confirms that such actions do not properly allege a seizure.

### a. Plaintiff Alleges No Intent to Restrain.

In *Torres v. Madrid*, the United States Supreme Court explained that "the 'seizure' of a 'person' plainly refers to an arrest[,]" and that "[a] seizure requires the use of force *with intent to restrain*." *Torres v. Madrid*, 141 S.Ct. 989, 996, 998 (2021) (emphasis in original). In *Torres*, a suspect brought a Section 1983 action against police officers alleging they used excessive force when, while attempting to execute an arrest warrant, they fired their weapons into the suspect's vehicle as she drove off, striking her. The suspect was not then apprehended. The relevant issue was whether the suspect had been seized for purposes of the Fourth Amendment when the bullets struck her, despite her alluding capture. The Supreme Court held that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id.* at 1003.

> A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend. We do not accept the dissent's invitation to opine on matters not presented here – pepper spray, flash-bang grenades, lasers, and more.
>
> Moreover, the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context. Only an objective test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment . . . . Nor does the seizure depend on the subjective perceptions of the seized person.

*Id.* at 998-99 (internal citations omitted).

According to Plaintiff's own allegations, Dvorak's deployment was not motivated by "an intent to restrain." His deployment was motivated by an intent to disperse. As explained above, earlier on November 20, protestors had already succeeded in partially dismantling the critical defensive barricade between law enforcement and protestors. The protestors' previous success in compromising the barricade is an important aspect of the potential threat posed by concealed protestor activity in the immediate vicinity of the remaining burned-out truck later in the evening. In this context, the

8

challenged conduct was for purposes of preventing Plaintiff from compromising an important defensive barrier between law enforcement and protestors. Further, Wilansky was in a concealed location relative to law enforcement. She acknowledges that a metal sheet was propped against the driver-side front bumper of the burned- out truck that was part of the defensive barricade between law enforcement and protestors. ECF 259 at ¶ 125. She acknowledges that she was located behind the sheet. *Id.* at ¶ 134. She acknowledges that law enforcement could not see her and had to move to get a better line of sight. *Id.* at ¶ 138.

Plaintiff's own allegations confirm law enforcement's objective intent to disperse her from the barricade. Plaintiff specifically alleges that "law enforcement officers ordered [Wilansky and Joachinson] to *move away* from the burned-out vehicle and accused them of having someone under the truck." *Id.* at ¶ 134. She confirms her understanding of law enforcement's directive several times in her Complaint. For instance, after she started to run south, away from the burned-out truck, she alleges that "[w]hile she was running, she was overtly complying with a law enforcement order to move south away from the barricade." *Id.* at ¶ 149. *See also* ¶ 2 ("Sophia was hit by one of these munitions and began running away from the police barricade, in compliance with law enforcement orders to move south.") Overall, Plaintiff's allegations show that the deployment of munitions, including that of Dvorak, were intended to disperse her from a concealed area of the critical defensive barricade that protestors had already partially dismantled.

The alleged application of force by Dvorak objectively manifested an intent to disperse Wilansky, not to seize her. In other words, the conduct Plaintiff challenges here was immediately proceeded by an order to disperse, which she apparently interpreted as exactly that – specifically, as an order to disperse to the south. Second Amended Complaint at ¶¶ 2, 144. *See Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 839-40 (8th Cir. 2021) (pre-*Torres* case determining the use of tear gas by an officer against plaintiffs did not constitute a seizure because it was used to disperse the plaintiffs, not to terminate or restrict their freedom of movement – plaintiffs were able to leave the scene); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 48-49 (D.C. 2021) (post-*Torres* case determining officers did not seize protesters under the Fourth Amendment through use of flashbang grenades, rubber bullets, and tear gas because they were used to disperse the crowd,

9

not to restrain them or attempt to seize them in place – protesters had a means of egress). Absent an intent to restrain Wilansky, there can be no seizure to support her Fourth Amendment claims.

