IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

CIVIL NO. 1:18-CV-00236-CSM

| | | |
|---|---|---|
| SOPHIA WILANSKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF LAW IN** |
| | ) | **SUPPORT OF COUNTY DEFENDANTS'** |
| MORTON COUNTY, NORTH DAKOTA; | ) | **MOTION TO DISMISS PLAINTIFF'S** |
| KYLE KIRCHMEIER in his official | ) | **SECOND AMENDED COMPLAINT** |
| capacity; ADAM J. DVORAK, in his | ) | |
| personal capacity; and JONATHAN R. | ) | |
| MOLL, in his  personal capacity, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*                    \*\*\*                    \*\*\*

## I.    INTRODUCTION

Defendants Morton County, Kyle Kirchmeier, in his official capacity, and Jonathan R. Moll, in his personal capacity, ("County Defendants") request dismissal, with prejudice, of Plaintiff Sophia Wilansky's ("Wilansky") claims against all Defendants[1] contained in Wilansky's *Second Amended Complaint* (doc. 259) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Pursuant to the Court's *Order Granting, in Part, and Converting to Summary Judgment and Deferring, in Part, County Defendants' Motion to Dismiss and Granting Defendant Iverson's Motion to Dismiss* (doc. 46) filed October 29, 2020, in addition to dismissing with prejudice

---

[1] As Wilansky claims Morton County is responsible for the alleged conduct of State Defendant NDHP Sgt. Adam Dvorak, County Defendants' incorporate herein by reference State Defendant Dvorak's *Memorandum in Support of Motion to Dismiss Second Amended Complaint* (doc. 266) as additional bases for dismissal of claims asserted against Dvorak.

1

Wilansky's defamation claims against Defendants Kirchmeier, Laney and Iverson, and Wilansky's request for injunctive relief, the Court also therein dismissed with prejudice Wilansky's Fourteenth Amendment excessive force claim as to the then "John Doe" defendant, and the *Monell* claims asserted against Defendant Morton County and Kirchmeier, in his official capacity[2]. (Doc 46 at ¶¶ 124-25.) The Court determined the only causes of action not then dismissed with prejudice were Wilansky's Fourth Amendment excessive force claim against "John Doe", and Wilansky's state law claims for assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress, all against "John Doe" and Morton County, as well as the state law

---

[2] Wilansky's *Second Amended Complaint* continues to allege a Fourteenth Amendment excessive force claim against Defendants Moll and Dvorak, as well as *Monell* Claims against Morton County and Kirchmeier. (Doc. 259 at Counts II and III.) The Court previously dismissed these claims <u>with prejudice</u>. "A dismissal with prejudice has the effect of a final adjudication on the merits." *TCBY Sys., Inc. v. EGB Assocs., Inc.*, 2 F.3d 288, 290 (8th Cir. 1993) quoting *Nemaizer v. Baker,* 793 F.2d 58, 60 (2d Cir.1986)). *See also* Fed. R. Civ. P. 41(b) (unless otherwise indicated, a dismissal order, except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19, operates as an adjudication on the merits). These dismissed claims will therefore not be addressed again by County Defendants in this brief. To the extent the Court deems such claims revived by the *Second Amended Complaint*, County Defendants rely upon their arguments at pages 34-37 (concerning Fourteenth Amendment excessive force claim) and 42-43 (concerning *Monell* claims) of *Memorandum of Law in Support of City and County Defendants' Motion to Dismiss Plaintiff's First Amended Complaint* (doc. 188) and in State Defendant Dvorak's brief (doc. 266) at pages 16-17. It should be noted Plaintiff has, following dismissal of such claims with prejudice, added numerous additional allegations bearing upon such claims (especially in relation to the dismissed *Monell* claims). Plaintiff should not be permitted to rely upon these new factual allegations for purposes of any subsequent appeal from the Court's prior dismissal of these claims with prejudice. In addition, Plaintiff's *Second Amended Complaint* (doc. 259) continues to inappropriately reference Arndt, Bakke, Grosz, Hanson, Nelson, Rode, Savageau, Skar, Ternes and White) as defendants in the captions to Claims I (Fourth Amendment Excessive Force), II (Fourteenth Amendment Excessive Force), and IV (Assault and Battery), and paragraph 139 continues to reference "Defendant Arndt" and "Defendant Hanson". As all claims against these individuals were stricken by the Court pursuant to the Court's *Order Granting, in Part, and Denying, in Part, City and County Defendants' Motion to Strike Portions of Plaintiff's First Amended Complaint* (doc. 254) ("Strike Order") (doc. 254, 254-1), it is assumed such references in the *Second Amended Complaint* are simply clerical errors and are not separately addressed in this brief.

claim of negligence and violation of North Dakota Century Code §§ 9-10-01 and 9-10-06 asserted against "John Doe", Morton County, and Kirchmeier in his official capacity only.  (*Id*. at ¶¶ 126.) The Court subsequently dismissed, with prejudice, all of Wilansky's state law claims against Dvorak pursuant to *Order Adopting Plaintiff's Stipulation of Dismissal of Certain Claims Against Certain Defendants* filed September 21, 2022 (doc. 185).  Therefore, the only remaining claims now at issue are: 1) Wilansky's Fourth Amendment excessive force claim against Moll and Dvorak; 2) Wilansky's state law claims for assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress against Moll and Morton County, and 3) state law claims of negligence and violation of North Dakota Century Code §§ 9-10-01 and 9-10-06 asserted against Moll, Morton County, and Kirchmeier in his official capacity only.

As explained below, Wilansky has failed to allege a violation of her Fourth Amendment rights as she has not alleged facts to establish either Moll or Dvorak "seized" her in the context of the Fourth Amendment.  Even assuming, arguendo, facts establishing a "seizure" have been alleged, Moll and Dvorak are entitled to qualified immunity.  In addition, Wilansky's state law claims against Moll and Dvorak are time-barred.  As Wilansky's state law claims against Morton County are derivative of her claims against Moll and Dvorak, those claims should be dismissed as well.  All Defendants are also immune from Wilansky's state law claims under the North Dakota Disaster Act of 1985 and pursuant to N.D.C.C. § 12.1-05-07.2.  County Defendants are also immune to Wilansky's state law claims under North Dakota's public duty doctrine.  Finally, Wilansky's Intentional Infliction of Emotional Distress Claim should also be dismissed as Wilansky has not alleged Moll or Dvorak engaged in extreme and outrageous conduct.

## II.   MATTERS WHICH MAY BE CONSIDERED BY THIS COURT IN CONSIDERING A MOTION TO DISMISS

### A.   <u>Applicable Federal Rule of Civil Procedure 12 Standard</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the court takes all facts alleged in the complaint to be true.  *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* (citations omitted).  The Court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pled.  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  Well-pleaded facts, not legal theories or conclusions, determine the adequacy of the complaint.  *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009).  The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  *Id.*  "[A] plaintiff 'must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, . . ., rather than facts that are merely consistent with such a right.'"  *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009), quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).  "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.E.2d 868 (2009).

> In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or in opposition to the motion.  *See Martin v. Sargent*, 780 F.2d 1334, 1336-37 (8th Cir. 1985).  Some materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss.  *See Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Hollis v. United States Dep't of Army*, 856 F.2d 1541, 1543-44 (D.C. Cir. 1988).

4

*State v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999); *see Papasan v. Allain*, 478

U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal

Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking

notice of items in the public record, such as documentation of the history of the Mississippi and

other school lands grants.").

> While courts primarily consider the allegations in the complaint in determining whether
> to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by
> reference or integral to the claim, items subject to judicial notice, matters of public
> record, orders, items appearing in the record of the case, and exhibits attached to the
> complaint whose authenticity is unquestioned;" without converting the motion into one
> for summary judgment. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice
> and Procedure* § 1357 (3d ed. 2004).

*Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (taking into

consideration, in relation to Rule 12(b)(6) motion, plaintiff's initial and amended complaints, and

the record created as a result of the plaintiff's motion for temporary restraining order, preliminary

injunction and expedited discovery filed by plaintiff after the motion to dismiss was filed); *see,*

*also Williams v. Employers Mutual Casualty Company*, 845 F.3d 891, 903-04 (8th Cir. 2017)

(citing *Miller* for proposition "courts may consider matters incorporated by reference or integral

to the claim, items subject to judicial notice, matters of public record, orders, items that appear in

the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned"

without converting a motion for judgment on the pleadings into a motion for summary judgment.)

In the event the Court determines any material presented with this motion may not properly

be considered by the Court under Federal Rule of Civil Procedure 12(b)(6), County Defendants

request the Court disregard such material and decide the motion without consideration of such

material, rather than deciding the motion on a summary judgment standard.

**B.**     **Testimony of Sophia Wilansky**

Wilansky's own deposition testimony in this case may also be considered in the context of a Rule 12 motion to dismiss. *See Miller v. Redwood Toxicology Laboratory, Inc*., 688 F.3d 928, 931 n.3 (8th Cir. 2012) (taking into consideration, in relation to Rule 12(b)(6) motion, plaintiff's initial and amended complaints, <u>and the record created as a result of the plaintiff's motion for temporary restraining order, preliminary injunction and expedited discovery</u> filed by plaintiff after the motion to dismiss was filed); *Blount v. ADP, Inc., 2012 WL 12957379 *2 (S.D. Cal. 2012)* (considering the plaintiff's sworn deposition testimony which was part of the record in that case which contradicted allegations in complaint when ruling on Rule 12 motion to dismiss); *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 996 (D. Minn. 2013) (internal quotation marks omitted), *aff'd*, 823 F.3d 462 (8th Cir. 2016) (when evaluating a motion to dismiss, if "a written instrument contradicts allegations in the complaint ... the exhibit trumps the allegations.") Wilansky cannot reasonably argue her own testimony cannot be used against her.

