UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Sophia Wilansky,<br><br>                        Plaintiff,<br><br>   vs.<br><br>Morton County, North Dakota, et al.,<br><br>                   Defendants. | **REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>**Case No. 1:18-cv-00236** |

Plaintiff's Response is flawed both legally and factually. On the legal side, she asks this Court to expand the Fourth Amendment beyond all recognition, in direct violation of the recent dictates of the Supreme Court in *Torres v. Madrid*, 141 S. Ct. 989, 1002 (2021). Simultaneously, she distorts her factual allegations; the facts she argues here bear little resemblance to her actual Complaint. Application of the correct law to the plain language of the Complaint clearly shows that she fails to state a claim against State Defendant Dvorak – or any defendant – for any Constitutional violation. This failure entitles Dvorak to qualified immunity due to her failure to plead the violation of a Constitutional right. And to the extent there is any question left as to the necessity of dismissal, it is unequivocally dispersed by binding Eighth Circuit precedent on the second prong of the qualified immunity analysis, which confirms the impression supplied by common sense: no reasonable officer could have *possibly* been on notice that deployment of a less-lethal munition with intent to disperse could cause any seizure whatsoever. For all of these reasons, State Defendant Dvorak asks that the claims against him be dismissed.

## BACKGROUND

Plaintiff commences her Response with fourteen numbered "key facts." Doc. No. 277, 11-14. Most are addressed in the argument below, but Dvorak will note a few broad points here.

First of all, Plaintiff cannot make up her mind as to *how* Dvorak deployed his munitions – *i.e.*, whether he threw them purposely *toward* her with an intent to maliciously injure her, or, *behind*

her so as to trap her against the shield.[1] Further, the allegation that he threw the Stinger Ball grenades "behind" her is nowhere located in the Complaint.[2] Essentially, Plaintiff seeks to describe the Stinger Ball grenades as both a direct weapon meant to impact her, and simultaneously as a sort of herding mechanism deliberately placed behind her to keep her from dispersing south. Assigning the Stinger Ball grenades this double duty is the only way she can plausibly detain a seizure, but it violates common sense; not even at the motion-to-dismiss stage can one object be flying in two directions at once. Further, these efforts betray the sole truly plausible inference from the allegations: Dvorak was deploying the Stinger Ball grenades *not* as a direct-impact weapon, and *not* as a trap, but simply as a mechanism to disperse her south.

Second, Plaintiff cannot make up her mind about the exact sequence of events regarding her alleged entrapment behind the shield. The actual Complaint explains that Plaintiff was *already* "pinned behind the sheet unable to move or leave" by the time Dvorak deployed the Stinger Balls. Doc. No. 259, 26 at ¶ 135.[3] But now, she alleges that it was Dvorak who pinned her behind the metal sheet. Doc. No. 277 at 13; *see also id.* at 20. This court should disregard these new claims that Dvorak was causally connected to Plaintiff's alleged "pinning" behind the metal sheet.

### LAW AND ARGUMENT

I.   **Plaintiff Fails the First Prong of Qualified Immunity Because She Does Not State a Claim for Violation of a Constitutional Right.**

A.   **Plaintiff Misapprehends the Governing Law.**

Interestingly, in her Response, Plaintiff explains that she is *not* alleging a seizure based on physical contact between a munition and her person. Rather, she claims that her seizure occurred

---

[1] *See, e.g.*, *Doc 277* at 12, "Defendant Dvorak threw two stinger grenades <u>toward</u> her," *id.* at 13, "<u>toward</u> Sophia while she was trapped," *id.* at 13, "over the truck such that they landed <u>behind</u> Sophia", *id.* at 20, "<u>behind</u> Sophia," *id.* at 24, "over a barricade so that they land <u>behind</u> someone,"*id.* at 24, "<u>at – or even near</u> – specific individuals" *id.* at 28, "<u>at</u> an unarmed girl," etc.
[2] Should the Court grant the Municipal Defendants' request to consider Plaintiff's deposition testimony at the current Rule 12 stage, Dvorak would draw the Court's attention to the fact that Plaintiff testifies that these munitions exploded to the west of her, i. e., *beside* her, not to her south which would be behind her. Doc. No. 120-10, at p. 116, lines 23-25, p. 117, lines 1-20.
[3] Defendant Moll doesn't even make an appearance until three paragraphs later. Id. at ¶ 138.

by "acquisition of control." But in articulating her test for such a seizure, she ignores the governing law as it was clarified in 2021 by the United States Supreme Court in *Torres v. Madrid.*

> **1.    There Are Two Distinct Kinds of Seizures and Neither Happened Here.**

Seizures can take two distinct forms: those effected by physical force, and those effected by a show of authority which restrains a person's liberty. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). The latter kind, also described by the Court as a "seizure by control," has two distinct subvariants: "**either** voluntary submission to a show of authority **or** the termination of freedom of movement." *Id.* at 991. The distinction between a seizure by physical force and a seizure by control is critical to Fourth Amendment jurisprudence as explained below.

