**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Sophia Wilansky, | |
| Plaintiff, | |
| vs. | Case No. 1:18-cv-00236 |
| Morton County, North Dakota;<br>Kyle Kirchmeier in his official capacity;<br>Adam J. Dvorak, in his personal capacity; and<br>Jonathan R. Moll, in his personal capacity, | |
| Defendants. | |

---

**AMENDED ORDER GRANTING MOTIONS TO DISMISS**

---

**INTRODUCTION**

[¶1]    THIS MATTER comes before the Court upon two Motions to Dismiss filed by the Defendants on August 18 and August 25, 2023. Doc. Nos. 265, 270. Plaintiff Sophia Wilansky ("Wilansky") filed a consolidated Response on September 29, 2023. Doc. No. 277. The Defendants filed their Replies on October 20, 2023. Doc. Nos. 283, 284. For the reasons set forth below, the Motions to Dismiss are **GRANTED**.

**BACKGROUND**

[¶2]    This case has followed a peculiar procedural history. Suffice it to say, Wilansky filed an Amended Complaint (Doc. No. 259) on July 28, 2023, after the Court previously permitted limited discovery after converting the Defendants original Motion to Dismiss the Complaint into a Motion for Summary Judgment. However, throughout the course of the limited discovery, the Court stayed consideration of Summary Judgment because Plaintiff was seeking to amend her Complaint. Once the Amended Complaint was filed, and certain matters were struck as outside the scope of the

permission, the Defendants, rather than continue with Summary Judgment, moved to dismiss the Amended Complaint. In doing so, the Defendants ask the Court to consider numerous extraneous matters in support of their Motion to Dismiss.  Because the Amended Complaint can be dismissed without consideration of these matters, the Court exercises its discretion and only considers the facts as alleged in the Amended Complaint. See Packard v. Darveau, 759 F.3d 897, 905 (8th Cir. 2014) (finding the district court did not abuse its discretion in declining to consider matters outside the pleadings); Stahl v. U.S. Dept. of Agriculture, 327 F.3d 697, 701 (8th Cir. 2003) (quoting 5A Charles Alan Write & Arthur R. Miller, *Federal Practice and Procedure* § 1366, at 491 (2d ed. 1990) ("The court has complete discretion to determine whether or not to accept any materials beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.")); Skyberg v. United Food and Commercial Workers Intern. Union, AFL-CIO, 5 F.3d 297, 302., n.2 (8th Cir. 1993) ("A court has wide discretion in electing to consider matters outside the pleadings.").

[¶3]    The circumstances of this case are well known to the Court. Leading up to November 20 and 21, 2016, there was a tumultuous protest at the Dakota Access Pipeline ("DAPL") site near the Backwater Bridge ("the Bridge") on Highway 1806 in Morton County, North Dakota, in which Morton County recruited law enforcement help from across the United States. Doc. No. 259, ¶¶ 27-114. Sometime on or before November 20, 2016, law enforcement constructed a barricade across the Bridge to prevent protestors[1] from accessing the highway further down the road. Id. at ¶ 95. Due to the protest activities, there were two burned out vehicles on the Bridge on the opposite side of the roadblock from law enforcement. Id. On the afternoon of November 20, 2016, numerous protestors went to the Backwater Bridge with a semi-truck to move one of the burned-out vehicles

---

[1] The Amended Complaint euphemistically refers to the protestors as "water protectors." The reality of the situation, even as alleged in the Amended Complaint, is these individuals were protesting the construction of the pipeline and, thus, were protestors.

to the ditch. Id. at ¶ 98. When it came to the removal of the second burned-out vehicle, law enforcement ordered the protestors not to remove it. Id. at ¶ 99 ("Law enforcement officers prevented these [protestors] from towing away the second burned-out vehicle.").