In *Dundon II*, this Court fully analyzed the circumstances involved on the evening of Wilansky's injury in light of existing precedent to address "the question of whether the use of force through less-lethal munitions in a large crowd-control context by law enforcement can constitute a seizure under the Fourth Amendment." 577 F. Supp. 3d at 1036. This Court concluded there was no seizure for Fourth Amendment purposes:

> The Court . . . recognizes some protestors allege they were physically injured in such a way that they required assistance to leave. However, based on the totality of the circumstances facing officers and given that the evidence, offered by Plaintiffs themselves, shows protestors, including almost all named-Plaintiffs, moved freely upon and off the Bridge or in the area after force was used against them, protestors rushing *toward* officers in the face of force, and protestors even returning to the area after force was used upon them, the Court finds no seizure occurred here.

*Id.* at 1041.

The Court's analysis in *Dundon II* is equally applicable to the Fourth Amendment claims brought by Wilansky. Absent an intent to restrain, Wilansky cannot demonstrate that any officers violated her Fourth Amendment rights. Absent proof of a constitutional violation, there can be no claim.

        **b.**        **Even if there were an attempt to restrain, no physical force was applied.**

Even in the unlikely event that law enforcement's command to disperse somehow manifested an intent to restrain, Plaintiff's claim still fails because no physical force was actually applied. The lack of physical force in the context of a failed restraint dooms a Fourth Amendment claim as a matter of law.

Wilansky alleged that, after Dvorak's munition failed to impact her, she "began running as fast as she could south, away from the barricade and truck." ECF 153, at ¶¶146. She made it approximately "30 yards south" before stopping and bending towards the ground. *Id.* at ¶¶150, 154.

In other words, any allegation that Dvorak attempted to "restrain" Wilansky by deploying two Stinger grenades failed. Sophia was not restrained. Instead, she ran away. And a "failed

attempt to restrain a suspect is not a 'seizure' within the meaning of the Fourth Amendment unless there is some application of physical force." *Steed, by & through Steed v. Missouri State Highway Patrol*, 2 F.4th 767, 770 (8th Cir. 2021).

In *Steed*, the Eighth Circuit considered a claim that a plaintiff's Fourth Amendment rights were violated when a law enforcement officer deployed spike strips during a car chase, but the fleeing car swerved around the spike strips and continued onwards. *Steed*, 2 F.4th at 769. Noting that a failed attempt to restrain did not constitute a seizure, the court observed that "[h]ere, the officers tried to stop the Explorer with the spike strips – physical force – but were unsuccessful." *Steed*, 2 F.4th at 770. The Court dismissed the plaintiff's argument that the car might have driven over the spike strips because dashcam footage in the record showed that the spike strips were in the two left lanes, and the car drove in the far right lane. *Id*. The Court concluded "the record clearly establishes that the troopers did not apply physical force by trying to use the spike strips, so there was no seizure." *Id*. In other words, "trying" to use physical force but failing to physically contact the subject does not constitute a seizure in the context of a failed attempt to restrain.

Here, too, Dvorak did not apply physical force to Wilansky because he did not physically contact her within the meaning of the Fourth Amendment. A failed attempt at restraint "is not a 'seizure' within the meaning of the Fourth Amendment *unless there is some application of physical force*." *Steed*, 2 F.4th at 770. Indeed, if a nearby-but-not-touching *threat* of force constitutes a seizure, the *Steed* court would have found a seizure; indeed, the spike strips forced the fleeing car to swerve into the other lane. But the Court held otherwise: A failed attempt at restraint requires physical force as understood under the Fourth Amendment. *See id.* And physical force is something that Plaintiff does not allege. *See also Torres v. City of St. Louis*, 39 F.4th 494, 506 (8th Cir. 2022), reh'g denied, No. 21-1761, 2022 WL 3151858 (8th Cir. Aug. 8, 2022) ("It is undisputed that Dennis was not shot or otherwise injured at the time that he claims the defendant officers opened fire on him. Thus, there was no application of physical force.")

### 2. Plaintiff Fails to Allege Unreasonable Force.

Even setting aside the specific defects in Plaintiff's claims – i.e., her failure to allege a seizure, *supra* – Plaintiff's allegations do not actually state a claim of excessive force under the Fourth

11

Amendment. The test for whether force is excessive under the Fourth Amendment is "whether the amount of force used was objectively reasonable under the particular circumstances." *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). "The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). *Williams v. City of Burlington, Iowa*, 27 F.4th 1346, 1351 (8th Cir. 2022).