Wilansky obtained a ride with people she did not know from Pittsburgh to North Dakota, and arrived in North Dakota on November 4, 2016. (Wilansky Depo. [doc. 120-10] at 8.) She did not know anyone, and did not have contact with anyone already at the protest when she travelled to North Dakota. (*Id*. at 11.) While in North Dakota, Wilansky stayed in her own tent within the Oceti Sakowin camp, located a short distance south of the Backwater Bridge. (*Id*. at 18-19.)

On November 21, 2016, including at the time of the subject explosion, Wilansky was wearing goggles and a snowboarding helmet specifically for protection from police weapons. (Wilansky Depo. [doc. 120-10] at 20-23.) She was also wearing a green puff jacket, depicted in a photograph of her taken on November 21, 2016 after the subject explosion. (*Id*. at 52-54; doc. 120-11 [photograph].) Beneath the green puff jacket she wore a blue vest, with a long sleeve shirt beneath that. (*Id*. at 58.) She also wore long thin pants. (*Id*.)

Prior to coming to North Dakota, Wilansky claims she had heard law enforcement officers were shooting people in the head, so that's why she put the helmet on before going to the Backwater Bridge on November 20-21, 2016. (Wilansky Depo. [doc. 120-10] at 24.) Wilansky asserts she knew before coming to the protests that less lethal weapons were being used by law enforcement officers, including impact rounds, flashbangs, and gas. (*Id*. at 27.) She states she was aware of the possibility of being subject to less lethal weapons if she engaged in protest activities. (*Id*. at 28.)

On November 20, 2016, Wilansky knew that law enforcement were utilizing less lethal munitions at the Backwater Bridge before she went to the bridge herself that night. (Wilansky Depo. [doc. 120-10] at 28-29.) Despite this knowledge, Wilansky went to the Backwater Bridge during the evening of November 20, 2016 and observed other protesters being shot with less lethal impact rounds at that time. (*Id*. at 33-34.) Wilansky was on the Backwater Bridge for many hours on November 20, 2016, arriving after dark on the 20th, at approximately 6:00 p.m. (*Id*. at 34.) She claims she saw law enforcement deploy bean bag rounds, rubber bullets, teargas, light sound munitions and water cannons for hours that night. (*Id*. at 35-36.) Wilansky agrees hundreds of protesters were involved that night, maybe more. (*Id.* at 37.) Wilansky saw the razor wire along law enforcements' line, and concedes law enforcement officers remained north of the barricade. (*Id*. at pp. 45, 51-52.) Sometime between 10:00 or 11:00 pm on November 20, 2016, Wilansky returned to the protester camp to eat and warm up. (*Id.* at 60). She then returned to the Backwater Bridge around 2:00 a.m. on November 21. (*Id*. at 65.) Wilansky believes the subject explosion occurred around 4:00 a.m. on November 21, 2016. (*Id*. at 59.) She recalls being on the Backwater Bridge for a long time during that two hour period. (*Id*. at 65-66.)

At the scene, Wilansky observed law enforcements' barricade with razor wire and had been told by someone that the burned-out truck was chained to the barricade, and she observed

chains under the truck.  (Wilansky Depo. [doc. 120-10] at 77-78.)  Wilansky was aware that protesters had the previous day removed one of two burned-out trucks from the barrier, and had attempted to move the remaining burned-out truck.  (*Id*. at 79-81.)  Wilansky asserts she stood immediately behind the burned-out truck, near the driver's side front bumper, often behind a large metal shield measuring approximately 7' tall by 4' wide which was positioned near that location along the truck, for approximately half an hour to an hour and half, but moved around in that vicinity.  (*Id*. at 86-88.)  She asserts she was maintaining a vigil until other protesters returned. (*Id*. at 96.)  The shield was covered with a blue plastic tarp.  (Id. at 92-93.)  She doesn't remember if anyone was holding the shield up.  (*Id*. at 87.)  Wilansky did not speak to law enforcement officers located north of the barricade, and does not recall any other protesters doing so.  (*Id*. at 95.)  Wilansky asserts that during the last few minutes prior to the subject explosion, it was only her and Stephen Joachinson[3] who were positioned near the burned-out truck.  (*Id* at 90.)  She denies anyone was underneath the burned-out truck during the time period she was near the truck. (*Id*. at 101-02.) She denies attempting to remove or detach the chain or chains underneath the truck while she was present.  (*Id*. at 102.)

Wilansky recalls multiple less lethal impact rounds striking the metal shield she was standing behind.  (Wilansky Depo. [doc. 120-10] at 115.)  She also recalls law enforcement making loud announcements over the LRAD on November 21, 2016, including to get out from underneath the truck.  (*Id*. at 110-11, 113.)  She recalls hearing the LRAD being utilized on November 20, 2016 as well.  (*Id*. at 112.)  She does not remember if law enforcement gave warnings to protesters to "get back", "stay away from the bridge", "move back", "back away from the concertina wire and return to the south side of the bridge", "back away from the barricades",

---

[3] Counsel for City and County Defendants attempted to subpoena and depose Mr. Joachinson in this case, without success.

"stop trying to cut the razor wire", on November 20, 2016 or at any time prior to the warning being given over the LRAD to get out from under the truck near 4:00 a.m. on November 21, 2016. (*Id*. at 194-95.)  Wilansky does not deny these warnings were given by law enforcement officers to protesters – she simply claims she does not remember hearing them.  (*Id*. at 195-96.)

Wilansky asserts law enforcement were not able to hit her at first with less lethal munitions when she was behind the metal shield (Wilansky Depo. [doc. 120-10] at 110, 115), but she was ultimately shot with an impact round in her upper left arm by an officer to the west of her location, while she was standing in this position.  (*Id*. at 89, 126-27.)  She also believes Joachinson, who was also partially behind the shield with her, was hit several times by impact rounds.  (*Id*. at 123.) She also recalls hearing one or two explosive munitions explode a few feet to the west of her while she claims she was behind the shield, about one minute prior to her being shot in her upper left arm, but after the LRAD announcements to get out from under the truck were made.  (*Id*. at 116-18, 120, 124.)  She says there was light and an explosive sound from these prior explosions, and she does not recall any flame, burning smell or smoke.  (*Id*. at 118, 120.)  Wilansky claims it was when she was struck in her arm by the impact munition that she decided she was going to leave the bridge.  (*Id.* at 120-21.)  Wilansky estimates the period of time between when the LRAD announcement to get out from under the truck was made until the explosions to the west of her occurred was within minutes.  (*Id*. at 126.)  She estimates the time period between when the impact rounds were fired against the shield until she was hit in the arm and decided to leave the bridge was about two minutes.  (*Id.* at 121.)  She did not say anything to law enforcement officers during that two minute period of time.  (*Id*. at 121-22.)  Wilansky claims that as she was proceeding south, she said "I'm leaving.  Please don't shoot".  (*Id.* at 129.)  She did not say anything else thereafter until the subject explosion.  (*Id*. at 129.)

Wilansky asserts she proceeded east and south at a jog on the bridge from the burned-out

truck and she estimates she was approximately 30 feet south of the truck, and not less than 15 to 20 feet south of the truck, east of center on the bridge, and was passing a pile of plywood and bin lids located on the east side of the bridge when the subject explosion occurred.  (Wilansky Depo. [doc. 120-10] at 129-33.)  Wilansky claims she reached with her right hand towards the pile intending to pick up a piece of plywood to provide some protection against being shot while retreating.  (*Id.* at 134, 137.)  She was not struck with any impact munitions from the time she left the truck until she reached down towards the pile.  (*Id.* at 134.)  She did not hear or see anything as she jogged between those two points that suggested someone was attempting to shoot something at her.  (*Id.* at 134-35.)  Wilansky claims she was injured when an object exploded upon impacting her left arm.  (*Id.* at 136.)  Wilansky claims her body was facing roughly east or southeast at the time of the explosion, towards the pile.  (*Id.* at 136-37.)

Wilansky claims she saw a very bright light from the explosion, and denies seeing any flames or smoke.  (Wilansky Depo. [doc. 120-10] at 136, 140-41.)  She did not look around to see what had exploded.  (*Id.* at 140.)  Neither the device which exploded, nor any fragments thereof, were located by anyone to Wilansky's knowledge.  (*Id.* at 169.)  Wilansky does not know the identity of any officer who allegedly used force against her surrounding the incident.  (*Id.* at 142.)  She does not know what law enforcement agency Officer Doe was with or affiliated with.  (*Id.* at 142.)  She does not know whether John Doe officer was employed by Morton County.  (*Id.* at 158.)  Wilansky does not know whether the object that exploded was launched or thrown or rolled – she did not see it coming towards her.  (*Id.* at 142-43.)  She did not have any burn marks on her forearm or body anywhere, and there was not any fire damage to her jacket or clothing.  (*Id.* at 144.)  A metal fragment was removed from Wilansky's arm at the Hennepin County Medical Center shortly following the explosion, a photograph of which is attached as Exhibit S (depo. exh. 17).  Wilansky believes the metal fragment came from whatever exploded as she has no other

explanation as to how the fragment got into her injured arm. (*Id*. at 145-46, 192.) Wilansky believes that whatever exploded broke up into little metal pieces. (*Id*. at 147.) Wilansky did not suffer any injury to any other portion of her body, other than to her lower left arm. (*Id*. at 146.)