> **a.    Physical Force Seizures**

The requirements of a seizure by physical force were addressed by the Court in *Torres,* where it was faced with deciding whether a woman who started to flee the police when she was struck by a bullet, but continued driving, was seized. *Id.* at 995. Looking to common law, the Court concluded that the plaintiff *was* seized "for the instant that the bullets struck her." *Id.* at 999. However, the Court placed important limits on its holding regarding a physical force seizure:

> We stress, however, that the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. **A seizure requires the use of force with intent to restrain.** Accidental force will not qualify. . . Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend.

*Torres*, 141 S. Ct. at 998.

> **b.    Seizures by Control**

The other form of seizure is a seizure by control, and critically, there are two types: voluntary submission to a show of authority, **or,** termination of freedom of movement. Describing the two variants of seizure by control, the Court in *Torres* explains:

> Unlike a seizure by force, a seizure by acquisition of control involves **either** voluntary submission to a show of authority **or** the termination of freedom of movement. A prime example of the latter comes from *Brower*, where the police seized a driver when he crashed into their roadblock. 489 U.S., at 598–599, 109 S.Ct. 1378; see also, e.g., *Scott v. Harris*, 550 U.S. 372, 385, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (ramming car off road); *Williams v. Jones*, Cas. t. Hard. 299,

301, 95 Eng. Rep. 193, 194 (K. B. 1736) (locking person in room). Under the common law rules of arrest, **actual control** is a necessary element for this type of seizure. *See* Wilgus, *Arrest Without a Warrant*, 22 Mich. L. Rev. 541, 553 (1924). Such a seizure requires that "**a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.**" *Brower*, 489 U.S., at 599, 109 S.Ct. 1378.

*Torres* at 1001.

As noted by the Court, the "prime example" of termination-of-freedom-of-movement seizures is *Brower v. Cnty. of Inyo*, 489 U.S. 593, 595-96 (1989).[4, 5] There, the Court considered whether police use of a roadblock during a high-speed chase was a seizure when the suspect car's movement was not restrained by law enforcement *until* he hit the roadblock. *Brower*, 489 U.S. at 595-96. The Court noted that, if a suspect was being chased by police and accidentally lost control of their car, that would not be a seizure – because "[v]iolation of the Fourth Amendment requires *an intentional acquisition of physical control.*" *Id.* at 595-596. But the Court reasoned that the accidental crash hypothetical was distinguishable from the present case, which involved the use of a police roadblock "crossing both lanes of the highway." *Id.* at 598. Discussing the distinction, the Court wrote that for a seizure, "the detention or taking itself *must be willful.*" *Id.* at 596. In other words, a Fourth Amendment seizure only occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 597-599. Noting that the police roadblock crossing the entire highway "is *designed* to produce a stop by physical impact," the Court held the stop to be a seizure. *Id.* at 598.

In sum, *Torres* instructively clarifies the distinction between seizures directly by physical force and those imposed by control through termination of movement. In the former, the physical force directly impacts a person; in the latter, a person is physically boxed in by a roadblock crossing

---

[4] Earlier in the opinion, the Court explains that *Hodari D.* is a case that "principally concerns a show of authority." *Id.* at 995. *See also California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Other cases in this genealogy include those discussed in footnote 7, below.

[5] The 1924 law review article by Professor Wilgus which is cited by the Court in the above quote gives even more examples of both subtypes of seizures by control. See Wilgus, *Arrest Without a Warrant*, 22 Mich. L. Rev. 541 (1924).Wilgus explains that "show of authority" subtype includes situations where a bailiff locates someone and says, "You are my prisoner," and the person goes back to the jail with him. *Id.* at 553. As for the "freedom of movement" subtype of seizures by control, other examples include preventing someone from leaving a room or preventing them from leaving a ship. *Id.* Wilgus concludes the discussion of both types by stating "all are sufficient detentions to constitute arrest in each case, **if the purpose was to make an arrest.**" *Id.* at 555.

two lanes of a highway down which they are driving, or locked in a room, or trapped aboard a ship. Further, the Court in *Torres* confirmed the obvious intentionality requirement of seizures by control.