[¶4]     Over the next several hours, hundreds of protestors gathered to protest the continued closure of the Bridge. Id. at ¶ 100. In response, Morton County Sheriff Kyle Kirchmeier ("Sheriff Kirchmeier") requested help from all law enforcement within 100 miles of the Bridge. Id. at ¶ 101. The protest allegedly ended around midnight, at which time all the protestors returned to their camps or were otherwise dispersed by law enforcement. Id. at ¶¶ 111-12. By 2:00 a.m. on November 21, 2016, with most of the protestors dispersed, those who remained were chatting near "makeshift campfires." Id. at ¶ 114. Wilansky wandered back to the Bridge around 2:00 a.m., alleging the area was "quiet and tranquil." Id. at ¶ 120. Throughout the night, Wilansky was unarmed. Id. at ¶ 126 Around 4:00 a.m., Wilansky approached the barricade and stayed in very close-proximity to the burned out vehicle for more than thirty minutes. Id. at ¶¶ 124, 127.

[¶5]     Law enforcement officers ordered the protestors to move away from the burned-out vehicle around 3:57 a.m. on November 21, 2016, believing someone to be under the vehicle. Id. at ¶ 131. A fellow protestor yelled there was no one under the car. Id. at ¶ 132. Believing someone was nevertheless still under the burned-out vehicle, law enforcement began firing less-lethal munitions towards Wilansky and the other protestor. Id. at ¶ 133. Rather than leave the scene and comply with the officers' commands, Wilansky and the other protestors hid behind a metal sheet propped up against the driver-side of the burned-out vehicle in order to avoid getting hit. Id. at ¶¶ 125, 134. At this time Defendant Adam Dvorak ("Dvorak") threw two Stinger Ball grenades[2] toward them,

---

[2] Stinger Ball grenades are 32 caliber rubber ball grenades. Doc. No. 259, ¶ 57. They are akin to flashbangs, containing flash powder ignited by fuse and producing a bright light and loud sound.

which landed and exploded within a few feet of Wilansky. Id. at ¶ 135. No one was injured from this use of force. See id. (not indicating any injury from this use of the Stinger Ball grenade).

[¶6]     While Wilanksy and the other protestor were still behind the metal sheet next to the burned-out vehicle, Defendant Jonathan Moll ("Moll") positioned himself on the turret of a Humvee with his 12-gauge shotgun to better aim at Wilansky. Id. at ¶ 138. One of the law enforcement officers eventually shot a less-lethal munition at Wilansky. Id. at ¶ 139. The Amended Complaint indicates two other officers may have hit her with less-lethal munitions. Id. They are not named as Defendants to this case. After this, Wilansky "began running as fast as she could south, away from the barricade and [burned-out] truck" yelling, "I'm leaving. Please don't shoot." Id. at ¶¶ 141-42. Wilansky was able to run approximately thirty (30) yards south. Id. at ¶ 145. While running, she saw a piece of plywood lying on the ground, stopped, and picked it up to use as a shield. Id. at ¶¶ 146-47.

[¶7]     As she stopped, Moll shot an Aerial Signaling/Warning Munition[3] which hit Wilansky's left forearm and exploded, causing significant injuries. Id. at ¶¶ 148-50; see also Doc. No. 1-1 (photo of Wilansky's injury). According to the Amended Complaint, "[t]he blast destroyed almost all of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm." Id. at ¶ 151. Wilansky claims the officers "laughed and cheered" and "congratulated Defendant Moll on his marksmanship." Id.  at ¶ 154. Protestors helped transport her in a car away from the Bridge for

---

Id. at ¶ 61. They differ from flashbangs in that Stinger Ball grenades have numerous rubber pellets that function as projectiles when the grenade detonates. Id.

[3] Aerial Signaling/Warning Munitions are flashbangs launched from a 12-guage shotgun shell. Doc. No. 259, ¶ 62. The shell contains flash powder and a fuse that ignites when fired from a shotgun. Id. They are designed to travel approximately fifty (50) to one hundred (100) meters before the fuse ignites the flash powder and creates a bright flash with loud sound. Id. For ease, the Court will refer to the Aerial Signaling/Warning Munitions launched by Moll simply as a flashbang.

medical care. Id. at ¶¶ 156-159. Wilansky was ultimately treated at the Hennepin County Medical Center, which incredibly avoided amputation. Id. at ¶¶ 160-63.