Even ignoring that the Complaint does not allege objective facts of intent to seize, or any alleged facts of physical force being applied upon Wilansky as understood under the Fourth Amendment, the "force" used would not be objectively unreasonable. All the Complaint alleges is that the Stinger grenades were deployed closer than perhaps they should have been for purposes of dispersing Wilansky. But, "the Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general." *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995). Plaintiff's claim against Dvorak is based on deployment of less-lethal munitions that did not seize, touch, or injure her in any way. All she manages to truly allege is that his conduct is "ill-advised." But not every criticism of a law enforcement decision equals a Constitutional violation. She has failed to plead one here.

In addition, it is notable that Wilansky fails to allege any physical injury arising from the alleged excessive use of force by Dvorak. Such a failure indicates that nothing more than a *de minimis* amount of force that is not actionable under the Fourth Amendment was utilized. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (noting in the Eighth Amendment context that "[t]he extent of injury may . . . provide some indication of the amount of force applied"); *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) (explaining in the Fourth Amendment context that a "*de minimis* use of force is insufficient to support a claim" and that "it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of

force."); *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) (determining "as a matter of law" that an officer did not use excessive force where the plaintiff "alleges no injuries occurred" from the officer's actions); *Smith v. City of Dallas*, No. 3:18-cv-01684-K (BT), 2018 WL 7075126, at *3 (N.D. Tex. Dec. 21, 2018), *report and recommendation adopted*, No. 3:18-cv-01684-K, 2019 WL 247202 (N.D. Tex. Jan. 17, 2019) (dismissing a Fourth Amendment excessive force claim where the plaintiff did not allege that he suffered any injury whatsoever because "[w]ithout at least some physical injury, Smith has no claim for excessive force"). Here, Wilansky has alleged no physical injury occurred from the deployment of munitions by Dvorak, and thus not even a *de minimis* physical injury would not be sufficient.

In conclusion, Wilansky fails to allege a violation of her Constitutional rights. As such, she cannot defeat the first prong of qualified immunity, and her claim under the Fourth Amendment must be dismissed on this basis alone.

### B. Plaintiff cannot show a violation of a clearly established Constitutional right.

In addition, Wilansky cannot satisfy the second prong of the Court's analysis of the State Defendants' qualified immunity defense. Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). The defense must be evaluated from the perspective of a reasonable officer based on facts available to the officer at the time of the alleged constitutional violation. *Gladden v. Richbourg*, 759 F.3d 960, 964 (8th Cir. 2014). If based on those facts, the officer reasonably failed to comprehend that he was violating a person's clearly established constitutional rights, he is entitled to qualified immunity from suit. *Louden v. City of Minneapolis, Minn.*, 233 F.3d. 1109 (8th Cir. 2000).

Qualified immunity protects all but the "plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Consequently, to defeat qualified immunity a plaintiff must demonstrate that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022). To show that defendants had fair notice that their conduct violated clearly established rights, a plaintiff ***must*** establish that "various courts have determined that certain factually similar conduct is a constitutional violation." *Dixon v. Lowery*, 302 F.3d 857, 861

(8th Cir. 2002). "[P]olice officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). When law enforcement are presented with a unique set of circumstances, that alone should be "an important indication . . . that [the officials'] conduct did not violate a clearly established right." *White v. Pauly*, 580 U.S. 73, 80 (2017).

In this case, there is no prior case law that would have put Dvorak on notice that he would, without regard to subjective motivation, be deemed objectively to be intending to seize Wilansky under the Fourth Amendment when he deployed the Stinger grenades. There is no prior case law that would have put Dvorak on notice that deploying the Stinger grenades would constitute the application of physical force for purposes of a seizure, based solely on the allegation that he deployed it closer than it should have been deployed, but without contacting or injuring Wilansky in any way. And finally, there is no prior case law that would have put Dvorak on notice that the use of a Stinger grenade that makes no contact and causes no injury to effectuate a seizure is, beyond the pale of debate, unreasonable under the circumstances Dvorak faced as alleged in the First and Second Amended Complaint.