Wilansky claims her injury was the result of a munition which exploded. (Wilansky Depo. [doc. 120-10] at 106-07.) Wilansky does not recall any medical doctor telling her that her injury was caused by a less lethal munition of some type. (*Id.* at 108.) No person professing to be an expert in less lethal munitions has ever told her that her injury was caused by a less lethal munition. (*Id*. at 108.)

### C.   Wilansky's Allegations in First Amended Complaint

Wilansky's *Second Amended Complaint* is comprised of 46 pages and 256 paragraphs. The majority of the pleading is comprised of legal conclusions, often cast in the form of factual allegations – all of which this Court may disregard for purposes of this motion to dismiss. Wilansky's specific allegations relevant to her claims are reproduced in the argument below, where relevant, to avoid duplication.

### D.   Matters Of Public Record Or Of Which Judicial Notice May Be Taken Or Which Do Not Contradict Wilansky's Complaint

A district court may also consider matters of public record, matters for which judicial notice may be taken, and matters which do not contradict the plaintiffs' complaint without converting a motion to dismiss to a motion for summary judgment. Adjudicative facts which may or must be judicially noticed by the Court are governed by Rule 201 of the Federal Rules of Evidence, which provides, in part:

**(a)    Scope**. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b)  Kinds of Facts That May Be Judicially Noticed**.  The court may judicially notice a fact that is not subject to reasonable dispute because it:

11

    **(1)**    is generally known within the trial court's territorial jurisdiction; or

    **(2)**    can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c)**    **Taking Notice.**  The court:

    (1)    May take judicial notice on its own; or

    (2)    Must take judicial notice if a party requests it and the court is supplied with the necessary information.

Fed. R. Evid. 201(a), (b), (c) (bold in original).  Pursuant to Federal Rule of Evidence 201(c)(2), a court "<u>must</u> take judicial notice if a party requests it and the court is supplied with the necessary information."  (Underline added for emphasis). "[C]ourts may take judicial notice of any fact which is capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary."  *United States v. Gould*, 536 F.2d 216, 219 (8th Cir. 1976) (quotation omitted).  "Under Federal Rule of Evidence 201(b), a court may take judicial notice of a 'fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *Williams v. Employers Mut. Cas. Co.*, 845 F.3d at 903 (taking judicial notice of well-established scientific theory and principles).

County Defendants request the Court take judicial notice of the following facts, or otherwise consider the following facts to the extent they do not contradict the Wilansky's pleadings.

1.    On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency due to protester activity occurring at the DAPL project site which threatened the health, well-being and safety of Law Enforcement and the public, and required additional manpower, resources and other expenditures to protect life and property. (*Dundon v. Kirchmeier*, Case No. 1:16-cv-406, 577 F.Supp.3d 1007, 1019 ¶15 (D.N.D.

2021), *appeal docketed* No. 22-1246 (8th Cir. Feb. 1, 2022) (hereinafter "*Dundon*"); doc. 30-1.)

2.      On August 19, 2016, North Dakota Governor Jack Dalrymple signed Executive Order 2016-04 (doc. 30-2) authorizing total utilization of the North Dakota State Emergency Operations Plan to respond to the situation.  (*Dundon,* at 1019 ¶16.)

3.      On September 8, 2016, Governor Dalrymple activated a military police unit of the North Dakota National Guard to support Law Enforcement efforts with primary responsibilities to be with traffic control points and administrative duties.  (*Dundon*, at 1019-1020 ¶20; doc. 30-3.)

4.      The State of North Dakota made an Emergency Management Assistance Compact request to other states for law enforcement assistance on October 7, 2016 due to the escalated unlawful tactics by individuals protesting the construction of the DAPL.  (*Dundon*, at 1020 ¶23; doc. 30-4.)

5.      During the course of the prolonged DAPL protest, protesters principally occupied three areas:  the Sacred Stone Camp and the Rosebud Camp located south of the Cannonball River, and the Seven Council Fires Camp (i.e. Oceti Sakowin) located between the north bank of the Cannonball River and the south bank of the North Branch of the Cantapeta Creek, a tributary of the Cannonball River.   (*Dundon*, at 1018, ¶13.)

6.      The Sacred Stone Camp and Rosebud Camps were located in Sioux County, whereas the Seven Council Fires Camp was located in Morton County.   (*Dundon*, at 1018, ¶13.)

7.      The Backwater Bridge is located on North Dakota Highway 1806 approximately 35 miles south of Mandan, North Dakota and crosses the north branch of the Cantapeta Creek, north

of where the Seven Council Fires Camp was located during the time frames at issue in this case. (*Dundon*, at 1018 ¶13.)

8. The Backwater Bridge and North Dakota Highway 1806 in the vicinity at issue in this lawsuit are located in an isolated rural area of Morton County.

9. A Site Map depicting the locations of protester camps and related areas of interest during the time frames at issue has been incorporated into the *Order Denying Plaintiffs' Motion for Preliminary Injunction* issued by this Court in *Dundon*, document 99, 2017 WL 5894552 *1 (D.N.D. February 7, 2017). A copy of that map is provided in this case as docket 30-12.

10. The drill pad from which the Dakota Access pipeline was to pass under the Missouri River was located approximately one mile to the northeast of the Backwater Bridge. (*Dundon*, at 1019 ¶14.)

11. The Dakota Access pipeline drill pad, and the location of the North Camp, were on land privately owned by Dakota Access, LLC, an affiliate of the company building the DAPL at the time of the events at issue in this lawsuit. (Corrective Warranty Deed to Dakota Access, LLC effective September 20, 2016 [doc. 30-5].)

12. Pursuant to a Uniform Incident Command Request for Support signed by then Governor Jack Dalrymple and Morton County Sheriff Kyle Kirchmeier dated October 7, 2016, Sheriff Kirchmeier was designated as the overall incident commander, and a Uniform Incident Command Policy Group was established to address the ongoing DAPL protests in Morton County, which included, among others, all Sheriffs from volunteering counties. (Doc. 30-13.)

13.   The Backwater Bridge was deemed unsafe and closed to all access on October 28, 2016 by the North Dakota Department of Transportation, and under the authority granted pursuant to N.D.C.C. § 39-10-21.1 and the Governor's Executive Order 2016-04, signed August 19, 2016.  (NDDOT Press Release issued October 28, 2016 [doc. 30-6; NDDOT Press Release dated October 31, 2016 [doc. 30-7]; *Dundon*, at 1021-1022 ¶¶ 27-29.)

14.   As of October 28, 2016, law enforcement had made 411 arrests in relation to the DAPL protests, with 141 protesters being arrested on October 27, 2016 alone during their removal from private lands located in the direct route of the DAPL project. (*See generally Dundon*, at 1019-1021 ¶¶ 17-25 [detailing numerous arrests of DAPL protesters in increasingly intense interactions between law enforcement and protesters from August through November of 2016 in vicinity of DAPL project route and Backwater Bridge].)

15.   The United States Army Corps of Engineers ("Corps") manages lands upon which all three camps were located, as well as additional federal lands in Morton County located along the north bank of the North Branch of the Cantapeta Creek extending from the Bridge and eastward to and then along the north bank of the Cannonball River, all the way eastward to the Missouri River.   (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [doc. 30-8]**;** Corps Release no. 20160916-002 [doc. 30-9]; Corps Release No. 20161127-001 [doc. 30-10]; (*Dundon*, at 1018, ¶14.)

16.   The Corps-managed land located along the north banks of the Cantepeta Creek and Cannonball River, as well as privately owned property north thereof, encompassed the DAPL project route and the location from which the DAPL project then planned to cross the Missouri River via horizontal directional drilling.   (Letter from Corps District

Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [doc. 30-8]; *Dundon*, at 1018, ¶14.)

17. The Corps had not granted anyone any permits or permission with respect to public use of Corps managed lands located north of the Cantapeta Creek or north and east of the confluence of the Cantepeta Creek and Cannonball Rivers, extending to the Missouri River. (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [doc. 30-8]; *Dundon*, at 1022 ¶30.)

18. Pursuant to a lease with a private party, said Corps-managed lands located on the north banks described were at all times relevant herein subject to private grazing rights. (Corps Release no. 20161127-001 [doc. 30-10]; Corps Release no. 20160916-002 [doc. 30-9]; Department of the Army Lease for Agricultural or Grazing Purposes to Dave Meyer dated April 8, 2014 [doc. 30-11].)

19. On November 1, 2016, the Corps requested the Morton County Sheriff's Department's assistance in removing what the Corps described to be trespassing protesters from federal lands located on the north side of the Cantapeta Creek.  (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [doc. 30-8]; (*Dundon*, at 1022 ¶30.)

20. A North Dakota Supreme Court statement establishes that 553 criminal cases resulting from the DAPL protests had been filed in state district court by mid-December 2016.  *See Matter of Petition to Permit Temp. Provision of Legal Servs*., 889 N.W.2d 399, 401 (N.D. 2017).