### 2.    Plaintiff Cannot Escape Torres

The defects in Plaintiff's view of the law, set forth at Doc. No. 277 at 17-19, are clear. First, she claims that the *Torres* test for a seizure by physical force – i.e., physical force with intent to restrain – does *not* apply to her case. *Id.* at 17. Rather, she claims to establish a seizure by control. Second, she asserts that "[a] seizure by control has no intent requirement," and "does not require any intent to restrain." *Id.* at 18-19. Both her attempts to dodge *Torres* must fail.

First of all, common sense bars Plaintiff's reasoning. She attempts to claim that the alleged flashbang which "applied physical force," *see* Doc. No. 259 at ¶ 194, did not seize her *because* it "applied physical force," but, for a different reason entirely – *i.e.*, its effect on her freedom of movement. Therefore, she says, it was a seizure <u>*by control due to*</u> physical force, as opposed to a seizure <u>*by*</u> physical force. As such, she contends, the *Torres* requirement of intent to restrain simply disappears. But if Plaintiff's analytical sleight-of-hand were legitimized by this Court, *any* person who encountered physical force applied without the intent to restrain could simply avoid the mandate of *Torres* by recasting the physical force as a seizure by control, thereby evading the Supreme Court's desire that application of the rule should not "transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure." *Id.* at 998. This cannot be the law.

But if the Court would find that Plaintiff's allegations regarding any defendant (particularly Dvorak, who after all did not impact Wilansky with any munition), should be analyzed as a seizure by control, the Court should disregard Plaintiff's unsupported assertion that "[a] seizure by control has no intent requirement," Doc. No. 277 at 18,  for the reasons set forth above.

As such, Plaintiff's case must be analyzed under the *Torres* test for physical force – which she would necessarily fail, as set forth below. But even if this Court does apply the seizure by

control, the clear lack of intent to restrain based on the objective actions of the officers on the face of the Complaint is dispositive: Plaintiff fails to establish any seizure.

B.      **Plaintiff Cannot Show a Seizure By Physical Force.**

In addition to her inability to show a physical impact – even a mere touch[6] – from Dvorak's munition, Plaintiff cannot escape the conclusion that her Complaint's only plausible reading is that Dvorak had an intent to disperse her. Her argument on this point, *see* Doc. No. 277 at 23-25, is based on factual inferences which are unsupported by the actual Complaint.

First, Plaintiff asserts that Dvorak "allowed" Plaintiff to be present on the bridge for more than an hour prior to her injury. *Id.* at 23. But nothing in the Complaint indicates that Dvorak himself, who does not appear in her Complaint until she is already pinned behind the sheet, Doc. No. 259 at ¶ 135, was anywhere near the vicinity during this hour, much less able to view Plaintiff.

Plaintiff next asserts that Dvorak "did not respond to Stephen's explanation that no one was under the truck or provide Sophia [] an opportunity to leave before attacking her." Doc. No. 277 at 24. But Plaintiff omits the fact that she was told to leave and apparently declined to do so. Recall that she was specifically "ordered . . . to move away from the burned-out vehicle." Doc. No. 259 at ¶ 131. Instead of immediately moving away, Joachinson chooses to yell "no one was under the truck." The Complaint gives no indication that Wilansky was complying with the command to disperse during this time.

Further, Defendant Dvorak's alleged "celebration" of Sophia's injury and his "failure to render aid" *supports* an intent to disperse. If he wanted to restrain Wilansky, he would have taken her into custody when she was allegedly lying on the ground. It is not plausible that a member of law enforcement – let alone a whole group of them – who mounts an attack to restrain someone would, after the person is injured, *forget* about the fact that they were trying to restrain the person and simply let their friends carry the person away. Again, Plaintiff was never actually successfully restrained, further militating against her finding of a seizure.

---

[6] Again, should the Court grant the Municipal Defendants' request to consider Plaintiff's deposition testimony at the current Rule 12 stage, Dvorak would draw the Court's attention to the fact that Plaintiff testifies that she did not see any exploding debris from these munitions, nor was she hit with any. Doc. No. 120-10. at p. 118, lines 1-18.