[¶8]     Wilansky's Amended Complaint Seven (7) claims for relief: (1) Excessive Force under the Fourth Amendment; (2) Excessive Force under the Fourteenth Amendment; (3) Monell Claim against Defendants Kirchmeier and Morton County; (4) Assault and batter under North Dakota law; (5) Intentional Infliction of Emotional Distress; (6) Negligent Infliction of Emotional Distress; and (7) Negligence and Violation of North Dakota Century Code §§ 9-10-01 and 9-10-06. The Defendants seek to dismiss each claim alleged in the Amended Complaint.

## DISCUSSION

### I.     Motion to Dismiss Standard

[¶9]     Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). A defendant may file a motion to dismiss asserting the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  To survive such a motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A plaintiff must show that success on the merits is more than a "sheer possibility."  Id.  A complaint does not need detailed factual allegations, but it must contain more than labels and conclusions.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

[¶10]   The Court must accept a complaint's factual allegations as true, but it does not need to accept a complaint's legal conclusions or "formulaic recitation of the elements of a cause of action."  Iqbal, 556 U.S. at 678.  A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id.  However, the determination of whether a complaint

states a claim upon which relief can be granted is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling him to relief. Ulrich v. Pope Cty., 715 F.3d 1054, 1058 (8th Cir. 2013).

## II.   Qualified Immunity Standard

[¶11]   This case involves several claims for qualified immunity[4] by the individual Defendants. "Qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would know." Ferguson v. Short, 840 F.3d 508, 510 (8th Cir. 2016). "The determination of whether qualified immunity is applicable in given circumstances is one of 'objective reasonableness.'" Herts v. Smith, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." Id. (citing Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)).

[¶12]   A two-step inquiry is undertaken to determine if qualified immunity is invoked: "(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation." Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).

[¶13]   Because the defendants bear the burden of proof on this affirmative defense, id., "qualified immunity is 'an immunity from suit rather than a mere defense to liability.'" Watson v. Boyd, 2 F.4th 1106, 1110 (8th Cir. 2021) (citation omitted). However, to defeat an asserted qualified

---

[4] Plaintiff urges the Court to reject the well-established jurisprudence relating to qualified immunity because it has no basis in the Constitution or Laws of the United States and "should be categorically rejected." Doc. No. 277, pp. 26-28. The Court has no authority to ignore the overabundance of binding caselaw regarding qualified immunity regardless of the degree to which the Court agrees qualified immunity cannot be found in Section 1983 or the Constitution.

immunity defense, the plaintiffs have the burden to show that their asserted right was clearly established at the time of the alleged violation. Quraishi v. St. Charles Cty., Missouri, 986 F.3d 831, 835 (8th Cir. 2021). At the motion to dismiss stage, defendants must show they are entitled to qualified immunity on the face of the complaint. Elder v. Gillespie, 54 F.4th 1055, 1063 (8th Cir. 2022); Baude v. Leyshock, 23 F.4th 1065, 1071 (8th Cir. 2022); Dadd v. Anoka County, 827 F.3d 749, 754 (8th Cir. 2016).

[¶14]   For the purposes of step two, "clearly established" means "[t]he 'contours of the right must be sufficiently clear that a reasonable official would [have understood] that what he was doing violates that right.'" Quraishi, 986 F.3d at 835 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "This generally requires a plaintiff to point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officer['s] conduct in the specific circumstances at issue." Martin v. Turner, 73 F.4th 1007, 1010 (8th Cir. 2023) (quotation marks omitted) (quoting Graham v. Barnette, 5 F.4th 872, 887 (8th Cir. 2021)).   "We . . . look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002). While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citations omitted). In other words, when there is no directly controlling authority, courts look to whether there is "a robust 'consensus of cases of persuasive authority.'" Ashcrof v. al-Kidd, 563 U.S. 731, 741-42 (2011) (quoting Wilson v. Layne, 526 U.S. 603, 617 (2011)). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning so long as the unlawfulness is apparent." Dean v. Searcey, 893 F.3d 504, 518 (8th Cir. 2018), cert. denied, 139 S. Ct. 1291, 203 L. Ed. 2d 414 (2019).

[¶15]   The Court will address which step in the qualified immunity analysis it will address first when discussing each claim.