In *Dundon II*, this Court also determined that the defendants would be entitled to qualified immunity on the question of a seizure for Fourth Amendment purposes due to lack of clearly established law at the time:

> Furthermore, based on these facts, officers would be entitled to qualified immunity on the question of a seizure. The law was not clearly established on November 20, 2016 such that a reasonable officer would have known using less-lethal munitions in a crowd of hundreds, if not a thousand, protestors, in a rural area of North Dakota would constitute a seizure, especially when the officers remained in place, did not encircle or herd protestors in a certain area, and provided a means for egress, i.e. anywhere south of the Bridge. The officers here did not have fair warning, as the limited cases discussed above prior to November 20, 2016 related to this issue do not fit here and no other case was on point at the time of the protest. In addition, recent decisions, including one out of the Eighth Circuit, highlight how this question of seizure, even today, is unsettled. For example, in *Alsaada v. City of Columbus*, the Ohio court recognized "[w]hether a constitutionally cognizable

seizure by control can occur in protest scenarios is a murkier landscape," further noting the question it was required to answer was "Was there a seizure by control when the police used less-lethal force, including pepper spray, tear gas, and physical force, to disperse—rather than detain—activists, protestors, and congregants?" 536 F.Supp.3d 216, 261 (S.D. Ohio 2021), modified sub nom. *Alsaada v. City of Columbus, Ohio*, No. 2:20-CV-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021). The court recognized that courts were split on the answer to the question, with some courts answering in the affirmative and other courts in the negative.[5] Id. In addition, the Eighth Circuit in *Quraishi v. St. Charles Cty., Missouri*, recently reiterated this, finding officers entitled to qualified immunity for the use of tear-gas on reporters at a 2014 event:

> Anderson argues that the tear-gassing was not a seizure under the Fourth Amendment, and he did not violate clearly established law. This court will address the second point. See *Smith [v. Kansas City, Missouri Police Dept.*, 586 F.3d 576, 580 (8th Cir. 2009)].
>
> Neither the district court nor the reporters cite authority that gave "fair warning" to Anderson that deploying one canister of tear-gas was a seizure. See *Sisney [v. Reisch*, 674 F.3d 839 (8th Cir. 2012)].
>
> The district court relied on inapposite law. True, use of pepper spray to arrest an unarmed, compliant suspect can be excessive force. *Peterson [v. Kopp*, 754 F.3d 594 (8th Cir. 2014)]. *Peterson* is distinguishable, because it focused on the officer's behavior after the individual was already seized. This court did not consider whether the use of chemical agents *alone* is a seizure. Id. at 597, 600-01. See, e.g., *Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 1866, 198 L.Ed.2d 290 (2017) ("The dispositive question is whether the violative nature of the *particular* conduct is clearly established." (internal quotation marks and citation omitted)). Here, the issue is whether deploying tear gas is a seizure.
>
> The reporters cite Supreme Court cases to argue they were restrained because they could not stay in their chosen location. *Brendlin [v. California*, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).]; *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598-99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). But these cases did not give fair warning. *Brendlin* held that, during traffic stops, passengers are seized. *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400. *Brower* held that setting up a roadblock that stops a fleeing suspect is a seizure. *Brower*, 489 U.S. at 598-99, 109 S.Ct. 1378. *Brendlin* and *Brower* are inapposite because both involve police action that terminated or restricted freedom of movement. See *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400; *Brower*, 489 U.S. at 598-99, 109 S.Ct. 1378. Here, the reporters' freedom to move was not terminated or restricted. See *Johnson [v. City of Ferguson, Missouri*, 926 F.3d 504 (8th Cir. 2019)] (no seizure where plaintiff was not

> "ordered to stop and remain in place" and "was able to leave the scene"). They were dispersed.
>
> The reporters cite no "precedent," "controlling authority" or "robust consensus of cases of persuasive authority" to show it was clearly established that tear-gassing was a seizure. See [District of Columbia v.] Wesby, [—— U.S. ——, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018)] (internal citations and quotations omitted). See generally Johnson, 926 F.3d at 509 (Melloy, J., dissenting) (noting the Sixth Circuit's holding that person is seized when they are not free to stay in place, but also the Second Circuit's holdings that an order to leave can become a seizure depending on whether there was physical contact).
>
> When Anderson deployed the tear-gas, it was not clearly established that his acts were a seizure. The district court should have granted qualified immunity to Anderson on the Fourth Amendment claim.
>
> 986 F.3d 831, 840 (8th Cir. 2021).
>
> No seizure occurred here. In addition, the defendants would be entitled to qualified immunity, as the law was not clearly established at the time of the protest that their actions constituted a seizure.