These facts cannot reasonably be disputed as they are established by public records, have been the subject of voluminous media reports and law enforcement press releases (i.e. generally known within the trial court's territorial jurisdiction), and have been established and recognized by the Court in other litigation before this Court.  *See* this Court's August 16, 2016 *Order Granting Plaintiff's Motion for Temporary Restraining Order* (doc. 7) and September 15, 2016 *Order Cancelling Hearing and Dissolving Temporary Restraining Order* (doc. 45) in an action entitled *Dakota Access, LLC v. Archambault, et al.*, Case No. 1:16-cv-296 (discussing unlawful and violent activities of DAPL protesters-reproduced below), and this Court's *Order Granting Motion for Summary Judgment* in *Dundon v. Kirchmeier*, 577 F.Supp.3d 1007 (D.N.D. 2021), *appeal docketed* No. 22-1246 (8th Cir. Feb. 1, 2022).

## E.       Prior Determinations by This Court in Interrelated Cases – Context/Background

Further, the Court should take judicial notice of the basic facts surrounding the protests embraced by the *Second Amended Complaint*, including but not limited to the mayhem and ongoing confrontations between law enforcement and protesters in the vicinity where the DAPL project was to cross Highway 1806 and otherwise in close proximity thereto, including at the Backwater Bridge on November 20, 2016 the evening prior to the incident at issue in this case, as not being reasonably disputable, irrespective of why such confrontations were occurring.  *See Freshman v. Atkins,* 269 U.S. 121, 124 (1925) (a court may take judicial notice of, and give effect to, its own records in another, but interrelated, proceeding); *Insulate SB, Inc. v. Advanced Finishing, Inc.*, 797 F.3d 538, 543 n.4 (8th Cir. 2015) (taking judicial notice of an order and documents in interrelated cases in relation to the existence of and basic facts surrounding the actions); *Rosemann v. Sigillito*, 785 F.3d 1175, 1178 n.3 (8th Cir. 2015) ("We may take judicial notice of judicial opinions, especially our own, and thus may reference the fact of Sigillito's

conviction and his sentence in our consideration of this case."); *State of Florida Board of Trustees of Internal Improvement Trust fund v. Charley Toppino and Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975) ("It is not error . . . for a court to take judicial notice of related proceedings and records in cases before that court." (*citing National Fire Insurance Co. v. Thompson*, 281 U.S. 331, 335 (1930)); *Enterprise Bank v. Magna Bank of Missouri*, 894 F.Supp. 1337, 1341 (E.D. Mo. 1995) (taking judicial notice of records of two earlier actions before the same court for the purpose of establishing the facts leading up to the action then before the court). Such general background information has been addressed by this Court in *Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sep. 6, 2016) ("Dakota Access"), and in this Court's order granting summary judgment dismissal of DAPL protesters' claims against law enforcement in relation to events occurring during this same incident on November 20-21, 2016 in *Dundon v. Kirchmeier*, 577 F.Supp.3d 1007 (D.N.D. 2021), *appeal docketed* No. 22-1246 (8th Cir. Feb. 1, 2022). This Court in *Dundon* referred to numerous "undisputed facts," including facts whose accuracy cannot seriously be questioned because they are recorded on videotape (via both ground level and aerial infrared surveillance video). *Id*. at 1018-23.

## III.   ARGUMENT

As summarized by the United States Court of Appeals for the Eighth Circuit:

Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 Led.2d 666 (2002). The test for whether an officer is entitled to qualified immunity is twofold: (1) whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009); *Henderson v. Munn*, 439 F.3d 497, 501-02 (8th Cir. 2006). If no reasonable factfinder could answer yes to both of these questions, the officer is entitled to qualified immunity. *See Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006).

*Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009).  The defense of qualified immunity must be evaluated from the perspective of a reasonable officer based on facts available to the officer at the time of the alleged constitutional violation.  *Gladden v. Richbourg*, 759 960, 964 (8th Cir. 2014). If "based on those facts, the officer reasonably failed to comprehend that he was violating a person's clearly established constitutional rights, he is entitled to qualified immunity from suit." *Id*.

> "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.' " Watson v. Boyd, 2 F.4th 1106, 1110 (8th Cir. 2021) (citation omitted). Accordingly, it " 'is effectively lost if a case is erroneously permitted to go to trial,' [and] law enforcement officers are at least 'entitled to a thorough determination of their claim of qualified immunity if that immunity is to mean anything at all.' " Id. (citations omitted). "Indeed, [the Supreme Court] ha[s] made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that " 'insubstantial claims" against government officials [will] be resolved prior to discovery.' " Pearson v. Callahan, 555 U.S. 223, 231 (2009) (third alteration in original) (citation omitted).

*Thunderhawk v. Morton Cnty*., No. 20-3052, 2022 WL 2441323, at *1 (8th Cir. July 5, 2022).

Dismissal as to all Defendants is appropriate as Wilansky has failed to allege a plausible violation of her constitution rights.  Even assuming, arguendo, Wilansky has alleged a plausible claim for violation of a constitutional right, such right was not so clearly established at the time of the deprivation so that a reasonable officer would have understood his conduct was unlawful under the very unique circumstances presented, thereby entitling the individual defendants to qualified immunity as to all claims arising under federal law.  In addition, Wilansky's state law claims are time-barred.  Further, Defendants are entitled to immunity in relation to the state law claims.

As Wilansky alleges Defendant Morton County is liable for the alleged conduct of all individual-Defendant officers, including State Defendant Adam Dvorak, County Defendants adopt and incorporate by reference arguments contained in Defendant Dvorak's *Memorandum in*

*Support of Motion to Dismiss Second Amended Complaint* (doc. 266) as additional bases for dismissal of claims asserted against Dvorak.  Additional arguments are provided below.

> **A.**   **Wilansky Has Failed to Allege A Plausible Violation of Her Federal Constitutional Rights Under the Fourth Amendment**

Wilansky alleges Defendants Morton County Deputy Moll and North Dakota Highway Patrol Sgt. Dvorak utilized excessive force in violation of the Fourth Amendment when they allegedly deployed explosive munitions (aerial warning/signaling munition or stinger ball grenades) at her.   This is Wilansky's only surviving claim arising under federal law.  Wilansky specifically alleges in her *Second Amended Complaint*, in relevant part, as follows:

131.   At approximately 3:57 a.m., law enforcement officers ordered them to move away from the burned-out vehicle and accused them of having someone under the truck.

132.   Stephen yelled back that no one was under the truck.

133.   Instead of responding to Stephen's explanation, numerous law enforcement officers began rapidly firing less-lethal munitions at [Wilansky] and Stephen.

134.   To avoid getting hit, [Wilansky] and Stephen cowered behind the metal sheet.

135.   While [Wilansky] and Stephen were pinned behind the sheet unable to move or leave, Defendant Dvorak lobbed two Stinger Ball toward them.

136.   In a blatant violation of his less-lethal training and appropriate police tactics, Defendant Dvorak did not inspect the likely detonation area to ensure no one would be hit by the grenades.  Instead, he actively aimed the grenades toward [Wilansky].

137.   The Stinger Ball Grenades landed and exploded within a few feet of [Wilansky].

138.   While [Wilansky] and Stephen were pinned behind the metal sheet, Defendants Moll and law enforcement officers Skar, Hinrich, Rode, and Arndt moved west to get a better line of sight.  Defendant Moll climbed into the turret of a Humvee with his 12-gauge shotgun, so he could better aim at [Wilansky] and Stephen.

139.   Eventually, the law enforcement officers hit [Wilansky] with at least one less-lethal munition.  Defendant Hanson may have hit [Wilansky] with a less-lethal munition as well.

140.   One of these bullets hit [Wilansky] in the upper left arm.  It left a mark that is still visible today.

141.   In extreme pain and realizing she had no way to avoid getting hit with additional munitions, [Wilansky] began running as fast as she could south, away from the

barricade and truck.

142.    As [Wilansky] ran south, she pleaded with the law enforcement officers, yelling, "I'm leaving.  Please don't shoot."

143.    As [Wilansky] ran, she was clearly unarmed and empty-handed.

144.    While she was running, she was overtly complying with a law enforcement order to move south away from the barricade.

145.    Over the course of the next few seconds, [Wilansky] ran approximately 30 yards[4] south.

146.    [Wilansky] saw a piece of plywood on the ground as she was running south.

147.    [Wilansky] stopped at the plywood and attempted to pick it up to use as a shield.

148.    But just as [Wilansky] stopped and began to bend down toward the plywood, Defendant Moll intentionally hit her with an explosive munition.

149.    Upon information and belief, the explosive munition was an Aerial Warning/Signaling Munition.

(Doc. 259 at ¶¶ 131-49.)  In relation to Wilansky's Fourth Amendment excessive force claim

against Moll and Dvorak, she alleges:

193.    While acting under color of law, Defendant Moll and Defendant Dvorak aimed and deployed explosive munitions directly at [Wilansky].

194.    Via these munitions, Defendant Moll and Defendant Dvorak applied physical force to [Plaintiff].

195.    Defendant Moll's intentional application of force terminated [Plaintiff's] movement and detained her by knocking her to the ground and grievously injuring her left arm.

196.    Defendant Moll's and Defendant Dvorak's uses of force against [Plaintiff] – both when she was cowering behind the metal sheet and when she was running south away from the police barricade – were objectively unreasonable and therefore excessive under the totality of the circumstances.

(*Id*. at ¶¶ 193-96.)  County Defendants deny Wilansky's alleged left arm injury was caused by

any explosive munition deployed by any law enforcement officer, and deny any responsibility

for her left arm injury.  Regardless, even assuming such munitions were deployed against

---

[4] Plaintiff testified during her deposition that she was between 15 and 30 feet (not yards) south of the burned-out truck when she was allegedly struck with an explosive munition which injured her left arm.  (Wilansky Depo. [doc. 120-10] at 129-33.)