Plaintiff next asserts that Dvorak's deployment of munitions to land behind her indicates that he was trying to trap her, but again, this allegation is not on the face of the Complaint. Plaintiff similarly misunderstands the significance of Plaintiff's position near the remaining burned-out truck. Protestors had already partially dismantled the defensive barricade by towing away the first burned-out truck. And Plaintiff cannot so easily dismiss the threat to the remaining truck from protestors simply because she and Joachinson were not, at the moment, accompanied by a tow truck. There are other ways to damage a truck attached to a barrier with metal chains – for instance, by cutting the chains with a pair of bolt cutters, use of homemade explosives, or some combination of the two.  It is simply false to state that, even taking these allegations, that removal of the truck "obviously" not a threat. And it is wrong to state that Dvorak did not "know [Plaintiff] was unarmed" –  neither Dvorak nor other law enforcement officers would have been able to see what *any* protestor was carrying in a pocket or inside a winter coat. In sum, Plaintiff's allegations do not establish that any member of law enforcement, let alone Dvorak, had an intent to restrain: they establish that they were trying to disperse her in accordance with the command they articulated.

### C.      Plaintiff Was Not Seized Under a Control Theory.

For all of these reasons, Plaintiff was not seized even under the seizure-by-control test, because both Defendants were clearly trying to disperse her. Strive as she may, nothing on the face of the Complaint actually creates the inference which Plaintiff seeks to create here, which is that Dvorak's munitions formed some sort of solid wall trapping her against the barricade. Plaintiff alleges a law enforcement barricade in front of her. Behind her was an entire highway. As evidenced by the order "move away from the burned-out vehicle," Doc. No. 259 at ¶ 131, the munitions of law enforcement were intended to make her retreat away from the burned-out vehicle.

The Eighth Circuit recently refused to find clearly established law establishing seizure by control in a very similar case. There, plaintiffs were dispersed at a protest and attempted to invoke

a *Brower*-like seizure by control.[7] In *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 840 (8th Cir. 2021), the Court stated:

> The reporters cite Supreme Court cases to argue they were restrained because they could not stay in their chosen location. *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400; *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598-99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). But these cases did not give fair warning. *Brendlin* held that, during traffic stops, passengers are seized. *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400. *Brower* held that setting up a roadblock that stops a fleeing suspect is a seizure. *Brower*, 489 U.S. at 598-99, 109 S.Ct. 1378. **Brendlin and Brower are inapposite because both involve police action that terminated or restricted freedom of movement.** See *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400; *Brower*, 489 U.S. at 598-99, 109 S.Ct. 1378. **Here, the reporters' freedom to move was not terminated or restricted.** *See Johnson*, 926 F.3d at 506 (no seizure where plaintiff was not "ordered to stop and remain in place" and "was able to leave the scene"). **They were dispersed.**

> *Quraishi,* 986 F.3d at 840.

Here, likewise, Plaintiff's freedom to move was not terminated or restricted – rather, she was dispersed. She was not an inhabitant of a car seized at a traffic stop as in *Brendlin*, nor did she crash into a police roadblock stretching across an entire highway as in *Brower*. *Brower* provides an illustrative factual distinction: there, the object of the seizure was moving *towards* a police barricade which law enforcement intentionally set up to intercept them; here, law enforcement was trying to move Plaintiff *away* from the police barricade, as she concedes in her Complaint. Even if Dvorak's stinger ball grenade *did* explode behind her, as opposed to besides her, it did not block her movement altogether – it would have simply been something she would have had to navigate her dispersal around, like the spike strips in one lane of the highway in *Steed, by & through Steed v. Missouri State Highway Patrol*, 2 F.4th 767, 770 (8th Cir. 2021). *See also Ratlieff v. City of Fort Lauderdale, Fla.*, No. 22-CV-61029-RAR, 2023 WL 3750581, at *8 (S.D. Fla. June 1, 2023) ("It

---

[7] To the extent that Plaintiff attempts to show the *other* sort of seizure by control – *i.e.*, a seizure by show of authority – Defendant submits that these cases applying are also inapposite. The cases relied on by Plaintiff involve *Mendenhall*-style street encounters, considering questions such as whether a police officer seizes someone by asking for their identification on a public street (*Oglesby v. Lesan*, 929 F.3d 526 (8th Cir. 2019)) or by approaching them and asking why they are standing in the road (*United States v. Dortch*, 868 F.3d 674 (8th Cir. 20190). See *also United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Their analysis is not particularly apposite in the instant situation, but if the Court finds that it is, it only strengthens the Defendant's case – not only did Plaintiff feel "free to leave," she was ordered to do so and in fact did do so, in compliance with the order. *See* Doc. No. 259 at ¶ 2.

is instead clear that Ramos fired the Direct Impact Round for some other purpose, namely, to disperse crowds of peaceful demonstrators, and that any reasonable person in Ratlieff's position would feel free—perhaps even encouraged—to leave.") (internal citations and quotations omitted).