### III.   Claim One: Excessive Force under the Fourth Amendment

[¶16]   Plaintiffs alleges Defendants Moll and Dvorak used excessive force on her while effectuating an alleged seizure. The Defendants argue the Amended Complaint fails to state a claim for excessive force under the Fourth Amendment because the use of force as alleged did not constitute a seizure. Even if it was a seizure, the Defendants argue the use of force was reasonable under the circumstances. Finally, the Defendants argue even if there was excessive force adequately alleged in the Amended Complaint, the Defendants would nevertheless be entitled to qualified immunity because the law was not clearly established by November 20, 2016, that their use of force (1) constituted a seizure and (2) was excessive under the circumstances.

[¶17]   Wilansky argues the Amended Complaint states a Fourth Amendment Excessive Force cause of action because the facts adequately allege a seizure by control and the use of force was unreasonable. She also argues the Defendants are not entitled to qualified immunity because it was clearly established by November 20, 2016, that the use of force here on an unarmed, peaceful individual was unreasonable.

[¶18]   The Court will begin with whether a constitutional violation occurred. The primary issue is whether the officers' use of force against Wilansky in the early morning hours of November 21, 2016 constituted a "seizure" under the Fourth Amendment. The Court concludes it does not.[5]

---

[5] The Court previously concluded the facts and circumstances as pled adequately state a claim that the Officers seized Wilansky. Doc. No. 46, ¶¶ 103-110. This, however, was prior to Torres v. Madrid, 592 U.S. 306 (2021) and other subsequent caselaw. In light of these cases, the analysis must result in a different conclusion.

Because there was no seizure under the circumstances alleged in the Amended Complaint, the Court does not need to reconsider[6] the objective reasonableness of the officers' conduct here.

[¶19]   "To establish a Fourth Amendment violation, the claimant must demonstrate that a seizure occurred and that the seizure was unreasonable." Dundon v. Kirchmeier, 85 F.4th 1250, 1255 (8th Cir. 2023). "A 'seizure' of a 'person' plainly refers to an arrest" and "that linkage persists today." Torres v. Madrid, 592 U.S. 306, 312 (2021). Under the Fourth Amendment, there are two ways in which a law enforcement officer may effectuate a "seizure," thus triggering the excessive force analysis: seizure by force and seizure by control. Id. at 322. These concepts have not been well-distinguished in past cases. Id. ("In all fairness, we too have not always been attentive to this distinction when a case did not implicate the issue."). Wilansky's Amended Complaint fails under both theories.

[¶20]   Use of force against an individual, even if an officer does not gain control over the arrestee, might be a seizure. Id. at 313. Nevertheless, not "every physical contact between a government employee and a member of the public" is "a Fourth Amendment seizure." Id. at 317. Indeed, with a seizure by force, there must be an intent to restrain the individual. Id. "Force intentionally applied for some other purpose [will not] satisfy this rule." Id. The "inquiry is whether the challenged conduct *objectively* manifests an intent to restrain" because courts "rarely probe the subjective motivations of police officers in the Fourth Amendment context." Id. A simple touch could potentially be enough to constitute a seizure, but the amount of force may be important to determine "the objective intent to restrain." Id. Likewise, the subjective perceptions of the individual claiming seizure are not considered. Id. "[T]he application of physical force to the body

---

[6] The Court previously held the Original Complaint adequately state a claim for unreasonable use of force on essentially the same facts here except for the allegation was against "John Doe Officers". Doc. No. 46, ¶¶ 111-116.

of a person **with intent to restrain** is a seizure even if the person does not submit and is not subdued." Id. at 325 (emphasis added).

[¶21]   Under the physical force analysis, the Amended Complaint clearly demonstrates the officers' intention in using less-lethal munitions and flash-bang grenades was to get Wilansky and others away from the burned-out vehicle and away from the Bridge. The officers never stated Wilansky was under arrest, likely because she was not under arrest. Prior to any use of force, the officers ordered Wilansky and her companion to move away from the burned-out vehicle shortly before 4:00 a.m. on November 21, 1016. Only after Wilansky refused to comply did the officers begin to use force to disperse her from the Bridge. During this time, the officers may have temporarily stalled her movement, but she was able to get away from the scene. Moll only shot the flashbang at Wilansky after Wilansky stopped retreating and retrieved the plywood. Even after the flashbang exploded on her arm, she was able to leave without any indication from the officers they intended to arrest her. As alleged in the Amended Complaint, there is no objective manifestation of officers' intent to seize Wilansky. Torres, 592 U.S. at 317 (requiring an objective manifestation of an intent to seize for a seizure by force). Rather, their objective intent was to disperse her from the Bridge and surrounding area. There was no seizure by force. Id. at 325 (explaining a seizure by force only occurs after (1) force is exerted on an individual and (2) the use of force was intended to restrain).