577 F. Supp.3d at 1041–43. The Court's analysis on the second prong of the qualified immunity defense in *Dundon II* is equally applicable to the Fourth Amendment claims brought by Wilansky against Dvorak in her Second Amended Complaint. Here, it is simply "not clearly established" that the deployment of two Stinger grenades constitutes a seizure.

### III. Plaintiff's Fourteenth Amendment Claim Against Dvorak Should Be Dismissed.

The procedural status of Wilansky's current claim against Dvorak under the Fourteenth Amendment is somewhat unclear. *See* Seconded Amended Complaint, ¶ 200. Wilansky's Fourteenth Amendment claim as set forth in her original Complaint against Officer Doe was already dismissed by this Court. *See* ECF 46 at ¶¶ 38–54. In so doing, the Court held that "[i]t does not shock the conscience for law enforcement to use non-lethal force to disburse protestors from an area where they were told to avoid." *Id.* at ¶ 54. In her First Amended Complaint, Plaintiff reasserted the claim, but stipulated to its summary dismissal. ECF 152 at ¶ 41, n.2. In her Second Amended Complaint, she does not explicitly stipulate to its summary dismissal.

In the event that the Court does consider this to be an active claim, however, the Court should dismiss it. Plaintiff's allegations regarding Dvorak do not state a claim for relief under the

Fourteenth Amendment, entitling Dvorak to qualified immunity on this claim.

The Fourteenth Amendment Due Process Clause protects citizens from governmental deprivation of life, liberty and property without due process of law. U.S. CONST. amend. XIV. In order to establish a violation of substantive due process, a plaintiff must show "(1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the 'contemporary conscience.'" *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012). First of all, Dvorak's deployment of a Stinger grenade did not deprive Wilansky of liberty. ECF 259 at ¶ 202. But even more obviously, Dvorak's conduct does not "shock the conscience." "Only the most severe violations of individual rights that result from the 'brutal and inhumane abuse of official power' rise to this level." *White v. Smith*, 696 F.3d at 757–58 (8th Cir. 2012) (citations and quotations omitted). Here, even taking Plaintiff's allegations as true, she was on a bridge closed to the public, specifically located at a defensive barricade that had already been partially dismantled hours earlier. In such a scenario, it does not shock the conscience to deploy less-lethal munitions near someone without hitting them. As such, Plaintiff fails to allege a violation of a Constitutional right, and certainly not one that was clearly established such that a reasonable person would have known about it.

### IV.     Plaintiff's State Law Claims Against Dvorak Should Be Dismissed.

Plaintiff's state law claims against Dvorak, *see* Complaint, Claims IV-VII, ¶¶ 226-265, were previously dismissed with prejudice by this Court. *See* ECF 85. But even if they were not, they must be dismissed for lack of jurisdiction.

Under North Dakota law, "[a]n action for an injury proximately caused by the alleged negligence, wrongful act, or omission of a state employee occurring within the scope of the employee's employment ***must be brought against the state***." N.D. Cent. Code § 32-12.2-03(1) (emphasis added). Pursuant to state law "[a] state employee is not personally liable for money damages for an injury when the injury is proximately caused by the negligence, wrongful act, or omission of the employee acting within the scope of employment." N.D. Cent. Code § 32-12.2-03(2). "'Scope of employment' means 'the state employee was acting on behalf of the state in the performance of duties or tasks of the employee's office or employment lawfully assigned to the

17

employee by competent authority or law.'" *State v. New Holland*, 869 N.W.2d 136, 140 (N.D. 2015) (quoting N.D. Cent. Code § 32-12.2-01(6)).