Wilansky, Wilansky has failed to allege a plausible violation of her Federal Constitutional Rights.

### 1. Excessive Force Claims Are Not Plausible Against Defendants Who Did Not Allegedly Injure Wilansky Through Application Of Force

"Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.  Section 1983 does not sanction tort by association." *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (internal quotation marks omitted).  "'An officer may be held liability only for his or her own use of excessive force.'" *Id*. at 547-48 (quoting *Smith v. Kansas City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009)).

Wilansky does not allege Dvorak's deployment of two stinger ball grenades actually touched her – the stinger ball grenades landed and exploded within a few feet of Wilansky (*id*. at ¶ 137).  Such alleged munition deployment which did not actually touch and injure her could not constitute excessive force as a matter of law – force was not actually applied upon her nor injured her.  *See Grider v. Bowling,* 785 F.3d 1248, 1252 (8th Cir. 2015) (if the suspect does not allege injuries from the officer's acts, then the use of force was not excessive); *Johnson v. Carroll,* 658 F.3d 819, 830 (8th Cir. 2011) (finding force not excessive in part because the plaintiff sustained no injury); *Chambers v. Pennycock*, 641 F.3d 898, 906 (8th Cir. 2011) (a "*de minimis* use of force is insufficient to support a claim" of excessive force under the Fourth Amendment, "and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of force.").

### 2. Wilansky Has Not Alleged She Was "Seized"

In addition, Wilansky's purely factual allegations fail to allege a "seizure" as required to state a cognizable Fourth Amendment excessive force claim.  The Fourth Amendment

protects individuals against "unreasonable searches and seizures." U.S. CONST. AMEND. IV. An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a "seizure" of the plaintiff by the government. *See Graham v. Connor*, 490 U.S. at 393-396 (noting the Fourth Amendment guarantees citizens right " 'to be secure in their persons . . . against unreasonable . . . seizures' of the person", and noting excessive force claims under the Fourth Amendment relate to the use of force in the context of seizures).

The United States Supreme Court has confirmed "The 'seizure' of a 'person' plainly refers to an arrest[,]" and that "[a] seizure requires the use of force *with intent to restrain*." *Torres v. Madrid*, 141 S.Ct. 989, 996, 998 (2021) (emphasis in original). In *Torres*, a suspect brought a § 1983 action against state police officers alleging they used excessive force when, while attempting to execute an arrest warrant, they fired their weapons into the suspect's vehicle as she drove off, striking her. The suspect was not then apprehended. The relevant issue on appeal was whether the suspect had been seized for purposes of the Fourth Amendment when the bullets struck her, despite her alluding capture. The Court in *Torres* held that "the application of physical force to the body of a person <u>with intent to restrain</u> is a seizure even if the person does not submit and is not subdued." *Torres*, at 1003 (underline added).

A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. <u>Nor will force intentionally applied for some other purpose satisfy this rule.</u> In this opinion, we consider only force used to apprehend. We do not accept the dissent's invitation to opine on matters not presented here – pepper spray, flash-bang grenades, lasers, and more.

Moreover, <u>the appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain</u>, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context. Only an objective test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. . . . .

Nor does the seizure depend on the subjective perceptions of the seized person.

*Torres*, at 998 (citations omitted, italics in original, underline added).

In Justice Gorsuch's dissenting opinion in *Torres*, with whom Justice Thomas and Justice Alito joined, it was noted that prior to the decision in *Torres* (2021), "a Fourth Amendment 'seizure' has required taking possession of someone or something." *Torres*, at 1003. The dissent noted that although prior to *Torres* some lower courts had held that a "mere touch" constitutes a Fourth Amendment "seizure", the "mere touch" reasoning was simply based upon dicta originating in *California v. Hodari D.*, 499 U.S. 621 (1991), a case where the issue presented was whether officers seized a defendant by a show of authority *without* touching him, which the Court answered in the negative. "The separate question whether a 'mere touch' also qualifies as a seizure was not presented by the facts of the case." *Torres*, at 1005. "*Hodari D.* has generated considerable confusion" and a split between the circuits. *Torres*, at 1004-05. In other words, at the time of the incident at issue (November 21, 2016), a seizure under the Fourth Amendment required an objective manifestation of intent to restrain. *Torres* was the first case in which the Supreme Court addressed and concluded that a seizure of a person occurs through the application of force where the suspect eludes capture, provided the challenged conduct objectively manifests an intent to restrain. Under *Torres*, intentional application of physical force which does not objectively manifest an intent to acquire possession of the person does not constitute a seizure under the Fourth Amendment. In *Torres*, a seizure occurred because the officers were trying to enforce an arrest warrant at the time they fired live ammunition which struck the fleeing suspect, thereby objectively manifesting an intent to acquire possession of the suspect.

The Eighth Circuit has interpreted *Torres* as meaning the application of force without an objective manifestation of intent to apprehend, but rather to disperse or repel someone, does not

constitute a "seizure" under the Fourth Amendment.  In *Martinez v. Sasse*, 37 F.4th 506 (8th Cir. 2022), an officer who pushed an attorney to the ground and locked the door to an ICE facility to prevent the attorney's entry was entitled to qualified immunity in relation to a Fourth Amendment excessive force claim <u>because the law was not clearly established as of June 2018</u> that the application of physical force for the purpose of repelling someone, rather than apprehending them, constituted a seizure under the Fourth Amendment.  *Id*. at 509-10.  *Martinez* distinguished *Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013) on the basis officer's conduct in *Atkinson* objectively manifested an intent to restrain the plaintiff because after bull-rushing the plaintiff, plaintiff was immediately hand-cuffed and arrested.  "The 'bull rush' was not performed to repel the citizen, and the decision did not provide clear guidance on whether force used only for that purpose constitutes a seizure." *Martinez* at 510.  The seizure in *Atkinson* was not the result of simply a mere touch.

    In 2021, even before *Torres* was decided, the Eighth Circuit determined in *Quraishi v. St. Charles County, Mo*., 986 F.3d 831 (8th Cir. 2021) that an officer who deployed tear gas to disperse a crowd of protesters was entitled to qualified immunity in relation to a Fourth Amendment excessive force claim brought by members of the press who were intermingled with protesters <u>because the law was not clearly established as of August 2014</u> that deploying tear gas for the purpose of dispersing a crowd, rather than to restrain anyone, constituted a seizure under the Fourth Amendment.  *Id*. at 840.  The Court rejected plaintiffs' argument they were restrained because they could not stay in their chosen location, noting the cited cases did not give fair warning the use of tear gas to disperse a crowd constituted a seizure.  *Id*.  *Quraishi* establishes that at the very least, even assuming the application of force to repel/disperse Wilansky constituted a seizure under the Fourth Amendment, which it did not, such law was not clearly established as of November 21,

2016, thereby entitling Moll and Dvorak to qualified immunity on the excessive force claim. At the very least, even assuming either Moll's or Dvorak's use of force to repel or disperse constituted a seizure under the Fourth Amendment, *Quraishi* and *Martinez* establish that at the time of the events at issue in this case, November 20-21, 2016, the law was not clearly established that the use of force for the purpose of repelling someone or dispersing a crowd, rather than to restrain them, constituted a seizure under the Fourth Amendment. This alone establishes Moll and Dvorak are entitled to qualified immunity on Wilansky's Fourth Amendment claim.

Further, in *Dundon*, this Court also properly noted Eighth Circuit precedent pre-dating the November 20, 2016 riot recognized the Fourth Amendment seizure requirement of an objective manifestation of intent to arrest in *Atkinson v. City of Mountain View, Mo*., 709 F.3d 1201 (8th Cir. 2013). Although this Court concluded *Atkinson* to be inapplicable to the question of seizure in the indirect physical touch crowd control case – it noted *Atkinson* falls in line with *Torres*. (App.42, R.Doc. 286 at ¶86.) In *Atkinson*, a plain-clothed police officer tackled and "bull rushed" the plaintiff, resulting in physical injuries to the plaintiff, with the plaintiff being arrested thereafter. The Court in *Atkinson* noted "a reasonable jury could find that [the officer] 'objectively manifested,' an intent to arrest Atkinson. The reported fury of [the officer's] charge temporarily incapacitated Atkinson, and immediately thereafter [the officer] ordered Mountain View police officers to take Atkinson into custody." *Atkinson*, 709 F.3 at 1212, n. 4 (citation omitted). The requirement of an objective manifestation of intent to arrest in the context of Fourth Amendment seizures was recognized by this Court prior to the November 2016 riot at issue.

In *Dundon*, this Court also properly distinguished other cases decided prior to the events in this case, and involving application of less-lethal force against protesters, including *Rauen v. City of Miami*, 2007 WL 686609 (S.D. Fla Mar. 2, 2007); *Jennings v. City of Miami*, 2009 WL

413110 (S.D. Fla. Jan. 27, 2009); *Coles v. City of Oakland*, 2005 WL 8177790 (N.D. Cal. April 27, 2005); and *Nelson v City of Davis*, 685 F.3d 867 (9th Cir. 2012).  In each of these cases, the protesters "essentially had no egress after force was used against them while they were 'herded' and encircled by officers into a certain location."  (App.42-43, R.Doc.286 at ¶¶86-87.)  Such circumstances evidenced an objective manifestation of intent by the officers to restrain the protesters.