The consequences of Plaintiff's bid to borrow elements of both seizures by control and seizures by physical force runs afoul of the Court's command in *Torres*, and perfectly illustrates the very situation the Court warned against:

> As common law courts recognized, any such requirement of control would be difficult to apply in cases involving the application of force. See supra, at 997 - 998. At the most basic level, it will often be unclear when an officer succeeds in gaining control over a struggling suspect. . . To cite another example, counsel for the officers speculated that the shooting would have been a seizure if Torres stopped "maybe 50 feet" or "half a block" from the scene of the shooting to allow the officers to promptly acquire control. . . For centuries, the common law rule has avoided such line-drawing problems by clearly fixing the moment of the seizure.

*Torres* at 1001-1002. In other words, it is difficult to apply tests for "control" in the context of application of force. For this reason, the Court in *Torres* rejected a test which "improperly erases" the distinction between seizures by control and seizures by force, thus avoiding these "line-drawing" problems, clarifying the issue for future courts. *Id.* at 1001-1002.

But Plaintiff erases this distinction now, asking the Court to solve the ultimate "line-drawing problem." In order to find a seizure on the basis of Plaintiff's Complaint, one must draw a veritable maze of lines over the Backwater Bridge, demarcating where physical force did control her and where it didn't, where the seizures stopped and where they started, presumably based on the exact locations of officer munitions. The Court should decline to participate in such an exercise.

 In sum, Plaintiff does not allege a seizure under any possible test. Accordingly, Defendant Dvorak is entitled to qualified immunity because Plaintiff has failed to carry her burden on the first prong of violation of a Constitutional right, because the Constitution isn't implicated on these facts. *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 744 (8th Cir. 2022).

### D.    **Even if Plaintiff Were Seized, the Force Used Was Reasonable.**

Application of the *Graham v. Connor,* 490 U.S. 386, 396 (1989)  factors to Plaintiff's allegations establishes that Dvorak's force was reasonable – indisputably so, because his "force"

did not impact Plaintiff. Dvorak's deployment of force *near* her was reasonable in light of the "immediate threat" facing law enforcement. As explained at length in Dvorak's opening brief, even from the face of the Complaint, it is clear that Dvorak's alleged deployment of munitions was intended to disperse Plaintiff from a concealed area of the critical defensive barricade that protestors had already partially dismantled earlier in the evening.

As a matter of law, his force was not excessive because he did not hit her, nor did he injure her. Plaintiff points to caselaw showing that post-traumatic stress disorder is a sufficient injury supporting an allegation of excessive use of force. But here, she doesn't plead post-traumatic stress disorder or any injury resulting from the Stinger Ball grenades. Further, the cases he cites for the proposition that deploying Stinger Ball grenades are excessive force (Doc. No. 277 at 29 referring to 32-33) refer not to Stinger Ball grenades, but to flash bangs – a different munition entirely.

## II.    Plaintiff Fails on the Second Prong of Qualified Immunity Because Eighth Circuit Caselaw Holds That the Right Here Was Not Clearly Established.

In addition to the cases cited above, *Martinez v. Sasse*, 37 F.4th 506 (8th Cir. 2022) clearly shows that any right violated here was not clearly established as of November 2016. That case concerns conduct which took place in June of 2018, concerning an ICE officer who physically pushed an attorney to keep them out of an ICE facility. *Martinez*, 37 F.4th at 508. Considering whether the push was a seizure as a matter of clearly-established law, the Court explained, "If there is a constitutional distinction between force used for repulsion that momentarily restricts forward movement and force used for dispersion that impels retreat, the distinction is not so readily apparent that every reasonable officer would have understood it." *Id.* at 510. This Court should recognize the same and dismiss these claims based on qualified immunity.

## CONCLUSION

For all the reasons stated above, and all the reasons in his opening brief, *see* Doc. No. 266, State Defendant Dvorak respectfully requests that the claims against him in the Second Amended Complaint be dismissed.

Dated this 20th day of October, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General


 /s/ Jane G. Sportiello
Jane G. Sportiello
Assistant Attorney General
State Bar ID No. 08900
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
Telephone (701) 328-3640
Email jsportiello@nd.gov

Attorneys for State Defendants