[¶22]   When use of force is not the basis for analysis, "a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." Id. Seizures by control require actual control of the individual. Id. "Such a seizure requires that 'a person be stopped by the very instrumentality set in motion or put in place **in order to achieve**

**that result.**'" Id. (quoting Brower v. County of Inyo, 489 U.S. 593, 599 (1989)) (emphasis added). "That result," being exercising physical control to effectuate an arrest. See id.

[¶23]   Under the seizure by control analysis, Wilansky's claim fails because the use of force was not set in place in order to place her under arrest.[7] After the officers began using force, Wilansky began moving away from the burned-out vehicle in compliance with their order. The officers must have stopped Wilansky by the less-lethal munitions or flash-bang grenades "put in place in order to achieve that result." Id. at 325. In other words, the officers must have intended to stop her by using the less-lethal munitions and flash-bang grenades. But the Amended Complaint plainly shows the officers use of the munitions and grenades were set in place to disperse Wilansky from the area, not to stop her in her tracks. In addition, the Amended Complaint fails to allege the officers were attempting to arrest her under the circumstances. Such an omission is independently fatal. See id.

[¶24]   The United States District Court for the District of Columbia faced a similar set of circumstances in Black Lives Matter D.C. v. Trump, 544 F.Supp.3d 15 (D.D.C. 2021). There, the plaintiffs alleged they were engaged in peacefully protesting racial injustice in Lafayette Park across from the White House. Id. at 26. In response to the protest, plaintiffs alleged officers were using tear gas, flash-bang grenades, smoke bombs, and rubber bullets in order to clear the area for the President to walk to a photo opportunity nearby. Id. at 26-27. Plaintiffs alleged the use of tear gas caused them to be seized under the Fourth Amendment and the force was objectively unreasonable under the circumstances. Id. at 48. The court concluded the officers had no intent to restrain the protestors because their express intent was to disperse them to make way for the

---

[7] Wilansky also did not voluntarily submit to the officers show of authority, but that is not at issue here.

President. Id. Similar to <u>Black Lives Matter D.C.</u>, the officers' express intent here was to force Wilansky to leave the area, not to seize her or stop her movement. It was to propel her movement away from the burned-out vehicle.

[¶25]   Accordingly, Wilansky was not "seized" under the Fourth Amendment either by physical force or under acquisition of control. Her claim for excessive force under the Fourth Amendment, therefore, fails.

[¶26]   Even if a seizure occurred, however, Moll and Dvorak are still protected under qualified immunity because it was not clearly established at the time that the use of force to disperse individuals, as opposed to restrain them, constituted a seizure under the Fourth amendment. <u>Dundon v. Kirchmeier</u>, 85 F.4th 1250, 1255 (8th Cir. 2023) (discussing the same protest on the same date at issue in this case, holding "the protestors have not shown that it was clearly established as of November 2016 that a use of force designed to disperse a crowd constituted a seizure"). <u>Dundon</u> controls this issue.

[¶27]   In <u>Dundon</u>, the protestors were ordered to leave the exact same Bridge area on November 20, 2016, but refused. <u>Id.</u> at 1254. In response, the officers fired tear gas canisters at the protestors. <u>Id.</u> The protestors argued the officers seized them by using force intended to disperse the crowd. <u>Id.</u> at 1255. The Eighth Circuit noted:

> As of 2014, it was not clearly established that the use of tear gas by police to disperse news reports from the site of public unrest and protests was a seizure. <u>Quraishi v. St. Charles County</u>, 986 F.3d 831, 839-40 (8th Cir. 2021). As of 2018, it was not clearly established that a push used to repel a subject seeking to enter a government facility was a seizure. <u>Martinez v. Sasse</u>, 37 F.4th 506, 510 (8th Cir. 2022).