Wilansky's Second Amended Complaint against Dvorak acknowledges that he was "at all times relevant to this action – an officer of the North Dakota Highway Patrol." ECF 259 at ¶ 8.  In addition, all of the conduct alleged in Second Amended Complaint occurred while he was acting on behalf of the state in the performance of duties or tasks assigned to him.  There are absolutely no allegations in the Second Amended Complaint that indicate anything to the contrary, i.e., that Dvorak simply showed up at the Backwater Bridge on his own volition, on his own time, or was acting outside the course and scope of his duties or doing anything but acting as an officer of the North Dakota Highway Patrol.

Accordingly, under North Dakota's statutory scheme, all of the state law claims alleged in Counts IV, V, VI, and VIII of the Second Amended Complaint are actually suits against the State of North Dakota even though they purport to be brought against a state employee in his individual capacity. It is the duties entrusted to this State Defendant, and not Wilansky's designation of individual capacity, that triggers application of North Dakota's statutory scheme requiring these claims to be brought in state court against the State of North Dakota. See *Montin v. Moore*, 846 F.3d 289, 292-93 (8th Cir. 2017) (disregarding a complaint's explicit declaration that suit was brought against state defendants in their individual capacities when "all the actions or omissions alleged occurred in the scope of defendants' state employment" in determining whether Nebraska waived its sovereign immunity under a similar statutory scheme).

Wilansky's attempt to bring these state law claim against the State of North Dakota in federal court fails for lack of subject matter jurisdiction because North Dakota has not waived its sovereign immunity to be sued in federal court. See N.D. Cent. Code § 32-12.2-10 ("This chapter does not waive the state's immunity under the Eleventh Amendment to the United States Constitution in any manner, and this chapter may not be construed to abrogate that immunity."); *see also Montin*, 846 F.3d at 293 (concluding state law claims brought in federal court against state defendants were barred by sovereign immunity where Nebraska's statutory scheme required such claims to be brought in state district court).

18

The lack of subject matter jurisdiction over the state law claim is not cured by 28 U.S.C. § 1367(a) giving supplemental jurisdiction over state law claims that arise from a "common nucleus of operative fact" with a federal constitutional claim, *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 539 (2002) (quotation marks and citation omitted), because "§ 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants." *Id.* at 542; *see also Dick v. Dickinson State Univ.*, Civil No. 1:13-CV-41, 2013 WL 12186146, at *2 (D.N.D. Sept. 17, 2013) (citing N.D. Cent. Code § 32-12.2-10 and concluding there was no subject matter jurisdiction to hear state law claims against a state defendant under § 1367 because the "State of North Dakota has specifically preserved its Eleventh Amendment sovereign immunity"), report and recommendation adopted, Case No. 1:13-CV-041, 2013 WL 12186147 (D.N.D. Nov. 4, 2013); *Burke v. N.D. Dep't of Corr. & Rehab.*, No. 1:12-CV-131, 2013 WL 1164322, at *7 (D.N.D. Feb. 28, 2013) ("In other words, the fact the State may have waived its immunity and allows suit to be brought against it in state court does not mean the State has waived its immunity from suit in federal court. In fact, . . . the State has expressly preserved its immunity from suit in federal court in the chapter under North Dakota law where the State has consented to suit in state court for various tort claims."), report and recommendation adopted, No. 1:12-CV-131, 2013 WL 1154478 (D.N.D. Mar. 20, 2013).

Thus, this Court has no subject matter jurisdiction to entertain any of Wilansky's state law claims against Dvorak, and has no choice but to dismiss all of the claims alleged in Counts IV, V, VI, and VII for lack of jurisdiction.

### VII. Conclusion.

For all the reasons stated above, State Defendant Dvorak respectfully requests that the claims against him in the Second Amended Complaint be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated this 18th day of August, 2023.

                State of North Dakota
                Drew H. Wrigley
                Attorney General

                /s/ Jane G. Sportiello
                Jane G. Sportiello
                Assistant Attorney General
                State Bar ID No. 08900
                Office of Attorney General
                500 North 9th Street
                Bismarck, ND  58501-4509
                Telephone (701) 328-3640
                Email jsportiello@nd.gov

Attorneys for State Defendants