In the present case, it is not disputed officers were at all times positioned behind a defensive barricade and made no attempt to proceed south of the barricade in an attempt to apprehend anyone.  Law enforcement's application of force objectively manifested an intent to disperse Wilansky and the other protester hiding behind the burnt-out truck and propped up shield, not to acquire possession of them.  Wilansky and other protesters were always able to, and did, leave the area where force was being applied by proceeding south across the bridge.  *See Martinez v. Sasse*, 37 F.4[th] at 509-10 (in a case decided post-*Torres*, determining the law was not clearly established as of June of 2018 that pushing attorney to ground to prevent entry into facility constituted a seizure under the Fourth Amendment); *Quraishi v. St. Charles County, Missouri*, 986 F.3d at 839-40 (in a case decided pre-*Torres*, determining the use of tear gas by an officer against plaintiffs did not constitute a seizure because it was used to disperse the plaintiffs, not to terminate or restrict their freedom of movement – plaintiffs were able to leave the scene); *Black Lives Matter D.C. v. Trump*, 544 F.Supp.3d 15, 48-49 (D.C. 2021) (citing *Torres*, and determining officers did not seize protesters under the Fourth Amendment through use of flashbang grenades, rubber bullets and tear gas because they were used to disperse the crowd, not to restrain them or attempt to seize them in place – protesters had a means of egress).  This Court in *Dundon* properly concluded "[t]he evidence in this case shows only one conclusion:  officers objectively manifested an intent to move

protesters away from the Bridge, get them to disperse, and control the crowd."  (App.44, R.Doc.286 at ¶89.)  As Wilansky has not alleged she was seized, her Fourth Amendment excessive force claim fails as a matter of law and should be dismissed.

A seizure requires more than the application of force - an intent to apprehend is required. *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (there was no "seizure" under Fourth Amendment where plaintiff sustained injuries as a result of being shoved aside by sheriff during course of sheriff taking plaintiff's adult daughter into protective custody because a seizure under Fourth Amendment requires intentional acquisition of physical control - citing among other cases *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989); "[t]he sheriff only intended to remove Plaintiff from his path to the door; he did not intend to acquire physical control over her.  Thus, no Fourth Amendment seizure occurred.").  Neither the United States Supreme Court nor the United States Court of Appeals for the Eighth Circuit has ever held that an officer's use of force alone constitutes a per se seizure under the Fourth Amendment.

Wilansky admits that shortly before the explosion, this same location had been the scene of a large-scale confrontation between law enforcement manning the barricade, and rioting protesters seeking removal of the barricade and reopening of Highway 1806 (to gain access to the nearby DAPL drill pad site).  Wilansky admits the Bridge was closed.  Wilansky admits law enforcement had applied less-lethal force against other protestors in near proximity to the barricade where Wilansky was located when force was allegedly applied as against her, and yet she voluntarily and intentionally walked up to the barricade within range of force allegedly applied by law enforcement.  This observance alone constituted a prior warning.  Wilansky alleges that prior to force being applied, law enforcement manning the barricade warned her to move away from the burned-out vehicle forming a part of the barricade - away from law enforcement.

Wilansky has not alleged she was arrested or restrained by law  enforcement, or even advised by law enforcement she was not free to terminate the encounter with law  enforcement. Wilansky does not allege law enforcement at any time told her to remain where she was. Wilansky does not allege nonconclusory facts to infer the force was applied for the purpose of law enforcement gaining physical control over Wilansky.  Instead, Wilansky alleges the force allegedly applied was intended to expel her away from law enforcement. Wilansky admits following the explosion, she proceeded south  off  the  Bridge, and was transported  further  south  to  the  Prairie  Knights  Casino  and  Resort,  from  where  she  was transported to a hospital.

Wilansky's allegation the deployment of stinger ball grenades (which did not impact her), or any other munition prevented her from proceeding south across the Bridge is contrary to her own admission that she did in fact proceed south across the Bridge.  As a practical matter, the stinger ball grenades allegedly deployed did not, as a matter of common sense, create any barrier to Wilansky's retreat.  Wilansky admitted during her deposition that she was not struck with any impact munitions from the time she left the truck until she reached down towards the debris pile where a shield was allegedly located.  (Wilansky Depo. [doc. 120-10] at 134.)  She did not hear or see anything as she jogged between those two points that suggested someone was attempting to shoot something at her.  (*Id.* at 134-35.)

Wilansky's allegations, even if accepted as true, objectively manifest law enforcement's intention in applying the alleged force of keeping Wilansky and other protesters away from law enforcement – the exact opposite of what is required for a seizure under the Fourth Amendment. Wilansky has failed to allege a "seizure" by law enforcement governed by the Fourth Amendment.  Wilansky's Fourth Amendment excessive force claim therefore fails as a matter of

law and should be dismissed.

## B.    <u>Moll and Dvorak Are Entitled To Qualified Immunity</u>

Even assuming, arguendo, Wilansky has alleged a plausible claim of violation of her constitutional rights, such rights were not clearly established as of November 21, 2016, thereby entitling the individual Defendants to qualified immunity from suit.

As explained  by the Supreme Court of the United States:

> Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.  In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law. This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality.

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.

> ***

> . . . Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Kisela v. Hughes*, 138 S.Ct. 1148, 1152-53 (2018) (per curiam) (numerous citations and quotations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021), reh'g denied (Aug. 20, 2021).  "This generally requires a plaintiff to 'point to existing circuit precedent that involves sufficiently 'similar facts' to 'squarely govern' the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present 'a robust consensus of cases of persuasive authority' constituting settled law."  *Id*. (citing *De La Rosa v. White*, 852 F.3d 740, 745

(8th Cir. 2017).  *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (alterations to original)).

"The plaintiff has the burden to prove that a right was clearly established at the time of the alleged

violation." *Id*. (citing *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018)).  "A right is not clearly

established by 'controlling authority' merely because it may be 'suggested by then-existing

precedent.'"  *Id*. (quoting *District of Columbia v. Wesby*, 138 S. Ct 577, 589-90 (2018)).

"'[E]xisting precedent must have placed the statutory or constitutional question beyond debate."

*Ashcroft v. Kidd*, 563 U.S. 731, 741 (2011).  Qualified immunity applies when a plaintiff has

"failed to identify a case where an [official] acting under similar circumstances . . . was held to

have violated the [Constitution]."  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation

marks and citations omitted).

There is no clearly established, existing precedent establishing the use of less-lethal

munitions from a strictly defensive position constitutes a seizure within the meaning of the Fourth

Amendment, and the individual officers would none-the-less be entitled to qualified immunity

from suit in relation to Wilansky's Fourth Amendment excessive force claim.  By comparison,

existing case law supports the use of less-lethal munitions for the purpose of preventing the

unlawful access to property, and protecting public and private property rights.  *See e.g. Bernini v.

City of St. Paul*, 655 F.3d 997 (8th Cir. 2012) (involving law enforcement's cordoning off

downtown St. Paul, Minnesota as a no-go zone during Republican National Convention in 2008

due to prior heavy property damage by protesters in the vicinity, and utilizing less-lethal munitions

to hold back aggressive protesters attempting to breach barricades); *Dundon v. Kirchmeier*, 577

F.Supp.3d at 1060 (a recent decision by this Court determining officers were entitled to qualified

immunity in relation to DAPL protesters' claims of excessive force as a result of use of less-lethal

munitions against protesters at the Backwater Bridge barricade during the evening of November

20, 2016 as there was no clearly established law prohibiting such conduct at that time).  There simply is no existing precedent which establishes beyond debate the unconstitutionality of Defendants' alleged conduct in this case.  *See Kisela v. Hughes*, 138 S.Ct. at 1151 ("Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.").  The alleged conduct of the individual Defendants did not violate clearly established federal constitutional rights of Wilansky at the time of the alleged conduct, and the individually-named Defendants are therefore entitled to qualified immunity.

### D.    <u>Wilansky's State Law Claims</u>

In the event the Court dismisses all of Wilansky's claims arising under federal law, the Court should decline to exercise supplemental jurisdiction over Wilansky's state law claims against all Defendants[5] of assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence and violation of N.D.C.C. §§ 9-10-0 and 9-10-06. "[W]hen a district court has dismissed every federal claim, as here, 'judicial economy, convenience, fairness, and comity' will usually 'point toward declining to exercise jurisdiction over the remaining state-law claims.'" *McManemy v. Tierney*, 970 F.3d 1034, 1041 (8th Cir. 2020) (quoting *Wilson v. Miller*, 821 F.3d 963, 970-71 (8th Cir. 2016) (citation omitted).

In the event the Court does not dismiss all of Wilansky's claims arising under federal law, the Court should none-the-less dismiss Wilansky's state law claims as 1) Wilansky's state law

---

[5] Pursuant to *Order Adopting Plaintiff's Stipulation of Dismissal of Certain Claims Against Certain Defendants* (doc. 185), all state law claims alleged in the *First Amended Complaint* as against the State Defendants, including Dvorak, were dismissed with prejudice.  In addition, as discussed in Defendant Dvorak's *Memorandum in Support of Motion to Dismiss Second Amended Complaint* (doc. 266), incorporated herein by reference, at pages 17-19, this Court lacks subject matter jurisdiction in relation state law claims asserted against Dvorak, which are effectively claims against the State of North Dakota to which Eleventh Amendment immunity applies.

claims against Moll and Dvorak are time-barred; 2) all Defendants are immune from civil liability on the basis of justification and immunity under North Dakota's Disaster Act of 1985; 3) County Defendants are immune under the public duty doctrine; and 4) as Wilansky's state law claims against Morton County are derivative and dependent upon the viability of her state law claims against Moll and Dvorak.