<u>Id.</u> In concluding, the Eighth Circuit in <u>Dundon</u> held, "[w]e conclude that the protestors have not established that the individual officers violated a clearly established right under the Fourth Amendment, because it was not clearly established as of November 2016 that the use of force to

disperse a crowd was a seizure." <u>Id.</u> at 1257. What was true in <u>Dundon</u> remains true today.[8] The use of force to disperse Wilansky from the scene was not clearly established at the time to be a seizure under the Fourth Amendment. <u>Id.</u>; <u>see also</u> <u>Keup v. Sarpy County</u>, ___ F.Supp.3d ___, 2023 WL 8829298, *17 (D. Neb. Dec. 21, 2023) (relying on <u>Dundon</u>, concluding it was not clearly established on May 29, 2020, that the use of force to disperse constituted a seizure under the Fourth Amendment). Because it was not clearly established, Moll and Dvorak are entitled to qualified immunity on Wilansky's Fourth Amendment Excessive Force claim.

[¶28]   Accordingly, The Defendants' Motion to Dismiss Claim One of the amended Complaint is **GRANTED**.[9]

### IV.   Claim Two: Excessive Force under the Fourteenth Amendment

[¶29]   Wilansky re-alleges her Excessive Force under the Fourteenth Amendment claim in the Amended Complaint. The Court previously found the use of non-lethal force against an unarmed protestor who was told to disperse did not shock the conscience. Doc. No. 46, ¶¶ 38-54. This claim was dismissed with prejudice as to the officers when they were unnamed. Nothing changes that holding and this claim remains dismissed with prejudice. However, even if Wilansky was

---

[8] The Court notes in <u>Torres</u>, the Supreme Court expressly avoided the question whether the use of "pepper spray, flash-bang grenades, lasers, and more" may constitute a *de facto* seizure. <u>Torres</u>, 592 U.S. at 317. As of 2021, when <u>Torres</u> was decided, the question presented in this case remained undecided at the Supreme Court. This further bolsters the conclusion the law was not clearly established in November 2016 that the use of force to disperse Wilansky constituted a seizure under the Fourth Amendment.

[9] The court does not take this conclusion lightly. Wilansky suffered horrific injuries to her forearm that was spared amputation because of the expert care she received at the Hennepin County Medical Center. Wilansky alleges the officers laughed at her and congratulated Moll for his "marksmanship." While the Court appreciates the need for officer safety, it can be easy to devalue the human life officers are sworn to protect—in this instance, the protestors. The allegation of laughing and congratulating, if true, is appalling.

permitted to have a second bite at this apple, the Court would dismiss it for the same reasons previously stated. Id. Accordingly, the Defendants' Motion to Dismiss Claim Two is **GRANTED**.

### V.     Claim Three: <u>Monell</u> Liability Against Sheriff Kirchmeier and Morton County

[¶30]   The Court previously dismissed with prejudice the <u>Monell</u> claims against Sheriff Kirchmeier and Morton County. Doc. No. 46, ¶¶ 77-91. This claim remains dismissed with prejudice. However, even if Wilansky were permitted to bring this claim, the Court would dismiss it with prejudice as previously stated. Id. Accordingly, the Defendants' Motions to Dismiss Claim Three are **GRANTED**.

### VI.     Claims Four through Seven: State Law Claims Count

[¶31]   Wilansky stipulates to the dismissal of Claims Four through Seven against Defendant Dvorak. Dvorak's Motion to Dismiss Claims Four through Seven is, therefore, **GRANTED**. Wilansky further stipulates to the dismissal of Claim Seven against all Defendants. The Defendants' Motions to Dismiss Claim Seven are, therefore, **GRANTED**.

[¶32]   Wilansky maintains Claims Four through Six as alleged against Defendant Moll, Sheriff Kirchmeier, and Morton County should be considered by the Court. The Defendants argue these claims are time-barred as alleged against Moll and the claims against Sheriff Kirchmeier and Morton County should be dismissed because they are provided immunity from these claims under North Dakota law. Wilansky argues that including Moll as a named Defendant in the Amended Complaint relates back to the filing date of the original Complaint and is, therefore, not barred by North Dakota's Statue of limitations. Furthermore, she argues Sheriff Kirchmeier and Morton County should not be afforded immunity. The Court agrees with the Defendants.