> **1.    Wilansky's State Law Claims Against Moll and Dvorak Are Time Barred.**

Wilansky's state law claims against Moll and Dvorak are also time barred. Specifically at issue in relation to this motion is Wilansky's failure to timely substitute Moll and Dvorak for the "John Doe" placeholder utilized in Wilansky's original complaint.

"[A]n action against the state or its employees and officials acting within the scope of their employment or office must be commenced within three years after the claim for relief has accrued." N.D.C.C. 28-01-22.1. "An action brought under [N.D.C.C. ch. 32-12.1 (governing state law claims against political subdivisions)] must be commenced within three years after the claim for relief has accrued." N.D.C.C. 32-12.1-10.

In this case, Wilansky alleges Defendants actions which allegedly resulted in her injuries occurred on November 21, 2016, and it cannot reasonably be disputed Wilansky was not aware of her injury at that time (i.e. her claims accrued at that time). Wilansky filed her original Complaint (doc. 1) on November 19, 2018 – only two days before expiration of the statute of limitations on her state law claims against any State defendant, and one year and two days before expiration of the statute of limitations on any state law claim against any political subdivision defendant. In January of 2019, the original County Defendants and original State Defendant Iverson timely filed Rule 12 motions requesting dismissal of Wilansky's original Complaint. (Docs. 26, 28.) On October 29, 2020, the Court granted Defendant Iverson's request for dismissal of all claims against

him (i.e. defamation), and granted County Defendants' motion, in part, and converted the remainder of the County Defendants motion to a motion for summary judgment. (Doc. 46.) Wilansky first requested leave to amend her original Complaint to assert claims against Moll and Dvorak on March 9, 2022 (doc. 140), over seven months after all briefing on County Defendants converted motion for summary judgment has been filed, to "to substitute . . . officers for the current 'John Doe' placeholder, so she can serve these officers and formally join them as Defendants before the statute of limitations on her excessive force claims runs in November of this year." Notably, no reference to meeting the statute of limitations on Wilansky's state law claims was referenced by Wilansky. The Court granted Wilansky leave to "serve and add new defendants for the John Doe' placeholder and stayed its decision on the then pending converted motion for summary judgment pursuant to *Order Granting Motion to Modify Scheduling Order and Temporarily Stay Decision on Pending Summary Judgment Motion* (doc. 151) on June 2, 2022. Wilansky filed the *First Amended Complaint* (doc. 153) first naming Moll and Dvorak as defendants on July 21, 2022. Moll was served with a Summons on July 25, 2022 (doc. 163). Dvorak was served with a *Summons* on July 26, 2022 (doc. 160).

Federal Rule of Civil Procedure 15(c) governs potential relation back of amendments to pleadings, and provides in full as follows:

**(c) Relation Back of Amendments**

**(1) When an Amendment Relates Back**. An amendment to a pleading relates back to the date of the original pleading when:

**(A)** the law that provides the applicable statute of limitations allows relation back;

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or

**(C)** the amendment changes the party or the naming of a party against whom a

claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> **(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and

> **(ii)** knew or should have known that the action would have been brought against it, <u>but for a mistake concerning the proper party's identity</u>.

(Bold in original, underlining added for emphasis.)

Rule 15(c)(1)(C) applies where "the amendment changes the party or the naming of a party against whom a claim is asserted," as at issue in relation to Wilansky's substitution of Moll and Dvorak for the "John Doe" placeholder. For any such amendment to relate back to the original pleading, Rule 15(c)(1)(C) requires, in relevant part, that "the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; **and** (ii) knew or should have known that the action would have been brought against it, **but for a mistake concerning the proper party's identity**." (Bold added.) The United States Court of Appeals for the Eighth Circuit specifically held in *Heglund v. Aitkin County*, 871 F.3d 572, 578-81 (8th Cir. 2017) that a plaintiff's utilization of a "John Doe" placeholder in a complaint pending later identification and substitution of a law enforcement officer does not constitute a "mistake" by the plaintiff to which a relation back of pleadings under Rule 15(c)(1)(C) applies for statute of limitations purposes. The Court concluded the term "mistake" under Rule 15(c)(1)(C)(ii) means the "wrong" defendant was originally identified, and does not apply where a plaintiff asserts he/she simply does not know who the correct defendant is. In other words, utilization of a "John Doe" defendant does not toll any applicable statute of limitations. The Court in *Heglund* also rejected the plaintiff's argument that the officer should be equitably estopped from asserting the statute of limitation as defendants allegedly caused the delay in plaintiff's identification of and

substitution of the named officer for the "John Doe" placeholder by filing an early Rule 12 motion to dismiss and initial refusal to disclose which officer was involved.  The Court noted that "filing a prompt motion to dismiss is not the sort of inequitable conduct that calls for application of the doctrine[,"] and there was no evidence that defendants engaged in any misleading conduct.  *Id*. at 578.

In the present case, the original State and County Defendant promptly filed Rule 12 motions to dismiss and did not engage in any misleading conduct.  Defendants denied, and continue to deny any law enforcement officer deployed an explosive munition at Wilansky which allegedly caused the injury to her lower left arm.  The statute of limitations on state law claims against both State (expired November 21, 2018) and County Defendant (expired November 21, 2019) had expired by the time the Court rendered its ruling on the original Rule 12 motion to dismiss on October 29, 2020 (doc. 46).  *Heglund* is dispositive of Wilansky's state law claims against Moll and Dvorak as being time-barred, and all such state law claims (Counts 4, 5, 6 and 7) must be dismissed.  To the extent the state law claims against Moll and Dvorak are time-barred, all state law claims against Morton County and Kirchmeier must also be dismissed as being wholly derivative and dependent upon the state law claims against Moll and Dvorak.

**2.     All Defendants Have Immunity from Liability In Relation To Wilansky's State Law Claims Pursuant to the North Dakota Disaster Act of 1985**

Even assuming, arguendo, Wilansky's injury was caused by an explosive munition deployed by County Defendants, or any other law enforcement officer, which is denied, all of Wilansky's claims arising under state law should be dismissed as all Defendants, including County Defendants, are immune for any injuries suffered by Wilansky pursuant to the North Dakota

Disaster Act of 1985 (the "Disaster Act"), codified at Chapter 37-17.1 of the North Dakota Century

Code.  Specifically, subsection 1 of section 37-17.1-16 thereof provides as follows:

> **37-17.1-16. Immunity and exemption**.
>
> 1.      All functions hereunder and all other activities relating to emergency management
> are hereby declared to be governmental functions. The state, a county or city, any
> disaster or emergency worker, an employee of a federal agency on loan or leave to
> the state in support of emergency service response whether the emergency is
> declared or undeclared, or any other person providing goods or services during an
> emergency if the person is working in coordination with and under the direction of
> an appropriate governmental emergency or disaster response entity, complying
> with or reasonably attempting to comply with this chapter, or any executive order
> or disaster or emergency operational plan pursuant to this chapter, or pursuant to
> any ordinance relating to any precautionary measures enacted by any county or city
> of the state, except in case of willful misconduct, gross negligence, or bad faith, is
> not liable for the death of or injury to persons, or for damage to property except as
> compensation may be provided in section 37-17.1-12, as a result of any such
> activity. This section does not affect the right of any person to receive benefits to
> which that person would otherwise be entitled under this chapter, or under
> workforce safety and insurance law, or under any pension law, nor the right of any
> such person to receive any benefits or compensation under any Act of Congress.
>
> ***

N.D.C.C. § 37-17.1-16.  Wilansky's non-conclusory factual allegations, and materials this Court

may consider in relation to this Rule 12 motion to dismiss, fall squarely within the parameters of

this immunity provision.  First, on August 15, 2016, the Morton County Board of Commissioners

issued an *Emergency Declaration Dakota Access Pipeline Civil Unrest* (doc. 30-1) to address the

ongoing "civil unrest occurring at the location of the Dakota Access Pipeline construction site"

which threatened "the health, well-being, and safety of responders and the public", and noted the

need to protect life and property.  On August 19, 2016, then North Dakota Governor Jack

Dalrymple issued *Executive Order 2016-04* (doc. 30-2), triggering the Disaster Act to address the

"[c]ontinuing unlawful activity [associated with DAPL protests, including at the DAPL

construction site] which could threaten the health, safety and well-being of the general public,

protesters and first responders who are committed to protecting life and property[]". All governmental entities and their employees involved with manning law enforcements' defensive barricade along the north end of the Backwater Bridge at the time of the Incident are encompassed by Section 37-17.1-16. The phrase "'Disaster or emergency worker' means any person performing disaster or emergency responsibilities or duties, at any place in this state subject to the order or control of, or pursuant to a request of, the state government or any political subdivision." N.D.C.C. § 37-17.1-04(3). The barricade was placed a short distance south of the privately owned DAPL drill pad site where protesters had previously gained access and burned heavy construction equipment on October 27, 2016, engaged in violent confrontations with law enforcement, and had established the North Camp in the direct path of the DAPL project. The barricade formed a part of law enforcement's southern boundary of an established security zone around the DAPL construction site to prevent a repeat of earlier unlawful protester activities.