[¶33]   Section 32-12.1-10 of the North Dakota Century Code provides, "an action brought [against a political subdivision or political subdivision employee] must be commenced within three

years after the claim for relief has accrued." N.D.C.C. § 32-12.1-10(1). The claims against Moll accrued on November 21, 2016, when he launched the Aerial Signal/Warning Munition at Wilansky. The clock began that day. Three years later was November 21, 2019. The original Complaint (Doc. No. 1), filed almost one year before that on November 19, 2018, and listed "John Doe law enforcement officer" for the remaining state law claims. The Amended Complaint naming Moll as a Defendant in the state law claims was not filed until July 21, 2022, [10] well over two years past November 21, 2019, statute of limitations deadline. Doc. No. 153. The question before the Court is whether the substitute of Moll for "John Doe" relates back to the filing of the original Complaint under Rule 15(c) of the Federal Rules of Civil Procedure.

[¶34]    Rule 15(c) of the Federal Rules of Civil Procedure governs when amended pleadings relate back in time to the filing of an original complaint. It provides, in relevant part:

> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
> *     *     *
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a **mistake** concerning the proper party's identity.

---

[10] Issues arose relating to the scope of the amendments and the Court ultimately struck certain portions of the amendments as outside the permission to amend. Doc. No. 254. The revised Amended Complaint, considered by this Court in this Order, was filed on July 28, 2023. Doc. No. 259. For the statute of limitations purposes, the Court uses the filing date of the first Amended Complaint (Doc. No. 153).

Fed. R. Civ. P. 15(c)(1)(C) (emphasis added).

[¶35]   Relying on <u>Heglund v. Aitkin County</u>, 871 F.3d 572 (8th Cir. 2017), the Defendants argue the substitution does not relate back because Rule 15(c) proscribes relations back except when the inclusion of the original defendant was a "mistake". Wilansky urges the Court to disregard the mistake requirement and focus on "what the party to be added knew or should have known, not the amending party's knowledge of its timeliness in seeking to amend the pleading." Doc. No. 277, p. 32 (quotation marks omitted) (quoting <u>Krupski v. Costa Crociere S. p. A.</u>, 560 U.S. 538, 579 (2010).

[¶36]   <u>Heglund</u> directly controls this issue. In <u>Heglund</u>, the plaintiffs sued numerous state agencies and "John Doe" state defendants. <u>Heglund</u>, 871 F.3d at 575. Later, they amended the complaint to replace one John Doe with Frank Scherf, a former police chief. <u>Id.</u> The Eighth Circuit considered this amendment in light of it falling outside the ordinary statute of limitations of such claims. <u>Id.</u> at 578-79. In doing so, the Circuit Court addressed the Supreme Court <u>Krupski</u> case. <u>Id.</u> at 579. The Circuit noted that the Supreme Court "affirmed that a plaintiff's deliberate choice, made with a full understanding of the legal and factual situation, is 'the antithesis of making a mistake.'" <u>Id.</u> (quoting <u>Krupski</u>, 560 U.S. at 549). As noted in <u>Heglund</u>, "a mistake occurs if a plaintiff knows that two or more parties exist but chooses to sue the wrong one based on a misunderstanding about the party's status or role." <u>Id.</u> (quoting <u>Kurpski</u>, 560 U.S. at 549). The Eighth Circuit concluded naming a "John Doe" defendant does not constitute a "mistake" as required by Rule 15(c) to qualify for a relation back to the date of the original complaint. <u>Id.</u> ("We conclude that naming a John Doe defendant is not a 'mistake.' Mistake implies inadvertence or a sincere but wrong belief.").

[¶37]   Wilansky's inclusion of John Doe in her original Complaint was not a "mistake" under Rule 15(c) and the Court is unpersuaded to consider <u>Krupski</u> in the manner Wilansky suggests. In <u>Krupski</u>, the Supreme Court held a mistake occurred because the plaintiff inadvertently chose the wrong individual as the defendant. <u>Krupski</u>, 560 U.S. at 579; <u>see also</u> <u>Smith v. City of Akron</u>, 476 Fed. Appx. 67, 69 (6th Cir. 2012) (noting that in <u>Krupski</u>, "the plaintiff knew of two potential parties when she filed the lawsuit, but she sued the wrong party and corrected the mistake only after the statute of limitations had expired"). But the Eight Circuit held that the inclusion of a John Doe defendant is not a mistake. <u>Heglund</u>, 871 F.3d at 579.