In addition, Wilansky purely factual allegations, even if true, which are denied, do not establish any use of an explosive munition by any defendant involved willful misconduct, gross negligence or bad faith. Instead, under the totality of the circumstances presented to officers at the time of the Incident, the utilization of an explosive less-lethal munition, such as an aerial warning/signaling munition (use denied), stinger ball grenade (use did not impact Wilansky), or flashbang (use denied), would not have even been negligent, and would have been objectively reasonable. Wilansky admits that on November 20, 2016, protesters had engaged in prolonged efforts to breach and circumvent law enforcements' defensive barricade. Protesters used force against law enforcements for a period of hours only a few hours earlier at this very location, protesters had only a few hours earlier successfully removed one of the burned-out trucks and were then engaged in additional efforts to remove the remaining burned-out truck from the barricade,

and Wilansky failed to obey verbal commands to move away from the burned out truck and proceed south of the bridge, and law enforcements' attempts to force her compliance through the use of impact munitions and stinger ball grenades had proven unsuccessful.  Wilansky admits she was located beside the burned-out truck.   Under these circumstances, officers would have reasonably been concerned for their lives and safety was an objectively reasonable belief and any deployment of an explosive less-lethal munition would have been objectively reasonable.

County Defendants request Wilansky's state law claims against all Defendants be dismissed on the basis of immunity under the Disaster Act.

### 3. All County Defendants Have Immunity from Liability In Relation To Wilansky's State Law Claims Pursuant to North Dakota's Public Duty Doctrine

All of Wilansky's state law claims against any County Defendant should also be dismissed as a matter of law under North Dakota's public duty doctrine. North Dakota Century Code Chapter 32-12.1 governing governmental liability, limits tort liability exposure of North Dakota political subdivisions and their employees relative to claims arising under state law.  Subsection 32-12.1-03(3)(f)(3) provides immunity to political subdivisions and their employees in relation to the provision of law enforcement services and operations, as follows:

> 3. A political subdivision or a political subdivision employee may not be held liable under this chapter for any of the following claims:

> ***

> f. A claim relating to injury directly or indirectly caused by the performance or nonperformance of a public duty, including:

> ***

> (3) Providing or failing to provide law enforcement services in the ordinary course of a political subdivision's law enforcement operations.

> ***

39

N.D.C.C. § 32-12.1-03(3)(f)(3).  Subsection 32-12.1-03(3)(g) provides further:

> g.      "Public duty" does not include action of the political subdivision or a political subdivision employee under circumstances in which a special relationship can be established between the political subdivision and the injured party.  A special relationship is demonstrated if all of the following elements exist.
>
> > (1)     Direct contact between the political subdivision and the injured party.
> > (2)     An assumption by the political subdivision, by means of promises or actions, of an affirmative duty to act on behalf of the party who alleged was injured.
> > (3)     Knowledge on the part of the political subdivision that inaction of the political subdivision could lead to harm.
> > (4)     The injured party's justifiable reliance on the political subdivision's affirmative undertaking, occurrence of the injury while the injured party was under the direct control of the political subdivision, or the political subdivision action increases the risk of harm.

As explained by the North Dakota Supreme Court in *Tangedal v. Mertens*, "[w]hen the provisions of N.D.C.C. ch. 32-12.1 are considered together to harmonize and give meaning to each provision, we conclude a political subdivision and an employee may not be held liable for a claim for an injury caused by the performance or nonperformance of a public duty unless a special relationship is established."  2016 ND 170, ¶ 23, 883 N.W.2d 871, 879.  Public duty immunity applies even where a political subdivision employee's work was so negligently performed that it constituted reckless and grossly negligent conduct, or wanton or willful misconduct under N.D.C.C. § 32-12.1-04(3).  *Id.*  The Supreme Court concluded that liability could only potentially exist where a special relationship is established under N.D.C.C. § 32-12.1-03(g).

In the present case, Wilansky alleges she was injured by law enforcement officers who were providing law enforcement services in the ordinary course of law enforcement operations of their respective political subdivisions – allegations falling squarely within the public duty immunity provisions of Section 32-12.1-03(3)(f)(3).  Wilansky has also not alleged any facts upon

40

which a special relationship under Section 32-12.1-03(3)(g) could be established. County Defendants request Wilansky's claims arising under state law be dismissed under the public duty immunity.

### 4.   Moll and Dvorak Are Immune From Civil Liability In Relation To Wilansky's State Law Claims For Justified Use of Force

Pursuant to North Dakota Century Code Section 12.1-05-07.2, "[a]n individual who uses force as permitted under this chapter is immune from civil liability for the use of force to the individual against who force was used or to that individual's estate unless . . . [such force was applied against a law enforcement officer]." "Conduct engaged in by a public servant in the course of the person's official duties is justified when it is required or authorized by law." N.D.C.C. § 12.1-05-02. "A person is justified in using force upon another person to defend himself against danger of imminent unlawful bodily injury . . . ." N.D.C.C. § 12.1-05-03. "A person is justified in using force upon another person in order to defend anyone else if: 1. The person defended would be justified in defending himself; and 2. The person coming to the defense has not, by provocation or otherwise, forfeited the right of self-defense." N.D.C.C. § 12.1-05-04. "Force is justified if it is used to prevent or terminate an unlawful entry or other trespass in or upon premises, or to prevent an unlawful carrying away or damaging of property, if the person using such force first requests the person against whom such force is to be used to desist from his interference with the premises or property, except that a request is not necessary if it would be useless or dangerous to make the request or substantial damage would be done to the property sought to be protected before the request could be effectively be made." N.D.C.C. § 12.1-05-06. "Deadly force is justified . . . a. When it is expressly authorized by law . . . .[or] b. When used in lawful self-defense, or in lawful defense of others, if such force is necessary to protect the actor or anyone else against death, serious bodily injury, or the commission of a felony involving violence. . . . [And] the duty

to retreat or avoid force does not apply under the following circumstances:  (1) A public servant is justified in using force in the performance of the public servant's duties . . . need not desist from the public servant's . . . efforts because of resistance or threatened resistance by or on behalf of the other individual against whom the public servant's . . . action is directed[.]"  N.D.C.C. 12.1-05-07.

In the present case, for the same reasons why Moll's and Dvorak's alleged conduct would have been objectively reasonable in the context of the excessive force and qualified immunity analyses above, their alleged conduct would have also been justified under North Dakota law, thereby immunizing them from civil liability pursuant to N.D.C.C. § 12.1-05-07.2.

5. **Wilansky's Intentional Infliction of Emotional Distress Claim Should be Dismissed For Lack Of Facts Alleging Extreme and Outrageous Conduct**

In addition, Wilansky's claim for intentional infliction of emotional should be dismissed for lack of facts alleging extreme and outrageous conduct on the part of Moll and Dvorak in this case.  The required elements of such a claim are: (1) extreme and outrageous conduct that is (2) intentional or reckless, and that (3) causes severe emotional distress.  *Muchow v. Lindblad*, 435 N.W.2d 918, 923-24 (N.D. 1989).

> [T]he threshold element of extreme and outrageous conduct is narrowly limited to outrageous conduct that exceeds all possible bounds of decency. In determining whether conduct is extreme and outrageous, courts consider whether the conduct is so extreme in degree as to be beyond all possible bounds of decency and utterly intolerable in a civilized society. Whether the alleged actions meet the threshold of extreme and outrageous conduct is a question of law to be decided by the court.

*Vandall v. Trinity Hosps*., 2004 ND 47, ¶ 29, 676 N.W.2d 88, 97 (citation omitted).  For the same reasons why the alleged use of an explosive less lethal munition was objectively reasonable and justified under the totality of the circumstances, such conduct was also not "beyond all bounds of decency and utterly intolerable."  Wilansky's intentional infliction of emotional distress claim fails on this basis as well and should be dismissed.

42

## IV.    CONCLUSION

For the reasons discussed above, the Court should dismiss Wilansky's claims against all

Defendants, in their entirety and with prejudice.

Dated this 25th day of August, 2023.

                            BAKKE GRINOLDS WIEDERHOLT


                     By:     /s/Shawn A. Grinolds
                            Randall J. Bakke (#03898)
                            Shawn A. Grinolds (#05407)
                            Special Assistant State's Attorneys for
                            Morton County
                            300 West Century Avenue
                            P.O. Box 4247
                            Bismarck, ND 58502-4247
                            (701) 751-8188
                            rbakke@bgwattorneys.com
                            sgrinolds@bgwattorneys.com

                            Attorneys for Defendants Morton County,
                            Kyle Kirchmeier, and Jonathan R. Moll

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2023, a true and correct copy of the foregoing
**MEMORANDUM OF LAW IN SUPPORT OF COUNTY DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** was filed electronically with
the Clerk of Court through ECF.

ATTORNEYS FOR PLAINTIFF:

Benjamin M. Stoll
Carlton Fields
1025 Thomas Jefferson Street NW
Suite 400 West
Washington, DC 20007-5208
(202) 965-8160
bstoll@carltonfields.com

Edward C. Barnidge
Williams & Connolly LLP
725 Twelfth Street NW
Washington, DC 20005

ebarnidge@wc.com

Lauren C. Regan
Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, OR 97401
lregan@cldc.org

ATTORNEYS FOR DEFENDANTS DEREK J. ARNDT, PAUL D. BAKKE, ADAM J. DVORAK, TRAVIS A. NELSON, JOSHUA W. RODE, EVAN M. SAVAGEAU, AND TRAVIS M. SKAR:

Courtney R. Titus
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
(701) 328-3640
ctitus@nd.gov

Jane G. Sportiello
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
(701) 328-3640
jsportiello@nd.gov

By:     */s/ Shawn A. Grinolds*
         SHAWN A. GRINOLDS