[¶38]   Wilansky was fully aware at the time she filed her Complaint of the legal consequences of suing a John Doe rather than waiting to determine the name of the Defendant. She does not contend otherwise. She asks the Court to find Moll should have been aware of his potential for liability. But that only goes to part of the requirements. John Doe's inclusion in the original Complaint was not a mistake and the Eighth Circuit has made clear Wilansky is not given the benefit of relating her claims against Moll back to the date of the original Complaint under these circumstances. <u>Id.</u>

[¶39]   Wilansky did not file her Amended Complaint until over a year after the three-year statute of limitations ran on her claims against Moll. Her claims against Moll are, therefore, time-barred under Section 28-01-22.1(1). Defendant Moll's Motion to Dismiss Wilansky's State Law claims against his is **GRANTED**.

[¶40]   As it relates to Wilansky's State Law claims against Sheriff Kirchmeier and Morton County, these Defendants are afforded immunity under Section 32-12.1-03 of the North Dakota Century Code, which provides in relevant part:

> 3. A political subdivision or a political subdivision employee **may not be held liable** under this chapter for any of the following claims:
>
> *       *       *

f. A claim relating to injury directly or indirectly caused by the performance or nonperformance of a public duty, including:

\*      \*      \*

(3) Providing or failing to provide law enforcement services in the ordinary course of a political subdivision's law enforcement operations.

N.D.C.C. § 32-12.1-03(3)(f)(3). There is a dearth of caselaw interpreting the scope of this provision.

[¶41]   Wilansky argues it "cannot possibly be correct" Sheriff Kirchmeier and Morton County are granted immunity under this provision because it defies "common sense." Doc. No. 277, p. 33. In making this argument, Wilansky claims cases in North Dakota have permitted assault and battery claims against law enforcement officers, relying on Ellis v. Devig, 2009 WL 1886644, at \*9 (D.N.D. June 26, 2009).

[¶42]   Ellis is inapplicable here. Ellis dealt with a claim for immunity under North Dakota's discretionary function exception under N.D.C.C. § 32-12.1-03(3)(d). This case falls under N.D.C.C. § 32-12.1-03(3)(f)(3), which provides immunity for actions relating to law enforcement services in the ordinary course of Morton County's law enforcement operations. The circumstances of this case were extraordinary. But it is entirely ordinary for a county to send law enforcement to a protest site, especially a site that becomes embroiled in conflict between a private company and protestors, such as happened at the DAPL protests. Sheriff Kirchmeier's and Morton County's response was providing law enforcement services in the ordinary course of Morton County's law enforcement operations. N.D.C.C. § 32-12.1-03(3)(f)(3). This does not defy common sense. Rather, it is the law and this Court has no authority to disregard what the North

Dakota legislature has made clear: Kirchmeier and Morton County are afforded immunity from Wilansky's state law claims under North Dakota law. [11] Id.

## CONCLUSION

[¶43]   For the reasons set forth above, the Defendants' Motions to Dismiss are **GRANTED**. The Amended Complaint is **DISMISSED with prejudice.**

[¶44]   **IT IS SO ORDERED**.

DATED April 5, 2024.

Daniel M. Traynor, District Judge
United States District Court

_____

[11] This holding is similar to Smith, 476 Fed. Appx at 70-71. In Smith, the Sixth Circuit noted, "Smith filed several state common law tort claims against the city defendants, including negligence and intentional infliction of emotional distress." Because Ohio law provided immunity to municipalizes "for injuries 'caused by an act or omission of . . . an employee of the political subdivision in connection with a governmental . . . function.'" Id. (quoting Ohio Rev. Code § 2744.02(A)(1)). "Smith claim[ed] that police do not serve a governmental function." Id. The Six Circuit disagreed concluding, "Ohio law says otherwise" and granted the municipalities immunity from Smith's state law claims. Id.